## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **RAMIZA DURMIC, AZIZ ISAAK AND NADIA MOHAMED on behalf of themselves and all others similarly situated,**<br><br>    **Plaintiffs,**<br>**vs.**<br><br>**J.P. MORGAN CHASE BANK, NA**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **C.A. NO. 10-10380**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Ramiza Durmic, Aziz Isaak and Nadia Mohamed bring this suit on behalf of themselves and a class of similarly situated Massachusetts residents ("Plaintiffs") to challenge the failure of Defendant J.P. Morgan Chase Bank, NA ("Defendant" or "Chase") to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.     Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that

promise to be kept.  This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure.

3.      In 2008, J.P. Morgan Chase accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  On July 31, 2009 Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which Chase received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

4.      As a participating servicer in HAMP, Chase has, in turn, entered into written agreements with Plaintiffs in which it agreed to provide Plaintiffs with permanent loan modifications if Plaintiffs made three monthly trial period payments and complied with requests for accurate documentation. Plaintiffs, for their part, have complied with these agreements by submitting the required documentation and making payments.  Despite Plaintiffs' efforts, Defendant Chase has ignored its contractual obligation to modify their loans permanently.

5.      The same problems affect other members of the putative class.  As a result, hundreds, if not thousands, of Massachusetts homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  Defendant's actions thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

6.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because the action is between parties that are citizens of different states and the amount in controversy is greater than $75,000.  For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate.  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306

(2006).  J.P. Morgan Chase Bank, NA is, on information and belief, a citizen of New York.

Plaintiffs are citizens of Massachusetts.

7.    This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that it is

brought as a putative class action in which the matter in controversy exceeds the sum or value of

$5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a

citizen of a State different from any defendant.

8.    Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful

practices are alleged to have been committed in this District, Defendant regularly conducts business

in this District, and the named Plaintiffs reside in this District.

## PARTIES

9.    Ramiza Durmic is an individual residing at 9 Blair Court, Lynn, MA 01905.

10.    Aziz Isaak and Nadia Mohamed are a married couple residing at 58 Rand Street, Lynn,

MA 01904.

11.    J.P. Morgan Chase Bank, N.A. is a loan servicer with its corporate headquarters located

at 270 Park Avenue, New York, NY 10017-2014.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

12.    Over the last three years, the United States has been in a foreclosure crisis.  A

congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in

foreclosure or default.[1]

13.    The number of Massachusetts properties with foreclosure filings in 2008 was 150%

higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two years.[2]

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

14.    According to 2009 data, the numbers continue to rise; in the third quarter of 2009, foreclosures were filed on 12,667 Massachusetts properties, a 35% increase over the same period of 2008.[3]  Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure filings against them which, while slightly less than 2008, still represents an increase of over 100% from 2007 levels and an increase of more than 400% over 2004.[4]

15.    Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

16.    State legislative efforts were able to temporarily slow the pace of completed foreclosures in 2009, but toward the end of the year, the number of new filings once again rose, demonstrating that foreclosures were merely delayed, not prevented.[5]

17.    The foreclosure crisis is not over.  Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

---

[2] RealtyTrac Staff. Foreclosure Activity Increases 81 Percent in 2008. Jan. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681.
[3] RealtyTrac Staff. U.S. Foreclosure Activity Increases 5 Percent in Q3. Oct. 15, 2009. Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=7706.
[4] RealtyRrac Staff.  RealtyTrac Year End Report Shows Record 2.8 Million U.S. Properties with Foreclosure Filings in 2009.  Available at http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333
[5] For 2007 comparison, see Gavin, Robert. Fewer Lose Their Homes in August. Boston Globe. Sept. 23, 2009. Available at http://www.boston.com/realestate/news/articles/2009/09/23/foreclosures_in_mass_drop_but_petitions_soar/.

### *Creation of the Home Affordable Modification Program*

18.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A. §5201 *et. seq.* (2009).

19.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

20.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

21.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

22.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

23.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C.A. §5219.

