### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

_____
)
RAMIZA DURMIC, DONALD　　　　　　)
TREANNIE, JEAN LICATA, AND　　　　)
ARSENIA RODRIGUES, on behalf of　　)
themselves and all others similarly situated,  )
)
　　　PLAINTIFFS,　　　　　　　　　)
)
v.　　　　　　　　　　　　　　　　　)　　　Civil Action No. 10-cv-10380-RGS
)
J.P. MORGAN CHASE BANK, NA,　　　)　　　**Leave to File Granted on July 12, 2010**
)
　　　DEFENDANT.　　　　　　　　　)
_____)

### MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT JPMORGAN CHASE BANK, N.A. TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    The U.S. Treasury's Home Affordable Modification Program. ............................ 3

    B.    Prior Litigation to "Enforce" HAMP. .................................................................. 5

    C.    Plaintiffs' Complaint.............................................................................................. 7

LEGAL STANDARD............................................................................................................ 9

ARGUMENT ...................................................................................................................... 10

I.    PLAINTIFFS DO NOT STATE A CLAIM FOR BREACH OF CONTRACT (COUNT I). ................................................................................... 10

    A.    Plaintiffs' Breach of Contract Claim Fails for Lack of Consideration. ...................................................................................... 10

    B.    Plaintiffs Allege No Legally Cognizable Damages Either. .................................. 13

    C.    Any Purported Promise to Provide a Loan Modification Lacked Material Terms and Would Be, at Most, an Unenforceable Agreement to Agree. ............................................................................................. 16

II.      PLAINTIFFS DO NOT STATE A CLAIM FOR BREACH OF THE
         IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
         (COUNT II). .............................................................................................................. 18

III.     PLAINTIFFS DO NOT STATE A CLAIM FOR PROMISSORY
         ESTOPPEL (COUNT III) EITHER................................................................................. 19

IV.      PLAINTIFFS' CHAPTER 93A CLAIM (COUNT IV) FAILS AS A
         MATTER OF LAW AS WELL......................................................................................... 21

         A.      Plaintiffs Have Not Satisfied the Jurisdictional Requirement of
                 Sending a Valid Demand Letter........................................................................... 21

         B.      In Any Event, Plaintiffs' Chapter 93A Claim Fails as a Matter of
                 Law Because It Is Derivative of Plaintiffs' Breach of Contract
                 Claim................................................................................................................... 23

V.       THREE OF THE NAMED PLAINTIFFS DO NOT ALLEGE THAT
         THEY HAVE BEEN DENIED PERMANENT MODIFICATIONS, AND
         THUS DO NOT STATE ANY CLAIMS. ........................................................................ 24

CONCLUSION................................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aleem v. Bank of Am., N.A.*,
  No. 09-cv-01812, 2010 U.S. Dist. LEXIS 11944 (C.D. Cal. Feb. 9, 2010) ............................6

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ...............................................................................................................9

*Ball v. Wal-Mart, Inc.*,
  102 F. Supp. 2d 44 (D. Mass. 2000) ........................................................................................21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................................9, 14

*Benito v. Indymac Mortg. Servs.*,
  No. 2:09-CV-001218, 2010 U.S. Dist. LEXIS 51259 (D. Nev. May 21, 2010) ......................7

*Blackstone Realty LLC v. FDIC*,
  244 F.3d 193 (1st Cir. 2001) .......................................................................................................9

*Bosque v. Wells Fargo Bank, N.A.*,
  No. 4:10-cv-10311-FDS (D. Mass., filed Feb. 23, 2010) ..........................................................7

*Burtzos v. Countrywide Home Loans*,
  No. 09-cv-2027W, 2010 U.S. Dist. LEXIS 53509 (S.D. Cal. June 1, 2010) .............................7

*Canney v. New England Tel. & Tel. Co.*,
  228 N.E.2d 723 (Mass. 1967) ...................................................................................................10

*Cataldo v. Zuckerman*,
  482 N.E.2d 849 (Mass. App. Ct. 1985) ....................................................................................18

*Cavanaugh v. United States*,
  640 F. Supp. 437 (D. Mass. 1986) ............................................................................................20

*Christensen v. Kingston Sch. Comm.*,
  360 F. Supp. 2d 212 (D. Mass. 2005) .......................................................................................19

*City of Revere v. Boston/Logan Airport Assocs., LLC*,
  443 F. Supp. 2d 121 (D. Mass. 2006) .......................................................................................13

*Clorox Co. v. Procter & Gamble Commercial Co.*,
  228 F.3d 24 (1st Cir. 2000) .......................................................................................................10

*Cohoon v. Citizens Bank*,
  No. 00-2774, 2000 Mass. Super. LEXIS 604 (Mass. Super. Ct. Nov. 11, 2000) ....................13

*Contrast Kattar v. Demoulas*,
    739 N.E.2d 246 (Mass. 2000) ............................................................................13

*Dixon v. Shamrock Fin. Corp.*,
    482 F. Supp. 2d 172 (D. Mass. 2007) ................................................................9

*Emerson v. Deming*,
    23 N.E.2d 1016 (Mass. 1939) ..........................................................................11

*Escobedo v. Countrywide Home Loans, Inc.*,
    No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017 (S.D. Cal. Dec. 15, 2009) ...........7

*Famm Steel, Inc. v. Sovereign Bank*,
    571 F.3d 93 (1st Cir. 2009)................................................................................19

*Ferris v. Federal Home Loan Mortg. Corp.*,
    905 F. Supp. 23 (D. Mass. 1995) .....................................................................19

*First Colonial Bank for Sav. v. Webster*,
    No. 92-6679B, 1993 Mass. Super. LEXIS 87 (Mass. Super. Ct. Oct. 12, 1993)....................12

*Fitzgerald v. Hutchins*,
    983 A.2d 382 (Me. 2009)..................................................................................18

*Fontneau v. Town of Sandwich*,
    251 F. Supp. 2d 994 (D. Mass. 2003) ..............................................................20

*Gabovitch v. Mercury Records*,
    No. 93-2384, 1998 Mass. Super. LEXIS 459 (Mass. Super. Ct. Aug. 26, 1998) ...................20

*Gaitan v. Mortg. Elec. Registration Sys.*,
    No. 09-cv-1009, 2009 U.S. Dist. LEXIS 97117 (C.D. Cal. Oct. 5, 2009)................................6

*Gonzalez v. First Franklin Loan Servs.*,
    No. 09-cv-099941, 2010 U.S. Dist. LEXIS 1657 (E.D. Cal. Jan. 11, 2010) ............................6

*Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*,
    255 N.E.2d 793 (Mass. 1970) ..........................................................................11

*Hall v. Horizon House Microwave, Inc.*,
    506 N.E.2d 178 (Mass. App. Ct. 1987) ............................................................20

*In re Lloyd, Carr & Co.*,
    617 F.2d 882 (1st Cir. 1980)........................................................................11, 13

*In re WellNx Mktg. & Sales Practices Litig.*,
    673 F. Supp. 2d 43 (D. Mass. 2009) ................................................................15

*John Hancock Mut. Life Ins. Co. v. Banerji*,
  858 N.E.2d 277 (Mass. 2006) ............................................................... 15

*Johnson v. BAC Home Loans Servicing, LP*,
  No. 1:10-cv-10316-RWZ (D. Mass., filed Feb. 23, 2010) ......................... 7

*Jordan-Milton Machinery, Inc. v. F/V Teresa Marie, II*,
  978 F.2d 32 (1st Cir. 1992) .......................................................... 17, 18

*Kaufman v. Lennox*,
  164 N.E. 450 (Mass. 1929) .................................................................. 10