24.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

25.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

26.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

27.     The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

28.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

29.     HAMP is funded by the federal government, primarily with TARP funds.  The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

30.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.   Servicers receive $1000.00 for each HAMP modification.

### Broken Promises Under HAMP

31.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans.  Chase is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

32.     Should a servicer elect to participate in HAMP,[6] they execute a Servicer Participation Agreement ("SPA") with the federal government.

33.     On July 31, 2009, Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA, executed an SPA, thereby making Chase a participating servicer in HAMP.  A copy of this SPA is attached hereto as Exhibit 1.

34.     The SPA executed by Chase incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA at ¶ 1.A.), and are incorporated by reference herein.

35.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  (SPA at ¶¶ 1.A., 2.A.)[7]

36.     The Program Documentation requires Participating Servicers to evaluate *all loans*, which are 60 or more days delinquent for HAMP modifications.  (SD 09-01 at 4)  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

37.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[8]  The

---

[6] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program, are subject to mandatory inclusion in HAMP.  Otherwise, participation by servicers in the HAMP program is voluntary.

[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.

TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

38.     Chase offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

39.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

40.     Chase has routinely failed to live up to their end of the TPP Agreement and offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that Chase had 424,965 HAMP-eligible loans in its portfolio.  Of these loans, just 7,139 resulted in permanent modifications (approximately 1.7 %) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The Treasury Report is attached hereto as Exhibit 6.

41.     By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, Chase is not only leaving homeowners in limbo, wondering if their home can be saved,  Chase is also preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

*Ramiza Durmic*

---

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

42.     Ramiza Durmic has been the owner of 9 Blair Court since March 29, 2006.  She works at Target while raising her family.

43.     On February 9, 2007 Durmic took out a $272,000 mortgage loan (hereinafter the "mortgage loan") for her residence at Blair Court from Washington Mutual Bank, FA.

44.     The servicing of the Plaintiff's mortgage loan was transferred to the Defendant Chase sometime after February 9, 2007 and continues to this date.

45.     After taking out the mortgage loan, Durmic began experiencing various financial hardships, which combined to cause her to have difficulty making payments on her mortgage loan and resulted in her falling behind on her payments.

46.     Around late May, 2009 or early June, 2009 Durmic applied for a *Making Home Affordable* loan modification.

47.     By June, 2009 Durmic was about 9 months behind in her mortgage payments.

48.     On June 19, 2009, Chase offered Durmic a TPP Agreement entitled *Home Affordable Modification Trial Period Plan* (hereinafter Trial Period Plan or TPP).  A copy of the letter accompanying the TPP Agreement is attached hereto as Exhibit 7.  Durmic timely accepted the offer by executing the TPP Agreement and returning it to Defendant Chase, along with the Hardship Affidavit, IRS Form 4506-T, payment and other supporting documentation, by Federal Express on June 26, 2009.  A copy of the TPP signed by Durmic and other partially redacted items submitted to Defendant Chase is attached hereto as Exhibit 8.

49.     The TPP Agreement provided that the plan was effective July 1, 2009 and would run from July, 2009 to September, 2009.  Durmic's monthly mortgage payments (Principle, Interest, Taxes and Insurance) were reduced to $829.02/month under the TPP.

50.     The TPP Agreement is entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

51.     The TPP Agreement also states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  Nevertheless, to date, Chase has still sent neither a signed copy of the Plan, nor a written rejection.

52.     Durmic timely made each of the payments provided for in the TPP Agreement due in July, August and September, 2009.  She has also timely made payments for October, November and December, 2009 and January and February, 2010, consistent with her TPP Agreement payment amount.

53.     In the midst of her trial period and despite the promise in the TPP Agreement that the "Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan…", Chase, through its attorney, attempted to collect on the mortgage loan by serving Durmic with:

> a.   An *Order of Notice* by letter dated August 19, 2009 expressing the holder's intention to foreclose by entry and possession and exercise of power of sale; and
>
> b.   An August 26, 2009 *Notice of Mortgage Foreclosure Sale* and *Notice of Intention to Foreclose Mortgage and of Deficiency After Foreclosure of Mortgage* and *Notice*

*of Mortgagee's Sale of Real Estate* setting the foreclosure sale date of Blair Court for September 28, 2009 at 9:00 AM.