*Kiely v. Raytheon Co.*,
  105 F.3d 734 (1st Cir. 1997) .................................................. 14, 15, 16

*LaChance v. BayBank Norfolk*,
  No. 92-1088, 1994 Mass. Super. LEXIS 82 (Mass. Super. Ct. Nov. 2, 1994) ........ 17

*Lambert v. Fleet Nat'l Bank*,
  865 N.E.2d 1091 (Mass. 2007) ............................................................ 17

*Lucey v. Hero Int'l Corp.*,
  281 N.E.2d 266 (Mass. 1972) ............................................................. 17

*Maldonado v. Fontanes*,
  568 F.3d 263 (1st Cir. 2009) ................................................................ 9

*Marine Midland Bank v. Herriott*,
  412 N.E.2d 908 (1980) ...................................................................... 17

*Marks v. Bank of Am, N.A.*,
  No. 03:10-cv-08039-PHX-JAT, 2010 U.S. Dist. LEXIS 61489
  (D. Ariz. June 22, 2010) .............................................................. 1, 6, 7

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
  412 F.3d 215 (1st Cir. 2005) .............................................................. 18

*McMahon v. Digital Equip. Corp.*,
  944 F. Supp. 70 (D. Mass. 1996) ......................................................... 21

*Moore v. La-Z-Boy, Inc.*,
  639 F. Supp. 2d 136 (D. Mass. 2009) .................................................... 20

*Neuhoff v. Marvin Lumber & Cedar Co.*,
  370 F.3d 197 (1st Cir. 2004) .............................................................. 10

*O'Connor v. Merrimack Mut. Fire Ins. Co.*,
  897 N.E.2d 593 (Mass. App. Ct. 2008) .................................................. 18

*Park Drive Towing, Inc. v. City of Revere*,
   809 N.E.2d 1045 (Mass. 2004) ....................................................................23

*Pimental v. Wachovia Mortg. Corp.*,
   411 F. Supp. 2d 32 (D. Mass. 2006) ...........................................................23

*Premier Capital, Inc. v. Dolan*,
   No. 97-3923, 1998 Mass. Super. LEXIS 545 (Mass. Super. Ct. Sept. 15, 1998),
   *aff'd*, 754 N.E.2d 1083, 2001 WL 1014541 (Mass. App. Ct. Sept. 5, 2001)..........................13

*Redgrave v. Boston Symphony Orchestra, Inc.*,
   855 F.2d 888 (1st Cir. 1988) (en banc)........................................................14

*Reyes v. IndyMac Mortgage Servs., FSB*,
   No. 1:10-cv-10389-RWZ (D. Mass., filed Mar. 4, 2010) ..............................7

*Richards v. Arteva Specialties S.A.R.L.*,
   850 N.E.2d 1068 (Mass. App. Ct. 2006) .....................................................22

*Rosenfield v. U.S. Trust Co.*,
   195 N.E. 323 (1935).....................................................................................16

*Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A.*,
   94 F.3d 721 (1st Cir. 1996)..........................................................................19

*Shawmut Bank, N.A. v. Wayman*,
   606 N.E.2d 925 (Mass. App. Ct. 1993) .......................................................19

*Simmons v. Countrywide Home Loans, Inc.*,
   No. 09cv1245, 2010 U.S. Dist. LEXIS 65031 (S.D. Cal. June 29, 2010) ................................7

*Simon v. Bank of Am., N.A.*,
   No. 10-cv-00300-GMN-LRL, 2010 U.S. Dist. LEXIS 63480
   (D. Nev. June 23, 2010)..............................................................................6

*Slaney v. Westwood Auto, Inc.*,
   322 N.E.2d 768 (Mass. 1975) .....................................................................22

*Sloan v. Burrows*,
   258 N.E.2d 303 (Mass. 1970) .....................................................................11

*Villa v. Wells Fargo Bank, N.A.*,
   No. 10-cv-81, 2010 U.S. Dist. LEXIS 23741 (S.D. Cal. Mar. 15, 2010) ..........................1, 6, 7

*Williams v. Geithner*,
   No. 09-1959, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009) ......................1, 3, 4, 6

*Zendejas v. GMAC Wholesale Mortg. Corp.*,
   No. 10-cv-0184, 2010 U.S. Dist. LEXIS 59793 (E.D. Cal. June 15, 2010) ............................7


STATUTES & RULES

12 U.S.C.
   § 5219(a)(1) ..............................................................................................................................3

Fed. R. Civ. P.
   12(b)(6) ......................................................................................................................................9

M.G.L. c.
   93A § 9(3) .........................................................................................................................21, 22
   106 § 3-413 ..............................................................................................................................12

## INTRODUCTION

Plaintiffs are homeowners who took out home mortgage loans from third-party lenders, but whose loans are now serviced by JPMorgan Chase Bank, N.A. ("Chase").  The complaint here is the latest in a series of failed efforts to craft some viable cause of action for borrowers to sue their mortgage servicers for failing to permanently modify their loans under the federal government's Home Affordable Modification Program ("HAMP").  Absent from the First Amended Complaint ("FAC") is any claim pled under HAMP.  This omission is no accident. Federal courts have uniformly held that there is no private right of action for borrowers to sue under HAMP.  Federal courts have also uniformly rejected the alternative claims pled by borrowers under the Due Process Clause or by alleging third-party beneficiary status under the contracts in which loan servicers agree with the government to participate in HAMP.  *See, e.g., Williams v. Geithner*, No. 09-1959, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009) (borrowers have no cognizable property interest in loan modifications); *Villa v. Wells Fargo Bank, N.A.*, No. 10-cv-81, 2010 U.S. Dist. LEXIS 23741 (S.D. Cal. Mar. 15, 2010) (borrowers lack third-party standing to sue under government contracts); *Marks v. Bank of Am,, N.A.*, No. 03:10-cv-08039-PHX-JAT, 2010 U.S. Dist. LEXIS 61489 (D. Ariz. June 22, 2010) (same).

Facing these very real legal hurdles, plaintiffs here advance a new, though equally faulty, contract theory.  They acknowledge that HAMP modifications are governed by the statute and a succession of guidelines issued by the Department of the Treasury, which has had primary administrative responsibility for the program.  And, plaintiffs concede that HAMP is supposed to involve a two-step process, the first of which is called a Trial Period Plan ("TPP").  Borrowers were allowed to proceed with a TPP if the income and debt information obtained from them orally indicated that they may be eligible for a modification.  During the TPP, the borrowers

were obligated to make reduced monthly mortgage payments and to submit documentation about their income and debts necessary to determine whether they were eligible for permanent loan modifications under HAMP.  Those ultimate eligibility requirements included whether, on the basis of verified information, the borrowers could afford to make the modified payments and, separately, whether the modification made more economic sense than pursuing foreclosure. Eligibility is critical to HAMP and reflective of the fact that the program was born of the financial crisis which saw many lenders fail and the fact that taxpayer dollars would be made available where loans were permanently modified.

Plaintiffs' current theory, however, is that so long as plaintiffs met the step one requirements — they made the trial payments and submitted the requested documentation — Chase and all HAMP servicers were obligated to permanently modify their loans.  This theory, which relies on a single phrase in a form TPP document, stands the HAMP program on its head. If ever accepted, it would eviscerate the core eligibility determination on which the program was founded.  Indeed, tellingly, none of the plaintiffs alleges that he or she was, in fact, qualified for a permanent loan modification.