54. Despite the threats to conduct a foreclosure sale, Durmic has continued to make payments as described in the TPP.

55. On August 28, 2009, Durmic's counsel called Chase seeking postponement of the September 28, 2009 foreclosure sale date. He was told that Chase would postpone the sale and that he should provide Chase with Durmic's last 2 pay stubs and her most recent bank statement even though her last 2 paystubs were submitted in June, 2009. Chase also indicated that it should be making a decision on whether it will offer Durmic a permanent loan modification by the end of September, 2009. Durmic's counsel sent the requested documents to Chase on August 31, 2009.

56. Having received no written confirmation from Chase that the September 28, 2009 foreclosure sale was postponed, Durmic's counsel sent a 93A demand letter to counsel for Chase seeking written confirmation of the postponement of the foreclosure sale. On September 18, 2009 counsel for Chase confirmed in writing that the foreclosure sale had been cancelled.

57. By letter dated October 2, 2009 Durmic received a written message from Chase with the startling headline: "YOUR MODIFICATION IS AT RISK-URGENT RESPONSE NEEDED!" The letter went on to state:

"…Under the terms of the Trial Plan Agreement previously sent to you, you are required to make trial plan payments and also provide certain documentation as a condition of approval for a permanent modification.

Unfortunately, we are still missing documentation necessary to evaluate your modification request… The deadline specified in your Trial Plan Agreement for submitting this documentation has passed. However, a recent decision by the Department of Treasury under the Making Home Affordable program provides you a one-time extension of this deadline, and we are writing to request that you provide these missing documents before we can proceed with a decision on your request for a modification.

58.     The October 2, 2009 letter instructed Durmic to continue making TPP payments at the same amount and identified the following documentation as missing: pay stubs, signed IRS Form 4506-T, and signed Hardship Affidavit.

59.     Durmic's counsel called Chase for clarification of the October 2, 2009 letter because Durmic had twice previously provided to Chase her most recent pay stubs, a signed IRS Form 4506-T, and a signed Hardship Affidavit.  She had not been previously required to provide proof of residence.  In that communication from Chase, it changed its document demand to:

      a.   Ms. Durmic's most recent pay stub,

      b.   Ms. Durmic's most recent bank statement, and

      c.   A utility bill in her name at the property's address.

60.     On October 9, 2009 Durmic faxed to Chase the documents demanded during the phone call with Durmic's counsel.

61.     As of this date, Durmic is in compliance with her obligations under the TPP Agreement and her representations to the Defendant continue to be true in all material respects.

62.     Despite having timely provided Chase with all documentation it requested, Chase did not provide Durmic with a permanent loan modification by the end of her Trial Period (September, 2009).

63.     Despite Durmic's compliance in all material respects with the terms of the TPP Agreement, Durmic still has not been offered a permanent loan modification under the HAMP Program guidelines.

64.     Defendant has therefore breached the provision of the TPP Agreement that compliance with the TPP Agreement for the three month trial period would result in a permanent loan modification.  At this point, her TPP is now in its eighth month with no end in sight.

*65.*     Like the other Plaintiffs in this matter, Durmic has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and her continued monthly payments under the TPP.

*Aziz Isaak and Nadia Mohamed*

66.     The Isaak-Mohameds have been the owners of 58 Rand Street since November 26, 2003. They hold down 3 jobs between them while raising a family.

67.     On November 18, 2005 the Isaak-Mohameds took out a $328,500 mortgage loan (hereinafter the "mortgage loan") for their residence at Rand Street from Franklin First Financial, LTD.

68.     The servicing of the Plaintiff's mortgage loan was transferred to the Defendant Chase sometime after November 18, 2005 and continues to this date.

69.     After taking out the mortgage loan, the Isaak-Mohameds began experiencing financial hardships, which combined to cause them to have difficulty making payments on their mortgage loan and resulted in them falling behind on their payments.