But even more immediately, plaintiffs' complaint fails to state the most basic elements of the common-law theories on which they rely.  Their contract claim articulates no viable theory of consideration supporting the TPPs as independent contracts; this is not surprising given that the TPPs allowed plaintiffs to stay in their homes while paying *less* than their existing mortgage contracts required.  Similarly, plaintiffs also fail to identify any cognizable legal harm that they suffered by entering into the TPP.  Moreover, even if the TPPs had promised to offer a permanent modification of plaintiffs' loans someday on unspecified terms, such an agreement would be, as a matter of law, an unenforceable "agreement to agree," lacking essential material

terms such as interest rate, monthly payment amount, and loan term.  Plaintiffs' claims for

violation of the implied covenant of good faith and fair dealing, promissory estoppel, and

Chapter 93A violation are entirely derivative of their contract theory, and so equally flawed.

The FAC does not articulate any legally viable claims and Chase's motion to dismiss

should be granted.

## BACKGROUND

### A.      The U.S. Treasury's Home Affordable Modification Program.

In February 2009, the U.S. Department of the Treasury announced the Making Home

Affordable Program, of which HAMP is a part.  HAMP aims "to financially assist three to four

million homeowners who have defaulted on their mortgages or who are in imminent risk of

default by reducing monthly payments to sustainable levels."  *Williams*, 2009 U.S. Dist. LEXIS

104096, at *6.  Although HAMP's purpose is to assist at-risk homeowners, it does not aim to

prevent all foreclosures—only "avoidable" foreclosures.  *See, e.g.*, 12 U.S.C. § 5219(a)(1)

(Emergency Economic Stabilization Act of 2008 ("EESA")) (authorizing the Secretary of the

Treasury to "facilitate loan modifications to prevent avoidable foreclosures").  HAMP does this

by offering financial incentives for borrowers, servicers, and investors to enter into loan

modifications where such modifications make economic sense for all parties.  (*See* FAC Ex. 2.)

Pursuant to authority delegated under the EESA, Treasury promulgated a series of

HAMP guidelines, which established a process for comparing the net present value ("NPV") of a

HAMP modified loan to the NPV of an unmodified loan (i.e., a loan that will likely proceed to

foreclosure).  (*See* FAC Ex. 2, at pp. 4-5.)  The guidelines specify threshold criteria to identify

borrowers who *may* be eligible for loan modifications.  (*Id*. at p. 2.)  The guidelines go on to

enumerate a sequence of steps for servicers to apply to the loans of potentially eligible

borrowers—known as the "Standard Modification Waterfall"—to evaluate a hypothetical loan

modification that would lower the borrower's payment to no greater than 31% of the borrower's gross monthly income.  (*Id*. at p. 8.)  The Standard Modification Waterfall includes:  reduction of the interest rate in increments of .125% (to no less than 2%), extension of the term of the loan, and principal forbearance.  (*Id*. at pp. 9-10.)  A potential modification can easily fail at the waterfall stage—a borrower's income, for example, may be insufficient to bring the required payment down to the threshold of 31% of monthly income.

The purpose of applying the Standard Modification Waterfall is to fashion a hypothetical modified loan that the servicer can use to conduct the NPV test, a "test that compares the NPV result for a modification to the NPV result for no modification."  (*Id*. at p. 4.)  "The NPV is essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure."  *Williams*, 2009 U.S. Dist. LEXIS 104096, at *8-9 n.3.  If the loan appears to qualify for a modification after application of all of the HAMP criteria, the loan may then be placed into a TPP.  *Id.*, at *9-10; (FAC Ex. 3, at p. 1)

For loans owned by Government-Sponsored Entities ("GSEs"), namely Fannie Mae and Freddie Mac, the HAMP guidelines went into immediate effect, as they were automatically incorporated into the GSEs' agreements with their loan servicers.  For non-GSE-owned loans, participation in HAMP is voluntary.  Servicers may choose to enter into contracts with the government—Servicer Participation Agreements ("SPAs")—to participate in HAMP.  (*See* FAC Ex. 2 at p. 1.)  The FAC alleges that Chase entered into a SPA on July 31, 2009.  (FAC ¶ 35.)

Since HAMP's inception, Treasury has been continually refining the program.  On April 6, 2009, Treasury issued its first Supplemental Directive.  It has since issued fourteen additional Supplemental Directives, the most recent of which was issued on June 3, 2010.

Prior to June 1, 2010, servicers had the option of evaluating applicants for TPPs based

solely upon the applicants' verbal representations concerning eligibility. This procedure allowed servicers to provide potentially eligible borrowers with payment relief quickly, by furnishing TPPs prior to receiving supporting documentation. After the borrower executed and returned the TPP, and provided the documentation necessary to verify his or her financial eligibility, the servicer would then finally evaluate the borrower for eligibility for a permanent modification (i.e., confirm that the NPV test continued to produce a positive result, that the pre-modification monthly payment ratio exceeded 31% of income, and that the modification produced a monthly payment ratio of no more than 31%). (FAC Ex. 2 at pp. 5-6.) The guidelines mandated that, where a TPP was extended based on verbal representations, the servicer "must" use the verified documentation to confirm eligibility before extending a permanent modification. (*Id.* at pp. 4-5.)

Although reliance on the applicant's initial, verbal representations allowed servicers to expedite the TPP process, it also resulted in some borrowers, who were originally extended TPPs, being ultimately found ineligible for permanent modifications, once their information was later verified. On January 28, 2010, Treasury issued Supplemental Directive 10-01, which effected a "significant program change," and directed servicers to require "full verification of borrower eligibility prior to offering a trial period plan."[1] Borrowers must now submit an "initial package" of documentation, including a Request for Modification and Affidavit Form, IRS Form 4056-T or 4056T-EZ, and evidence of income, before a TPP may be extended. *Id.*

### B.    Prior Litigation to "Enforce" HAMP.

This suit is part of a recent wave of actions claiming an entitlement to loan modifications under HAMP. The U.S. Treasury, however, has designated Freddie Mac as its exclusive agent in ensuring compliance with HAMP, and the program provides for extensive monitoring and

---

[1] Supplemental Directive 10-01 went into effect on June 1, 2010, long after each of the named plaintiffs applied for his or her modification. (FAC ¶¶ 50, 74, 93, 109.)

compliance procedures. (FAC Ex. 2 at p. 25.) Accordingly, every federal court to have

addressed the issue has uniformly held that there is no private right of action to enforce HAMP.

> Nowhere in the HAMP Guidelines, nor in the EESA, does it
> expressly provide for a private right of action. Rather
> Congressional intent expressly indicates that compliance authority
> was delegated solely to Freddie Mac. By delegating compliance
> authority to one entity, Freddie Mac, Congress intended that a
> private cause of action was not permitted.