70.     By September, 2009 the Isaak-Mohameds were about 12 months behind in their mortgage payments and their home was scheduled for a foreclosure sale date of September 23, 2009. The Isaak-Mohameds decided to seek help from their loan servicer in preserving their home and making their mortgage more affordable.

71.     On September 7, 2009 they applied for a HAMP loan modification by fax.  On September 9, 2009 they supplemented their application with additional financial information by fax.

72.     By letter dated September 16, 2009, Chase offered the Isaak-Mohameds a TPP Agreement entitled *Home Affordable Modification Trial Period Plan*.  A copy of the letter accompanying the TPP Agreement is attached hereto as Exhibit 9.

73.     The Isaak-Mohameds timely accepted the offer on October 9, 2009 by returning the executed TPP Agreement to Chase via Federal Express, along with along with the Hardship Affidavit, IRS Form 4506-T, payment and other supporting documentation.  A copy of the TPP Agreement signed by the Isaak-Mohameds, along with the partially redacted supporting materials sent to Chase, is attached hereto as Exhibit 10.

74.     The TPP Agreement provided that the plan was effective November 1, 2009 and would run from November, 2009 to January, 2010.

75.     The TPP Agreement is entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

76.     The TPP Agreement also states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  Nevertheless, to date, Chase still has sent neither a signed copy of the Plan, nor a written rejection.

77.     The Isaak-Mohameds timely made each of the payments provided for in the TPP Agreement for November and December, 2009 and January, 2010.  They have also timely made a payment for February, 2010 consistent with the TPP Agreement payment amount.

78.     Ignoring the documents that had previously been sent by the Isaak-Mohameds  on October 9, 2009, as stated above, Chase sent a letter dated October 16, 2009 (received by the Isaak-Mohameds on October 24, 2009) stating:

Chase Home Finance LLC is writing to inform you that we have not received all documents necessary to complete your request for a modification of the above referenced Loan.

In order for us to continue processing your request, you must submit the items indicated below within ten (10) days from the date of this letter.  If we do not receive all the information listed below, we may be forced to cancel your request and your modification will be denied.

- Most recent bank statement including all pages, last four if self-employed.

79.     Chase extended the deadline to submit the documents to October 27, 2009.

80.     Despite having previously sent their most recent bank statements with their original application in September 2009, the Isaak-Mohameds responded to the October 16, 2009 letter by faxing to Chase their most recent bank statements on October 27, 2009.

81.     On January 31, 2010 Chase sent the Isaak-Mohameds a letter with the startling headline: "YOUR MODIFICATION IS AT RISK-URGENT RESPONSE NEEDED!"  As before Chase claimed that "we have not received all required documents necessary to complete your request for a modification of the above-referenced Loan."  This time the following documents were stated as supposedly missing:

- Properly completed Hardship Affidavit

- Properly completed 4506-Y-EZ-Request for Transcript of tax return form

- Income Documentation

  o  If salaried or wage employee-two (2) most recent pay stubs indicating year-to-date earnings

The letter continues by stating "In addition to getting us the required documents, you must also continue to make trial period payments at your current amount."

82.     Despite having previously provided a Hardship Affidavit and an IRS Form 4506-T, the Isaak-Mohameds re-provided that documentation along with all of the pay-stubs requested plus a signed copy of their 2009 tax return with all schedules.

83.     As of this date, the Isaak-Mohameds are in compliance with their TPP Agreement and their representations to the Defendant continue to be true in all material respects.

84.     Despite having timely provided Chase with all documentation it requested, Chase did not provide the Isaak-Mohameds with a permanent loan modification by January 31, 2010.

85.     Despite their compliance in all material respects with the terms of the TPP Agreement, the Isaak-Mohameds still have not been given a permanent loan modification under the HAMP Program guidelines.

86.     Defendant has therefore breached the provision of the TPP Agreement that compliance with the TPP Agreement for the three month trial period would result in a permanent loan modification.  At this point, the TPP is now in its fifth month with no end in sight.