*Marks*, 2010 U.S. Dist. LEXIS 61489, at *16; *see also Simon v. Bank of Am., N.A.*, No. 10-cv-

00300-GMN-LRL, 2010 U.S. Dist. LEXIS 63480, at *26-27 (D. Nev. June 23, 2010) (holding

that "the Home Affordable Modification Program does not provide borrowers with a private

cause of action against lenders" and dismissing claim); *Aleem v. Bank of Am., N.A.*, No. 09-cv-

01812, 2010 U.S. Dist. LEXIS 11944, at *8-11 (C.D. Cal. Feb. 9, 2010) (same); *Gaitan v. Mortg.*

*Elec. Registration Sys.*, No. 09-cv-1009, 2009 U.S. Dist. LEXIS 97117, at *38 (C.D. Cal. Oct. 5,

2009) (same). Nor is there a right of action under the EESA, HAMP's authorizing statute. *See,*

*e.g.*, *Gonzalez v. First Franklin Loan Servs.*, No. 09-cv-099941, 2010 U.S. Dist. LEXIS 1657, at

*50 (E.D. Cal. Jan. 11, 2010) (no private right of action under EESA).[2]

    In an attempt to circumvent the lack of a private right of action, various borrowers

brought suits seeking to achieve the same result by asserting Due Process theories and breach of

contract claims as purported third-party beneficiaries of the SPAs. The federal courts, again,

have uniformly rejected these attempts to end-run HAMP's lack of a right of action. *See, e.g.,*

*Williams*, 2009 U.S. Dist. LEXIS 104096, at *21-22 (rejecting Due Process claim, and holding

that there is no cognizable property interest in loan modifications); *Escobedo v. Countrywide*

---

[2] The lack of a private right of action to enforce HAMP is no oversight. HAMP is a
voluntary program. *See Williams*, 2009 U.S. Dist. LEXIS 104096, at *22. Few banks would
agree to participate in HAMP if, by doing so, they exposed themselves to lawsuits by the
millions of borrowers who have sought or will seek HAMP modifications. *See Villa*, 2010 U.S.
Dist. LEXIS 23741, at *7 n.1 (noting that the "the breadth and indefiniteness of a class of
[would-be] beneficiaries" in holding that borrowers lacked standing to bring contract claims).

*Home Loans, Inc.*, No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017, at *4-7 (S.D. Cal. Dec. 15, 2009) (rejecting plaintiffs' breach of contract claim and holding that borrowers are not intended beneficiaries under the SPAs); *Villa*, 2010 U.S. Dist. LEXIS 23741, at *6-7 (same); *Benito v. Indymac Mortg. Servs.*, No. 2:09-CV-001218, 2010 U.S. Dist. LEXIS 51259, at *20-21 (D. Nev. May 21, 2010) (same); *Burtzos v. Countrywide Home Loans*, No. 09-cv-2027W, 2010 U.S. Dist. LEXIS 53509, at *5-6 (S.D. Cal. June 1, 2010) (same); *Zendejas v. GMAC Wholesale Mortg. Corp.*, No. 10-cv-0184, 2010 U.S. Dist. LEXIS 59793, at *7-9 (E.D. Cal. June 15, 2010) (same); *Marks*, 2010 U.S. Dist. LEXIS 61489, at *16 (same); *Simmons v. Countrywide Home Loans, Inc.*, No. 09cv1245, 2010 U.S. Dist. LEXIS 65031, at *15 (S.D. Cal. June 29, 2010) (same).

### C.     Plaintiffs' Complaint.

Plaintiffs' complaint represents the most recent wave of actions, including several others filed by the same plaintiffs' counsel, seeking to circumvent HAMP's lack of a private right of action.  *See Bosque v. Wells Fargo Bank, N.A.*, No. 4:10-cv-10311-FDS (D. Mass., filed Feb. 23, 2010); *Johnson v. BAC Home Loans Servicing, LP*, No. 1:10-cv-10316-RWZ (D. Mass., filed Feb. 23, 2010); *Reyes v. IndyMac Mortgage Servs., FSB*, No. 1:10-cv-10389-RWZ (D. Mass., filed Mar. 4, 2010).  This time, plaintiffs' theories are centered on the notion that the extension of a TPP creates an contractual entitlement to a permanent loan modification.  Based on this theory, the FAC asserts claims on behalf of a putative Massachusetts class for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), promissory estoppel (Count III), and violation of Massachusetts G.L. c. 93A (Count IV).  (FAC ¶ 127.)

Plaintiffs' core theory is that, so long as they submitted three TPP payments and sent in the requested documentation, they were entitled to permanent loan modifications, regardless of the content of their documentation and regardless of whether they in fact qualified for such modifications.  (FAC ¶ 41.)  Indeed, *none* of the plaintiffs alleges that he or she would qualify

for a permanent loan modification under HAMP.  In an attempt to support their dubious

proposition, plaintiffs latch on to the following sentence in the TPP:

> If I am in compliance with this Loan Trial Period and my
> representations in Section 1 continue to be true in all material
> respects, then the Lender will provide me with a Loan
> Modification Agreement, as set forth in Section 3.

(FAC ¶ 52.)  Section 1 attests to the borrower's hardship and imminent default, and promises to

provide "documentation for all income" of the borrower.  (FAC Ex. 8 at p. 9.)

In the very next paragraph, however, the TPPs state that the borrower's documentation

must be sent "to permit verification of all of my income . . . to determine *whether I qualify* for

the offer [of a permanent loan modification] described in this Plan (the 'Offer')."  (FAC Ex. 8 at

p. 9 (emphasis added).)  The TPPs highlight the possibility that the borrower may "not qualify

for the Offer" and require the lender to provide written notice in the event that the borrower does

not so qualify.  (*Id.*)  In addition, the TPPs emphasize that "the Plan is not a modification of the

Loan documents and that the Loan documents will not be modified unless and until . . . I meet *all

of the conditions* required for modification."  (*Id.* at ¶ 2.G (emphasis added).)  "[A]ll terms and

provisions of the Loan documents remain in full force and effect; nothing in this Plan shall be

understood or construed to be a satisfaction or release in whole or in part of the obligations

contained in the Loan Documents.  The Lender and I will be bound by, and will comply with, all

of the terms and provisions of the Loan Documents."  (*Id.* ¶ 4.)

The cover letter accompanying the TPPs also makes it clear that the borrower may not

ultimately qualify for a permanent modification:  "We have enclosed a customized Home

Affordable Modification Trial Period Plan ('Trial Period Plan').  *If you qualify* under the federal

government's Home Affordable Modification program and comply with the terms of the Trial

Period Plan, we will modify your mortgage loan . . . ."  (FAC Ex. 7 at p. 3 (emphasis added).)

The letter emphasizes that the TPP payments are only an "estimate of what your payment would be IF we are able to modify your loan under the terms of the program." (*Id.* (emphasis in original).)  The letter expressly highlights the possibility that "[y]ou may not qualify for this loan modification program." (*Id.*)  The Frequently Asked Questions section reiterates the point, addressing questions such as "How long will it take to process my modification request and *determine if I qualify* for the program?" and "What do you do with my first trial period payment *if I do not qualify* for the program?" (*Id.* at p. 7 (emphasis added).)  The documents upon which plaintiffs base their claims undercut the legal theories they assert, and the FAC should be dismissed for failure to state a claim.

## LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint.  *Dixon v. Shamrock Fin. Corp.*, 482 F. Supp. 2d 172, 174 (D. Mass. 2007).  Although the court must accept as true well-pleaded factual allegations, the court should "not accept as true legal conclusions from the complaint or naked assertion[s] devoid of further factual enhancement." *Maldonado v. Fontanes*, 568 F.3d 263, 266 (1st Cir. 2009) (citation omitted). Rather, the complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), and "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Where the complaint attaches exhibits, those exhibits are part of the allegations of the complaint for purposes of a motion to dismiss.  *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 195 n.1 (1st Cir. 2001) (citing Fed. R. Civ. P. 10(c)).  If the complaint's allegations conflict with the exhibits, the exhibits control.  *Clorox Co. v. Procter & Gamble Commercial Co.*, 228 F.3d

24, 32 (1st Cir. 2000) (citation omitted) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

## ARGUMENT

### I.   PLAINTIFFS DO NOT STATE A CLAIM FOR BREACH OF CONTRACT (COUNT I).

In an attempted end-run around HAMP's lack of a private right of action, plaintiffs advance a "breach of contract" claim based on their TPPs.  Putting aside the fact that the TPPs cannot reasonably be read to promise borrowers permanent loan modifications regardless of whether they would ultimately qualify for such modifications, the breach of contract theory fails because plaintiffs cannot satisfy its basic elements.  Breach of contract requires (1) an offer and acceptance, (2) with all essential contractual terms specified in reasonable detail and certainty; (3) consideration; (4) breach; and (5) damages.  *Canney v. New England Tel. & Tel. Co.*, 228 N.E.2d 723, 727 (Mass. 1967); *Kaufman v. Lennox*, 164 N.E. 450, 450-51 (Mass. 1929). Plaintiffs do not allege valid consideration, legally cognizable damages, or an agreement containing all of the essential terms for a permanent loan modification.