87.     Like the other Plaintiffs in this matter, the Isaak-Mohamed have been living in limbo, without any assurances that their home will not be foreclosed, despite their compliance with HAMP requirements and their continued monthly payments under the TPP.

### *Class Allegations*

88.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

89.     This class action is brought by the Plaintiffs on behalf of themselves and all Massachusetts homeowners whose loans have been serviced by Defendant and who, since July 31, 2009, have complied with their obligations under a written TPP Agreement, but have not received a permanent HAMP modification.

90.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

91.     Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendant.  Plaintiffs believe that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records.  Therefore, the proposed class is so numerous that joinder of all members is impracticable.

92.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

93.     All members of the class have been subject to and affected by the same conduct.  The claims are based on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class.  These questions include, but are not limited to the following:

> a.   the nature, scope and operation of  Defendant's obligations to homeowners under HAMP ;
>
> b.   whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent HAMP modification;
>
> c.   whether Defendant's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

    d.   whether the Court can order Defendant to pay damages and what the proper

measure of damages is, and also whether the Court can enter injunctive relief.

94.    The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that both the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.

95.    The individual named Plaintiffs will fairly and adequately represent the interests of the class.  They are committed to the vigorous prosecution of the class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

96.    A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

97.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

98.    The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
### *Breach of Contract*

99.    Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

100.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

101.    As described above, the TPP Agreement sent by Defendant to Plaintiffs constitutes a valid offer.

102.    By executing the TPP Agreement and returning it to Defendant along with the supporting documentation, Plaintiffs accepted Defendant's offer.

103.    Alternatively, Plaintiffs' return of the TPP Agreement constitutes an offer.  Acceptance of this offer occurred when Defendant accepted Plaintiffs' TPP payments.

104.    Plaintiffs' TPP payments to Defendant constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home, and Defendant received payments it might otherwise not have.

105.    Plaintiffs and Defendant thereby formed valid contracts.

106.    To the extent that the contracts were subject to a condition subsequent providing Chase an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP, this condition was waived by Chase and/or it is estopped to assert it as a defense to Plaintiffs' claims.

107.    By failing to offer Plaintiffs permanent HAMP modifications, Defendant breached those contracts.

108.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

109.    Plaintiffs have suffered harm and are threatened with additional harm from Defendant's breach.  By making TPP payments both during and after the TPP, Plaintiffs forego other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home.  On

information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

COUNT II

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

110.     Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

111.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

112.     Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

113.     "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

114.     Defendant routinely and regularly breaches this duty by:

    a.   failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

    b.   failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

    c.   routinely demanding information it has already received;

    d.   making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP;

    e.   failing to follow through on written and implied promises;

    f.   failing to follow through on contractual obligations; and

       g.   failing to give permanent HAMP modifications and other foreclosure alternatives to qualified Plaintiffs.

115.    As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiffs harm.

COUNT III

***Promissory Estoppel, in the alternative***

116.    Plaintiffs repeat and re-alleges every allegation above as if set forth herein in full.

117.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

118.    Defendant, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation, and made their TPP payments, they would receive a permanent HAMP modification.

119.    Defendant's TPP Agreement was intended to induce Plaintiffs to rely on it and make monthly TPP payments.

120.    Plaintiffs did indeed rely on Defendant's representation, by submitting TPP payments.

121.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

122.    Plaintiffs reliance was to their detriment.  Plaintiffs have yet to receive permanent HAMP modifications and have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

       a.     Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.       Enter a Judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, together with a Declaration that Defendant is required by the doctrine of promissory estoppel to offer permanent modifications to class members;

c.       Grant preliminary and permanent injunctive relief, enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class in violation of their contractual and other obligations undertaken and incurred in connection with HAMP;

d.       Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.       Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

g.       Award actual and punitive damages to the Plaintiffs and the class;

h.       Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

i.       Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiffs

/s/ Gary Klein
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)

RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-9595 (telephone)
(617) 542-8010 (fax)

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE:  March 3, 2010