### A.   Plaintiffs' Breach of Contract Claim Fails for Lack of Consideration.

Plaintiffs do not allege any legally cognizable form of consideration supporting the purported "agreement" on which their claim is based.  "A contract must have consideration to be enforceable and in order for a contract to have valid consideration, the contract must be a bargained-for exchange in which there is a legal detriment of the promisee or a corresponding benefit to the promisor."  *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 201 (1st Cir. 2004) (internal citation and quotation marks omitted).  Legal detriment entails "giving up something immediately prior thereto the promisee was privileged to retain, or doing or refraining

from doing something which he was then privileged not to do, or not to refrain from doing."

*Graphic Arts Finishers, Inc. v. Boston Redevelopment Auth.*, 255 N.E.2d 793, 795 (Mass. 1970)

(quoting Williston, *Williston on Contracts* § 102A (3d ed. 1957)) (internal quotation marks

omitted).  A corresponding benefit is "receiving as the exchange for his promise of some

performance or forbearance which the promisor was not previously entitled to receive."  *Id.*

    Plaintiffs argue that they provided valid consideration by making payments under their

TPPs.  (FAC ¶ 142.)  Plaintiffs suggest that this constitutes a legal detriment because they gave

up the ability to pursue other means to save their homes.  (*Id.*)  Plaintiffs further suggest that

Chase received a legal benefit because it "received payments it might otherwise not have."  (*Id.*)

    Plaintiffs' argument, however, fails for the simple reason that plaintiffs already had a

legal obligation to make payments on their existing mortgage loans.  (FAC ¶¶ 45-50, 69-74, 89-

94, 105-112 (alleging existence of plaintiffs' mortgage loans).)  Their TPP payments were *less*

*than* the monthly payments that plaintiffs were already obligated to make, and the TPP payments

were applied to paying down these pre-existing obligations.  (FAC ¶ 51 (Durmic), ¶¶ 105 & 112

(Rodrigues), Ex. 2, at pp. 8-10 (describing the Standard Modification Waterfall).)

    It is a "well-settled rule . . . that performance of a pre-existing legal duty that is neither

doubtful nor subject to honest and reasonable dispute is not valid consideration where the duty is

owed to the promisor."  *In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980) (applying

Massachusetts law).  As such, a debtor's partial payment on an amount that is indisputably due is

not consideration for the creditor's promise to discharge the remainder of the debt.  *Emerson v.*

*Deming*, 23 N.E.2d 1016, 1018 (Mass. 1939); *see also Sloan v. Burrows*, 258 N.E.2d 303, 305

(Mass. 1970) ("Since the duty to pay this amount already existed under the agreement, the rule

that performance of an existing legal duty or contractual obligation is not sufficient consideration for a new promise by the obligee applies.").

Plaintiffs had a pre-existing legal obligation to make payments as required by their loan agreements.  *First Colonial Bank for Sav. v. Webster*, No. 92-6679B, 1993 Mass. Super. LEXIS 87, at *5 (Mass. Super. Ct. Oct. 12, 1993) ("The maker of a promissory note is obligated to pay the note in accordance with its terms." (citing M.G.L. c. 106 § 3-413)).  Participation in the TPPs did not relieve plaintiffs of their obligations to repay their loans, as the TPPs emphasized:

> [A]ll terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.  The Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

(FAC Ex. 8 at p. 11 ¶ 4.D (Durmic) Ex. 9 at p. 4 ¶ 4.D (the Treannies)k Ex. 10 at p. 4 ¶ 4.D (Licata), Ex. 12 at p. 4 ¶ 4.D (Rodrigues).)

Moreover, all payments made under the TPPs were to be held and ultimately applied to the borrower's existing loan obligations, in the event that a permanent modification was not ultimately extended.  (FAC Ex. 8 at p. 10 ¶ 2.D, F; Ex. 9 at p. 3 ¶ 2.D, F; Ex. 10 at p. 3 ¶ 2.D, F; Ex. 12 at p. 3 ¶ 2.D, F.)  The TPP payments did not provide Chase with windfall revenues, nor did they result in the borrowers making additional outlays.  The money went precisely where it was already obligated to go —to paying down the borrowers' existing loan balances.  The TPPs entailed only one substantive change in plaintiffs' obligations:  they allowed plaintiffs to make *lower* monthly payments on their mortgage loans, while remaining in possession of their homes. (FAC at ¶¶ 51, 105, 112.)

These reduced payments cannot constitute consideration for permanent modifications. Massachusetts courts have repeatedly held that consideration is lacking where a mortgagor

attempts to pay a discounted amount in satisfaction of an existing debt. *See*, *e.g.*, *Premier Capital, Inc. v. Dolan*, No. 97-3923, 1998 Mass. Super. LEXIS 545, at *8-9 (Mass. Super. Ct. Sept. 15, 1998) (borrower's payment of a lesser amount than due on his mortgage loan was not consideration for lender's promise to settle the debt), *aff'd*, 754 N.E.2d 1083, 2001 WL 1014541, at *1 (Mass. App. Ct. Sept. 5, 2001); *Cohoon v. Citizens Bank*, No. 00-2774, 2000 Mass. Super. LEXIS 604, at *7 (Mass. Super. Ct. Nov. 11, 2000) (borrower's offer of a "discounted payoff" on a mortgage loan was "inadequate consideration to create a valid contract").

Apart from the making of reduced monthly payments, plaintiffs point to no other detriment to them or benefit to Chase flowing from the TPPs that could plausibly be deemed consideration —e.g., agreeing to pay higher interest rates or waiving rights that they would otherwise have should they file for bankruptcy. *Contrast Kattar v. Demoulas*, 739 N.E.2d 246, 254-55 (Mass. 2000). Plaintiffs' argument that Chase received money under the TPPs that it might otherwise not have received is precisely the type of argument that the pre-existing obligation rule is meant to defeat. *See Lloyd*, *Carr & Co.*, 617 F.2d at 890 ("The policy underlying [the pre-existing obligation] rule is to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do."). Plaintiffs' contract claim fails as a matter of law.

### B.    Plaintiffs Allege No Legally Cognizable Damages Either.

Even if plaintiffs had alleged consideration, the breach of contract claim would still fail because plaintiffs allege no cognizable damages. *See City of Revere v. Boston/Logan Airport Assocs., LLC.*, 443 F. Supp. 2d 121, 126-27 (D. Mass. 2006) (rejecting the breach of contract claim in the absence of legally cognizable damages). Plaintiffs *saved* money by participating in TPPs —they were permitted to make lower-than-normal monthly payments on their mortgage loans and still remain in their homes. (*See* Section I.A, *supra*.) Unable to identify any direct

monetary loss, plaintiffs point to three other forms of purported damages, none of which are legally cognizable.

Plaintiffs' first alleged harm is that, by making TPP payments, plaintiffs for-went other remedies that they might have pursued to save their homes, such as restructuring their debts under the bankruptcy code, or other strategies to deal with their default, such as selling their homes.  (FAC ¶ 147.)  As a matter of law, the assertion of foregoing unspecified "other" remedies or strategies that plaintiffs "might have pursued" is too speculative to survive a motion to dismiss.  *See Kiely v. Raytheon Co.*, 105 F.3d 734, 738 (1st Cir. 1997) (finding plaintiff's allegation of harm in that he refrained from pursuing other defense tactics because of the existence of a mutual-defense agreement "too speculative to be legally cognizable and redressable"); *Twombly*, 550 U.S. at 555 (to survive a motion to dismiss, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level").

More fundamentally, plaintiffs point to no causal connection between this alleged harm and their participation in the TPPs.  *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 898 (1st Cir. 1988) (en banc) (under Massachusetts law, alleged damages must be proximately caused by the alleged breach and not by other, independent factors).  Nothing in the TPPs, or in the alleged promise of permanent modifications, prevented plaintiffs from pursuing the other remedies that they list as examples —declaring bankruptcy or selling their homes —or from taking any other lawful measures to alleviate their debt obligations.  Plaintiffs could have pursued these remedies whether or not they participated in the TPPs.  They are free to do so now.  If anything, participation in the TPPs afforded plaintiffs greater opportunity to save their homes and to deal with their defaults by enabling plaintiffs to save more money every month to put toward other remedies and, at the same time, remain in their homes.

Plaintiffs' second alleged harm —that, "[o]n information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against their homes" (FAC ¶ 147) —is also not cognizable.  None of the named plaintiffs alleges that they had their homes foreclosed.  In evaluating plaintiffs' claims, it is irrelevant whether some other, unidentified members of the putative class, which has not been certified, suffered alleged injury.  "[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *In re WellNx Mktg. & Sales Practices Litig.*, 673 F. Supp. 2d 43, 54-55 (D. Mass. 2009) (citation omitted).  Furthermore, plaintiffs do not even claim that the alleged foreclosure activity against some putative class members had anything to do with participation in TPPs or failure to obtain permanent modifications.  Thus, plaintiffs fail to allege the requisite causal link between the harm and the breach.

Plaintiffs' last alleged harm —that they "have been living in a state of stressful anxiety because of the limbo in which the Defendant has placed them" (FAC ¶ 147) —is also not cognizable damage.  "[D]amages for mental suffering are generally not recoverable in an action for breach of contract."  *John Hancock Mut. Life Ins. Co. v. Banerji*, 858 N.E.2d 277, 288 (Mass. 2006) (concluding that a disability insurer's attempt to erroneously rescind policy benefits did not entitle the insured to damages for emotional distress under a breach of contract claim).  Moreover, even if emotional distress damages were cognizable, plaintiffs' distress is allegedly based on the "harms" described above, which are not cognizable as damages.  Where "harms" do not result in cognizable damages, the emotional distress resulting from those "harms" is not cognizable either.  *See Kiely*, 105 F.3d at 739 (Plaintiff's "claim that he suffered emotional harm

as a result of the first four types of harm is not legally cognizable because the four events

underlying the emotional harm are not cognizable.").

> ### C.     Any Purported Promise to Provide a Loan Modification Lacked Material Terms and Would Be, at Most, an Unenforceable Agreement to Agree.

Even if plaintiffs could somehow overcome their failure to state the basic elements of

consideration and damages, plaintiffs would still not have pled the existence of an enforceable

contract.  Although plaintiffs assert that the TPP "promises a HAMP modification" to any

borrower who makes three monthly payments and submits the requested documentation

(regardless of its content) (FAC ¶¶ 40-41), they nowhere allege that there was agreement on the

key terms for a permanent modification, such as the principal amount, the monthly payment

amount, the applicable interest rate(s), the loan term, or the amount of escrow payments owed, if

any.  The TPPs contained no such terms.  (*See* FAC Exs. 8-10, 12.)

Indeed, the TPP expressly specified that the monthly payment amount for any permanent

modification remained undetermined.  (*See id.* ¶ 3 ("Lender *will* determine the new payment

amount" only after the trial period ends) (emphasis added).)  The cover letter accompanying the

TPP further stated:  "At this time, we are not able to calculate precisely the Past Due Arrearage

Amount or the amount of the modified loan payment that will be due . . . ."  (FAC Ex. 7, at p. 1.)

The Treasury guidelines note that "the monthly payment due under the [modified] Agreement

may differ from the payment due under the Trial Period Plan."  (FAC Ex. 2, at p. 18.)

Any purported promise to agree to a future loan modification on unspecified terms would

be flatly unenforceable as a matter of law.  "An agreement to reach an agreement is a

contradiction in terms and imposes no obligation on the parties thereto."  *Rosenfield v. U.S. Trust*

*Co.*, 195 N.E. 323, 326 (1935).  To be enforceable, "[a]ll the essential terms . . . must be definite

and certain so that the intention of the parties may be discovered, the nature and extent of their

obligations ascertained, and their rights determined." *Lucey v. Hero Int'l Corp.*, 281 N.E.2d 266,

269 (Mass. 1972) (citation omitted). "The court cannot make for the parties a contract which

they did not make for themselves." *Id.* (citation omitted).

Massachusetts courts have specifically held that loan agreements are not enforceable

where they lack key terms such as interest rate, loan term, and monthly payment amount, as the

purported agreements do here. In *Marine Midland Bank v. Herriott*, 412 N.E.2d 908 (1980), the

court affirmed dismissal of a contract claim due to lack of an enforceable loan agreement,

holding that "[s]ignificant provisions of the understanding about a new loan, as described by

[plaintiff], remained open, *e.g.*, the term of the loan, how it would be secured, the manner and

timing of disbursements, events of default, and the manner and timing of interest payments." *Id.*

at 909. Similarly, in *LaChance v. BayBank Norfolk*, No. 92-1088, 1994 Mass. Super. LEXIS 82

(Mass. Super. Ct. Nov. 2, 1994), the court held that the loan "alleged to have been made by the

defendant is unenforceable because its essential terms are incomplete and vague." *Id.*, at *24.

The court emphasized that "neither [of the plaintiffs] alleges that the parties specifically agreed,

during the critical conversation, upon how the loan would be secured, the manner and timing of

disbursements and interest payments, the parties' obligations in the event of a default, or that the

loan would be a nonrecourse revolving one." *Id.*, at *24-25; *see also Lambert v. Fleet Nat'l

Bank*, 865 N.E.2d 1091, 1096 (Mass. 2007) (where the parties had only a "general expectation

that the bank would renew the [plaintiff's mortgage loan]" despite plaintiff's default, no

enforceable contract existed because "conspicuously absent was any discussion of specifically . .

. how much of a default on the loan the bank was required to overlook").

The First Circuit has agreed. In *Jordan-Milton Machinery, Inc. v. F/V Teresa Marie, II,

978 F.2d 32 (1st Cir. 1992), the court considered whether the parties had an enforceable contract

to finance the purchase of an engine.  The defendant purportedly said that another lender,

Caterpillar Financial Services, was offering an 8.25% interest rate with estimated monthly

payments of $3,000 to $4,000.  The defendant then allegedly stated, "We can do this deal."  *Id*. at

35.  The First Circuit held that, as a matter of law, "this agreement would be unenforceable as

being too vague and uncertain to constitute an enforceable contract."  *Id.*  "There was not any

agreement as to the term of the loan (i.e., when repayment was to begin and end); there was no

agreement as to the amount to be repaid each month; nor was there an agreement as to the rate of

interest to be charged by a lender other than Caterpillar Financial Services.  These omitted terms

are material to a determination of whether an agreement for financing existed.  Absent these key

terms, there was not a valid enforceable agreement to provide financing."  *Id.*[3]  The same logic

requires the dismissal of plaintiffs' breach of contract claim here.

## II.   PLAINTIFFS DO NOT STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT II).

Plaintiffs do not state a claim for breach of the implied duty of good faith and fair dealing

because they have not alleged a valid contract.  "[T]he implied covenant of good faith and fair

dealing governs conduct of parties after they have entered into a contract; without a contract,

there is no covenant to be breached."  *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics,*

*Inc.*, 412 F.3d 215, 230 (1st Cir. 2005) (applying Massachusetts law); *see also O'Connor v.*

*Merrimack Mut. Fire Ins. Co.*, 897 N.E.2d 593, 600 (Mass. App. Ct. 2008) ("failure to

demonstrate the existence of an enforceable contract . . . is fatal to [plaintiff's] contention that

[defendant] violated that contract's implied covenant of good faith and fair dealing").

---

[3] Although *Jordan-Milton* applied Maine rather than Massachusetts law, Maine employs the same test as Massachusetts on this issue.  *Compare Fitzgerald v. Hutchins*, 983 A.2d 382, 388 (Me. 2009), *with Cataldo v. Zuckerman*, 482 N.E.2d 849, 854 (Mass. App. Ct. 1985).

Moreover, even if plaintiffs had pled the existence of a valid contract, plaintiffs have not alleged any conduct "to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005).  In the lender-borrower context, the lender must have "purposefully injure[d] their right to obtain the benefit of the contract." *Famm Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009) (quoting *Shawmut Bank, N.A. v. Wayman*, 606 N.E.2d 925, 928 (Mass. App. Ct. 1993)).

The FAC makes no such allegation.  The FAC merely alleges that Chase breached the implied covenant by failing to "follow through," failing to "supervise" employees, and making "inaccurate" calculations or requests for documents.  (FAC ¶ 152.)  But, even if true, none of those allegations support the conclusion that Chase acted with the purpose of injuring plaintiffs or with the "dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing." *Schultz v. R.I. Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir. 1996) (applying Massachusetts law).  At most, plaintiffs claim that Chase "financially benefits" from the foregoing omissions by "not hiring sufficient staff."  (FAC ¶ 154.)  But, that claim is nothing more than the assertion that Chase, like virtually any other business, could have provided faster service by hiring more employees.  That does not state a claim for breach of the implied covenant. *See Ferris v. Federal Home Loan Mortg. Corp.*, 905 F. Supp. 23, 28 (D. Mass. 1995) ("[M]erely providing bad service does not constitute acting in bad faith."); *Wayman*, 606 N.E.2d at 928 (finding no breach of the implied covenant as a matter of law, regardless of the fact that the bank "could certainly have been more diligent in its monitoring and its lending decisions").

### III.    PLAINTIFFS DO NOT STATE A CLAIM FOR PROMISSORY ESTOPPEL (COUNT III) EITHER.

Perhaps recognizing that lack of consideration presents an insurmountable bar to their

breach of contract claim, plaintiffs fall back on asserting promissory estoppel.  However, the other flaws in plaintiffs' contract theory also foreclose their promissory estoppel claim.

Plaintiffs do not allege a key element of promissory estoppel:  detrimental reliance.  "An element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment."  *Hall v. Horizon House Microwave, Inc.*, 506 N.E.2d 178, 184 (Mass. App. Ct. 1987).  Here, in contrast, plaintiffs *benefited* by being permitted to make reduced mortgage payments, while remaining in their homes.  (*See* Section I.A, *supra*.) Plaintiffs suffered no legal detriment —that is, they have given up nothing that they were previously entitled to retain —through their participation in the TPP.  (*Id.*)  *See Cavanaugh v. United States*, 640 F. Supp. 437, 440 (D. Mass. 1986) (applying the same definition of "legal detriment" in the context of promissory estoppel as in the context of consideration).

Furthermore, the purported "promise" on which plaintiffs base their claim is, at best, an unenforceable agreement to agree.  "In order to establish the existence of an enforceable promise, the plaintiff must show that the defendants' promise included enough essential terms so that a contract including them would be capable of being enforced."  *Moore v. La-Z-Boy, Inc.*, 639 F. Supp. 2d 136, 142 (D. Mass. 2009).  Here, any purported promise of a permanent loan modification would lack, as a matter of law, the material terms required for an enforceable loan, such as interest rate, loan duration, and method of repayment.  (*See* Section I.C, *supra*.)  That fatal flaw does not vanish merely because plaintiffs assert their claim as one for promissory estoppel rather than one for breach of contract.  *See Fontneau v. Town of Sandwich*, 251 F. Supp. 2d 994, 1003 (D. Mass. 2003) (lack of "such material terms as duration and price" in the alleged promise "is as fatal to [plaintiff's] promissory estoppel claim as it is to his contract claim"); *Gabovitch v. Mercury Records*, No. 93-2384, 1998 Mass. Super. LEXIS 459, at *9 (Mass. Super.

Ct. Aug. 26, 1998) (rejecting promissory estoppel claim because promise was a mere "agreement to agree" lacking essential terms).  The promissory estoppel claim must be dismissed.

## IV.    PLAINTIFFS' CHAPTER 93A CLAIM (COUNT IV) FAILS AS A MATTER OF LAW AS WELL.

### A.    Plaintiffs Have Not Satisfied the Jurisdictional Requirement of Sending a Valid Demand Letter.

The Chapter 93A claim fails as a matter of law because none of the plaintiffs who assert this claim satisfied the jurisdictional prerequisite of sending a Chapter 93A demand letter before commencing suit.  M.G.L. c. 93A § 9(3); *see also Ball v. Wal-Mart, Inc.*, 102 F. Supp. 2d 44, 54 (D. Mass. 2000) (demand letter is an "absolute prerequisite to an action asserted under G.L. c. 93A, § 9"); *McMahon v. Digital Equip. Corp.*, 944 F. Supp. 70, 77 (D. Mass. 1996) (failure to send a demand letter "is fatal on a motion to dismiss").

On March 4, 2010, *after* initiating this action, plaintiff Ramiza Durmic and two other persons who are no longer parties to this action, Aziz Isaak and Nadia Mohamed, sent a Chapter 93A demand letter to Chase.  (FAC Ex. 13 at p. 2.)  That letter did not identify any other person by name or by the factual circumstances surrounding his or her claims.  (*Id.*)  Chase made offers of permanent modifications to all three petitioners, including Ms. Durmic.  Ms. Durmic has conditionally accepted the offer (FAC ¶ 67), and does not bring a Chapter 93A claim.  Mr. Isaak and Ms. Mohamed have accepted their offers too and have been dropped from the FAC. (*Compare* Compl. *with* FAC.)  However, on June 10, 2010, an amended complaint was filed naming four new plaintiffs: the Treannies, Ms. Licata, and Ms. Rodrigues, each of whom now asserts a Chapter 93A claim against Chase.  (FAC ¶¶ 163-64.)  These four new plaintiffs, none of whom were mentioned in the March 4 letter either by name or by a description of their factual circumstances, now purport to rely upon the March 4 letter to satisfy the statutory prerequisite.

The new plaintiffs' attempt to rely on the March 4 letter contravenes Chapter 93A's express requirement that the demand letter "identify[] the claimant and reasonably describe[] the unfair or deceptive act or practice relied upon and the injury suffered." M.G.L. c. 93A § 9(3). The FAC argues that the March 4 letter was sent not only on behalf of the persons actually named therein —Durmic, Isaak, and Mohamed —but also on behalf of "a group of similarly situated individuals," and that the Treannies, Licata and Rodrigues happen to be part of that group. (FAC ¶ 169.) But that does not satisfy Chapter 93A's statutory requirements that the demand letter identify *each* claimant and describe his or her injury. "[I]n judging the sufficiency of such a precertification demand letter, [Massachusetts courts] look solely to the description of the *individual claimant's* own injury, and the central issue in this case becomes whether the demand letter sufficiently described the injury suffered by the plaintiff *herself*." *Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068, 1075 (Mass. App. Ct. 2006) (emphasis added).

To adopt plaintiffs' position would not only violate Chapter 93A's express language, but it would also undercut the two purposes of the demand letter requirement: (i) to encourage negotiation and settlement, and (ii) to limit damages by capping recoverable damages at the amount of the defendant's reasonable tender. *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 779 (Mass. 1975). Chase could not have engaged in settlement negotiations with the Treannies, Ms. Licata, or Ms. Rodrigues, or tendered reasonable offers to them, on the basis of the March 4 letter because the letter gave Chase no notice of their identities and provided no details of their alleged injuries or the damages they sought. *See Richards*, 850 N.E.2d at 1075. To hold otherwise would permit plaintiffs' counsel to circumvent Chapter 93A's demand letter requirement by planning in advance to hold certain plaintiffs in the wings to leap into the suit after others have accepted Chapter 93A offers and decided to settle their claims.

### B.      In Any Event, Plaintiffs' Chapter 93A Claim Fails as a Matter of Law Because It Is Derivative of Plaintiffs' Breach of Contract Claim.

Even if the new plaintiffs had met the statutory demand letter requirement, their Chapter 93A claim would still fail as wholly derivative of their contract claim. *See Park Drive Towing, Inc. v. City of Revere*, 809 N.E.2d 1045, 1050 (Mass. 2004) (where Chapter 93A claim was "derivative of [plaintiff's] breach of contract claim," the Chapter 93A claim "must fail" "[i]n light of our conclusion that no contract existed between the parties"); *Pimental v. Wachovia Mortg. Corp.*, 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("Since [plaintiff] has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding [defendant] liable under Chapter 93A.").

Here, all of the alleged bases of the Chapter 93A claim either fail as a matter of law or are derivative of plaintiffs' breach of contract claim:

- Although plaintiffs point to "wrongful foreclosures" (FAC ¶ 166), plaintiffs do not allege that any of their homes were foreclosed. Rather, the FAC alleges only, on information and belief, that some putative class members suffered foreclosures. That is legally insufficient. (*See* Section I.B, *supra*).

- Plaintiffs point to "increased fees and other costs to avoid or attempt to avoid foreclosure." (FAC ¶ 166.) Again, none of the plaintiffs asserting Chapter 93A claims alleges that Chase attempted to foreclose on his or her property.

- The heart of plaintiffs' Chapter 93A claim is their alleged entitlement to receive a permanent loan modification under HAMP pursuant to the TPPs. (FAC ¶ 166 (alleging "less favorable loan modifications," "loss of savings in fruitless attempts to secure loan modifications," and "loss of opportunities to pursue other refinancing or loss mitigation strategies".) Those allegations are wholly derivative of plaintiffs' contract claim.

- Finally, plaintiffs refer to "significant stress and emotional distress." (FAC ¶ 166.) The only factual allegation supporting this claim is the alleged stress caused by not knowing if their reduced mortgage payments were temporary or permanent. (FAC ¶ 147.) Because that allegation is grounded in a claimed entitlement to receive a permanent loan modification, it too is derivative of plaintiffs' breach of contract claim.

Plaintiffs cannot save their contract claim by trying to reframe it as a Chapter 93A claim.

### V.   THREE OF THE NAMED PLAINTIFFS DO NOT ALLEGE THAT THEY HAVE BEEN DENIED PERMANENT MODIFICATIONS, AND THUS DO NOT STATE ANY CLAIMS.

Even if plaintiffs could overcome the legal hurdles that bar each of their claims as a matter of law, three of the named plaintiffs face yet another problem:  they do not allege that they were, in fact, denied permanent modifications.  Each of plaintiffs' claims rests upon a purported refusal by Chase to offer a permanent loan modification.  (FAC ¶ 127 (defining the putative class as those who "complied with their obligations under a written TPP Agreement, but have not received a permanent HAMP modification"); *see also* ¶¶ 145, 152.g, 158, 166.)

The allegations of the FAC, however, establish that named plaintiff Ramiza Durmic has, in fact, received an offer of permanent modification.  The FAC admits that "Chase made an offer of a permanent modification to Ms. Durmic, the terms of which have been conditionally accepted subject to a request for an accounting and receipt of documentation." (FAC ¶ 67.)  Similarly, Donald and Heather Treannie do not allege that Chase denied them a permanent modification.  They allege only that their TPP "has not resulted in any determination." (FAC ¶ 87.)

The FAC hints that the Treannies and Ms. Durmic may attempt to resuscitate their claims by arguing that the TPPs somehow guarantee a permanent loan modification before the end of the Trial Period.  (FAC ¶ 87.)  The allegations of the FAC, however, do not identify any language in the TPPs to that effect.  There is no such language.  (*See* FAC Exs. 8, 9.)  Indeed, the

TPPs state the opposite:  that no permanent modification can be provided until after the Trial

Period ends.  "I understand that the Plan is not a modification of the Loan Documents and that

the Loan Documents will not be modified unless and until . . . the Modification Effective Date

has passed."  (FAC Ex. 8 at p. 11 ¶ 2.G; FAC Ex. 9 at p. 4 ¶ 2.G.)  "Modification Effective Date"

is defined as the end of the Trial Period.  (FAC Ex. 8 at p. 10 ¶ 2; FAC Ex. 9 at p. 3 ¶ 2.)

In sum, even if plaintiffs could allege the basic elements of Counts I through IV of the

FAC, the claims of the Treannies and Ms. Durmic should still be dismissed, because those

plaintiffs do not allege that Chase has refused their requests for permanent loan modifications.

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed.

Dated: July 12, 2010                                  Respectfully submitted,
                                                      JPMorgan Chase Bank, N.A.,
                                                      By its attorneys,


                                                       /s/ Donn A. Randall
                                                      Donn A. Randall, BBO# 631590
                                                      Matthew A. Kane, BBO# 666981
                                                      Bulkley, Richardson and Gelinas, LLP
                                                      98 North Washington St.,Suite 500
                                                      PO Box 9750
                                                      Boston, MA  02114-0016
                                                      Telephone: (617) 368-2520
                                                      Facsimile: (617) 368-2525
                                                      drandall@bulkley.com
                                                      mkane@bulkley.com

                                                      OF COUNSEL:
                                                      Michael J. Agoglia (CA SBN 154810)
                                                      Wendy M. Garbers (CA SBN 213208)
                                                      MORRISON & FOERSTER LLP
                                                      425 Market Street
                                                      San Francisco, California  94105-2482
                                                      Telephone: (415) 268-7000
                                                      Facsimile: (415) 268-7522
                                                      magoglia@mofo.com
                                                      wgarbers@mofo.com

## **CERTIFICATE OF SERVICE**

I, Matthew A. Kane, hereby certify that a true copy of the foregoing document was served upon all counsel of record via this Court's CM/ECF system or, if not registered on this Court's CM/ECF system, then via first class mail, postage prepaid, on July 12, 2010.

 /s/ Matthew A. Kane
Matthew A. Kane