**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **RAMIZA DURMIC, DONALD TREANNIE, HEATHER TREANNIE, JEAN LICATA AND ARSENIA RODRIGUES, on behalf of themselves and all others similarly situated,**<br><br>      **Plaintiffs,**<br>**vs.**<br><br>**J.P. MORGAN CHASE BANK, N.A.**<br><br>      **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO. 1:10-CV-10380-RGS**<br><br><br>**Leave to File Granted July 12, 2010** |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

Table Of Authorities .................................................................................................ii

I. INTRODUCTION ................................................................................................1

II. BACKGROUND:  LANGUAGE OF THE CONTRACT & ALLEGATIONS ..............3

III. LEGAL STANDARD.........................................................................................5

IV. ARGUMENT ....................................................................................................5

    A.  Chase Mischaracterizes Plaintiffs' Legal Position ............................................5

        1. The HAMP Cases Chase Cites Have No Bearing on a Claim for
        Breach of the TPP Agreement between Chase and its Borrowers ...............6

        2.  Chase Distorts Plaintiffs' Position Regarding Eligibility ........................7

    B.  Plaintiffs Have Stated a Claim for Breach of Contract ......................................8

        1. Plaintiffs Have Adequately Alleged Consideration ...................................8

        2.  Plaintiffs Sufficiently Allege Damages ...................................................13

        3.  The TPP Agreements Are Complete, Enforceable Contracts .................15

    C.  Plaintiffs Have Stated a Claim for Breach of the Covenant of Good
    Faith and Fair Dealing ...................................................................................17

    D.  Plaintiffs Have Made Allegations Sufficient to Entitle Them to Relief
    Based Upon Promissory Estoppel ...................................................................19

    E.  Plaintiffs Adequately State a Claim for Relief Under G.L. c. 93A ...................19

        1. Plaintiffs Adequately Met the Demand Letter Requirement
        of G.L. c. 93A.........................................................................................19

        2.  Plaintiffs' 93A Claims are Independent of Their Contract Claims ........22

    F.  Plaintiffs Did Not Receive a Modification Agreement by the Date Promised ....25

V.  CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Armstrong Pharmaceuticals, Inc. v. Micron Technologies, Inc.*,
   Civil Action No. 09-11197-RWZ, 2010 WL 745057 (D. Mass. Feb. 25, 2010) ..................... 5

*Baldassari v. Public Fin. Trust*,
   369 Mass. 33 (1975) ............................................................................................... 20, 22

*Brooks v. White*,
   43 Mass. 283 (1841) ...................................................................................................... 12

*Bucholz v. Green Bros. Co.*,
   272 Mass. 49 (1930) ...................................................................................................... 14

*Cavanaugh v. U.S. Government*,
   640 F. Supp. 437 (D. Mass. 1986) ................................................................................. 19

*Chalfin v. Beverly Enterprises, Inc.*,
   741 F. Supp. 1162 (E.D. Pa. 1989) ................................................................................. 7

*Clark v. Gulesian*,
   197 Mass. 492 (1908) .................................................................................................... 14

*Commonwealth v. Fremont Investment & Loan*,
   452 Mass. 733 (2008) ...................................................................................................... 7

*Daddario v. City of Pittsfield*,
   301 Mass. 552 (1938) .................................................................................................... 13

*Deposit Guaranty Nat. Bank v. Roper*,
   445 U.S. 326 (1980) ....................................................................................................... 22

*Dodd v. Commercial Union Ins. Co.*,
   373 Mass. 72 (1977) ...................................................................................................... 23

*Don v. Soo Hoo*,
   75 Mass. App. Ct. 80 (2009) .......................................................................................... 15

*Emerson v. Deming*,
   304 Mass. 478 (1939) .................................................................................................... 12

*Escobedo v. Countrywide Home Loans, Inc.*,
   No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017 (S.D. Cal. Dec. 15, 2009) .......................... 6

*Evans v. Yegen Associates, Inc.*,
   556 F. Supp. 1219 (D.Mass.1982) .................................................................................. 14

*Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*,
   15 Mass. App. Ct. 992, 448 N.E.2d 70 (1983) ................................................................. 9

*FAMM Steel, Inc. v. Sovereign Bank*,
   571 F.3d 93 (1st Cir. 2009) ............................................................................................ 18

*Faulkner v. Onewest Bank*,
   No. 3:10-CV-12, 2010 WL 2472275 (N.D.W.Va., June 16, 2010) ................................... 2, 13

*George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*,
   283 Mass. 383 (1933) .......................................................................................................... 17

*Hacker v. Nitschke*,
   310 Mass. 754 (1942) .......................................................................................................... 13

*Hagan v. Riley*,
   13 Gray 515 (Mass. 1859) ................................................................................................... 14

*In re Lloyd, Carr and Co.*,
   617 F.2d 882 (1st Cir. 1980)................................................................................................ 12

*Kattar v. Demoulas*,
   433 Mass. 1 (2000) .............................................................................................................. 23

*Langston v. LaBrecque*,
   25 Mass. App. Ct. 463 (1988).............................................................................................. 23

*Liss v. Studeny*,
   450 Mass. 473 (2008) .......................................................................................................... 19

*Lowell Gas Co. v. Attorney General*,
   377 Mass. 37 (1979) ...................................................................................................... 23, 24

*Marine Contractors Co., Inc. v. Hurley*,
   365 Mass. 280 (1974) .......................................................................................................... 12

*Marks v. Bank of Am,, N.A.*,
   No. 03:10-cv-08039-PHX-JAT, 2010 U.S. Dist. LEXIS 61489 (D. Ariz. June 22, 2010) ...... 6

*Massachusetts v. Mylan Laboratories*,
   608 F.Supp.2d 127 (D.Mass. 2008) ..................................................................................... 18

*Park Drive Towing v. City of Revere*,
   442 Mass. 80 (2004) ............................................................................................................ 23

*Pimental v. Wachovia Mortgage Corp.*,
   411 F. Supp. 2d 32 (D. Mass. 2006) .................................................................................... 23

*Purity Supreme, Inc. v. Attorney Gen.*,
   380 Mass. 762 (1980) .......................................................................................................... 24

*Richards v. Arteva Specialties S.A.R.I.*,
   66 Mass. App. Ct. 726 (2006).............................................................................................. 20

*Schubach v. Household Finance Corp.*,
   375 Mass. 133 (1978) .......................................................................................................... 23

*Singarella v. City of Boston*,
   342 Mass. 385 (1961) .......................................................................................................... 14

*Speakman v. Allmerica Financial Life Ins.*,
   367 F. Supp. 2d 122 (D. Mass. 2005) .................................................................................. 17

*T.W. Nickerson, Inc. v. Fleet Nat. Bank*,
  456 Mass. 562 (2010) ................................................................... 17

*Targus Group Intern., Inc. v. Sherman*,
  76 Mass.App.Ct. 421 (2010) ......................................................... 17

*Tufankjian v. Rockland Trust Co.*
  57 Mass.App.Ct. 173 (2003) ......................................................... 18

*Turnpike Motors, Inc. v. Newbury Group, Inc.*,
  413 Mass. 119 (1992) ................................................................... 19

*U.S. v. Boston Scientific Corp.*,
  167 F. Supp. 2d 424 (D. Mass. 2001) ........................................... 16

*United States v. President and Fellows of Harvard College*,
  323 F. Supp. 2d 151 (D. Mass. 2004) ....................................... 7, 16

*V. & F.W. Filoon Co. v. Whittaker Corp.*,
  12 Mass. App. Ct. 932, 425 N.E.2d 399 (1981) ............................. 9

*Weiner v. Pictorial Paper Package Corp.*,
  303 Mass. 123 (1939) ................................................................... 16

*Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc.*,
  56 Mass. App. Ct. 853 (2002) ....................................................... 24

*Williams v. Geithner*,
  No. 09-1959, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009) ........... 6, 11

*Wit v. Commercial Hotel Co.*,
  253 Mass. 564, 572 (1925) ........................................................... 10

**Statutes**

G.L. c. 93A ........................................................................ 7, 19, 22, 23, 24
12 U.S.C. § 5211 ............................................................................ 1

**Other Authorities**

*Restatement (Second) Contracts* §205 ................................... 10, 17

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................. 5

**Treatises**

Samuel Williston, *A Treatise on the Law of Contracts* §7:4 (4th ed. 2008) ........... 10, 12

**Regulations**

940 C.M.R. ................................................................................. 25

## I.      INTRODUCTION

Plaintiffs Ramiza Durmic, Donald Treannie, Heather Treannie, Jean Licata and Arsenia Rodrigues, on behalf of themselves and all others similarly situated ("Plaintiffs") hereby oppose the Motion to Dismiss of Defendant J.P. Morgan Chase Bank, NA. ("Defendant" or "Chase").  The goal of this case is simple – Chase has routinely broken promises it made in written contracts to modify mortgages.  Unnecessary and inappropriate foreclosures on Massachusetts families result. Chase's failure to honor its obligations thus has and will continue to have tragic consequences.

In 2009, recognizing a national economic calamity of unprecedented scope, the federal government created a program – the Home Affordable Modification Program or "HAMP" -- explicitly designed to prevent foreclosures.  For privately held loans, participation by mortgage servicers in this program was voluntary and indeed, Chase signed up to participate.[1]  The aim of the program is to provide incentives for servicers to modify loans.  The modifications are intended to make home mortgages affordable for borrowers who have already defaulted or who attest to an imminent risk of default.  The form contract that lies at the heart of this case, known as the Trial Period Plan ("TPP") Agreement, draws on HAMP as the source of its governing principles.

Plaintiffs in this matter are united by a common factual circumstance – each of them was determined by Chase to be eligible and qualified for a Home Affordable Modification,[2] and each executed a binding TPP Agreement with Chase with an explicit bargained-for exchange -- if a homeowner complied with their TPP Agreement, Chase promised to tender them a permanent loan modification with definite terms upon completion of the three-month trial period.  Each of the Plaintiffs delivered on their end of the bargain – complying with the TPP Agreement's

---

[1] Although Chase's participation was voluntary, it was done against the backdrop of its acceptance of $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  *See* Complaint [Docket No. 4] ("FAC" or "Complaint") at ¶ 3.

[2] "Home Affordable Modification" is a technical term used in the TPP Agreements and refers to a permanent loan modification the terms of which are determined in accordance with the HAMP Program Documentation. *See* discussion in Section A. 3, *infra*.

certifications, making the payments promised and providing the documentation requested, which verified their eligibility.  Yet none of the Plaintiffs were tendered permanent modification offers upon completion of the three-month trial period, as promised.

Chase mischaracterizes Plaintiffs' legal positions, ignoring the allegations in the Complaint as well as Defendant's own statements about HAMP and the language of the TPP Agreement itself. Contrary to Chase's assertions, TPP Agreements are only given to borrowers who are determined eligible for HAMP and pass the Net Present Value ("NPV") test[3] on the basis of the information they initially report.[4]  The TPP Agreements state that borrowers who fail to provide verification for the oral information used to find them eligible, or whose representations are not true in any material respect *are not in compliance with the TPP Agreement*.  Such borrowers fall outside the parameters of this case.  The Complaint limits the claims at issue to borrowers who *are* in compliance with the TPP Agreement  - meaning those who have provided verification of all information that was used to find them eligible for HAMP, whose information was therefore truthful and correct at all times, and who have made their required trial payments. FAC at ¶¶ 63, 86, 102, 117, 123.  Such borrowers necessarily will qualify for a Home Affordable Modification at the close of the Trial Period.  Each Plaintiff alleges that he or she complied with *all* conditions of the TPP Agreement. Thus, Chase's speculation that Plaintiffs might not be qualified for Home Affordable Modifications is a factual dispute and not appropriate to a motion to dismiss.[5]

Chase's other arguments are also flawed.  Plaintiffs have alleged facts sufficient to support

---

[3] The NPV test, discussed in more detail below, is a threshold eligibility determination that a HAMP modification will be in the financial interest of the owner of the loan, on whose behalf Chase is acting.
[4] Chase essentially acknowledges this point in their motion papers.  *See* Chase's Memorandum in Support of Motion to Dismiss [Docket No. 12] ("Mot.") at 4-5.
[5] Just last month, the U.S. District Court for the Northern District of West Virginia denied a servicer's motion to dismiss a breach of contract claim brought by borrowers to enforce a HAMP modification agreement. *Faulkner v. Onewest Bank*, No. 3:10-CV-12, 2010 WL 2472275 (N.D.W. Va. June 16, 2010). The court rejected the servicer's claim that the Modification Agreement was conditional upon verification of the plaintiffs' income, and thus unenforceable.

2

their legal claims of breach of contract, breach of the covenant of good faith and fair dealing,

promissory estoppel and violation of G.L. c 93A, and those claims should not be dismissed.

## II.    BACKGROUND:  LANGUAGE OF THE CONTRACT AND PLAINTIFFS' ALLEGATIONS

The TPP Agreement that lies at the center of this dispute is a form contract between

Plaintiffs and the servicer of their mortgages.  The relevant language is identical for each borrower.

*See* FAC Exhibits 8, 9, 10, 12.[6]  The promise on which Plaintiffs' claims rest is the first sentence of

the TPP Agreement:

> If I am in compliance with this Trial Period Plan, and my representations in Section 1 [regarding verification of information] continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3. . . .

FAC, Ex. 9 at 1.

This promise is repeated and referenced in different forms and at different places throughout

the TPP Agreement.  For example, Section 2(G) states:

> I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements of this Plan.

And again, Section 3 states:

> If I comply with the requirements in Section 2 [i.e., regarding payment], and my representations in Section 1 [i.e., regarding certifications identified below], continue to be true in all material respects, the Lender *will send me a Modification Agreement* for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

(emphasis added).

Last, Chase's implied assertion that it is entitled to an ongoing period beyond the three-

---

[6] For convenience, this Opposition will cite to the TPP Agreement attached to the FAC as Exhibit 9. Exhibits 8, 10 and 12 are also TPP Agreements and contain the same language.

month trial period in which to continue evaluating Plaintiffs' eligibility is belied by the express language of the TPP Agreement itself.  *See* FAC, Ex. 9 at § 2(A) ("TIME IS OF THE ESSENCE" ).

Each Plaintiff was uniformly affected by Chase's conduct.  Each of the named plaintiffs completed the HAMP application process, were determined initially eligible for HAMP, passed the NPV test and were tendered TPP Agreements.  FAC at ¶¶ 48-50 (Durmic), ¶¶ 72-73 (Treannies), ¶ 93-94 (Licata), ¶ 109-110 (Rodrigues).  Each of the named plaintiffs executed and returned the TPP Agreement that was offered to them.  FAC at ¶ 50 (Durmic), ¶ 74 (Treannies), ¶ 95 (Licata), ¶ 111 (Rodrigues).  Each of the named plaintiffs made the payments called for under the TPP Agreement, and indeed, continued payments after the TPP ended.  FAC at ¶ 54 (Durmic), ¶ 78 (Treannies), ¶ 98 (Licata), ¶ 115 (Rodrigues).  Last, each named plaintiff fully complied with all documentation requests made to them (FAC at ¶ 64 (Durmic), ¶ 83 (Treannies), ¶ 99 (Licata), ¶ 116 (Rodrigues)) and with all other terms of the TPP Agreements (FAC at ¶ 63 (Durmic), ¶ 86 (Treannies), ¶ 102 (Licata), ¶ 123 (Rodrigues)).

Based on their eligibility and performance under the TPP Agreements, Chase was required to tender each Plaintiff a Home Modification Agreements, permanent loan modifications with payment terms determined according to HAMP, by the close of the three month trial periods, to be effective the first day of the month following the trial period.[7]  Chase not only failed to tender permanent modifications to the named Plaintiffs by the close of the trial period, it also neglected to send Plaintiffs any written decision within that timeframe. FAC at ¶ 65 (Durmic), ¶ 84 (Treannies), ¶ 100 (Licata), ¶¶ 117, 119 (Rodrigues).[8]  Instead, Plaintiffs were the targets of redundant,

---

[7] This timeframe is established by the TPP Agreement, which defines the "Modification Effective Date" as the first day of the month following the month in which the last Trial Period Payment is due, provides that "time is of the essence under this plan" and requires that the borrower receive the Modification Agreement prior to the Modification Effective Date.  *See* FAC, Ex. 9 at 2.
[8] Plaintiff Ramiza Durmic has now been tendered a permanent loan modification and reached a settlement in principle to dismiss her claims.  Once the settlement process has been finalized, she will take appropriate action to be dropped from the case.

ambiguous and threatening demands for documents.  FAC at ¶¶ 59-62 (Durmic), ¶¶ 80-82

(Treannies), ¶¶ 103 (Licata).  At least one Plaintiff was also subjected to improper foreclosure

threats and processes.  FAC at ¶¶ 55-58.

### III.    LEGAL STANDARD

In order to survive a motion to dismiss, the complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face.  *See Armstrong*

*Pharmaceuticals, Inc. v. Micron Technologies, Inc*., Civil Action No. 09-11197-RWZ, 2010 WL

745057 at *1 (D. Mass. Feb. 25, 2010) (Zobel, J.) *quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

(2009).  If the facts as pled allow the Court to draw a reasonable inference that the Defendant is

liable for alleged misconduct, the motion to dismiss must be denied.  *Id*.  Such is the case here.

Repeatedly, Chase's memorandum ignores the standard for dismissal under Fed. R. Civ. P.

12(b)(6), inappropriately disputing multiple allegations of the Complaint.  As discussed above,

Chase's repeated speculation that some Plaintiffs may ultimately be ineligible for permanent loan

modifications, *see* Mot. at 2, 8-9, is inconsistent with the requirement that factual allegations in the

Complaint must be taken as true for the purposes of this motion.  Similarly, Chase's assertion that

none of the named Plaintiffs were subjected to foreclosure activity during their TPPs (Mot. at 23) is

flatly contradicted by allegations in the FAC.  FAC at ¶¶ 55-58.

### IV.    ARGUMENT

### A.    Chase Mischaracterizes Plaintiffs' Legal Position

Chase's motion misleads the Court in at least two important respects.  First, Plaintiffs have

not brought suit to enforce HAMP based on a third-party beneficiary or due process claims, as

might be implied from the content of the section of Chase's brief entitled "Prior Litigation to

'Enforce' HAMP."  Nor do Plaintiffs assert that HAMP or its enabling legislation contain a private

right of action.  Rather, Plaintiffs assert breach of contract claims for violations of the TPP

Agreements between themselves and Chase.  Second, Plaintiffs do not assert, as Chase suggests, that every borrower who executes a TPP Agreement is automatically entitled to a permanent loan modification.  There are limited situations – not at issue here - where Chase might legitimately deny a borrower after the TPP Agreement has been executed.

> ### *1.  The HAMP Cases Chase Cites Have No Bearing on a Claim for Breach of the TPP Agreement between Chase and its Borrowers*

Not a single one of the HAMP cases cited by Chase depends on the form contract that is at the center of this dispute.  Instead, the cases cited by Chase stand for one of three propositions. First, Chase cites cases brought on the theory that the contract *between the servicer and the Treasury Department* is intended to benefit borrowers.  *See, e.g., Escobedo v. Countrywide Home Loans, Inc.*, No. 09-cv-1557, 2009 U.S. Dist. LEXIS 117017, at *4-7 (S.D. Cal. Dec. 15, 2009). Plaintiffs do not bring that claim.  The contracts at issue in the Complaint are altogether different – they are the agreements directly between the borrowers and Chase.  Second, Chase cites opinions that have rejected claims based on due process theories.  *See, e.g., Williams v. Geithner*, No. 09-1959, 2009 U.S. Dist. LEXIS 104096 (D. Minn. Nov. 9, 2009).  Plaintiffs here have not brought that claim either.  Third, Chase cites cases holding that HAMP and its enabling legislation does not provide for a private right of action.  *See, e.g., Marks v. Bank of Am,, N.A.*, No. 03:10-cv-08039-PHX-JAT, 2010 U.S. Dist. LEXIS 61489 (D. Ariz. June 22, 2010).  Plaintiffs do not seek to enforce HAMP directly, but rather seek to enforce the contracts that promise them a HAMP modification in the circumstances present here.

Chase's accusation that Plaintiffs here are performing an "end-run" around the lack of a private cause of action in HAMP is misleading and wrong.  It is clear that Plaintiffs have not brought a cause of action under HAMP because their claims do not arise unless and until the TPP

Agreement is breached.  It is the contract – not HAMP – that Plaintiffs seek to enforce.[9]  Of course,

the contract was formed in the context of Chase's participation in HAMP, and thus the program

provides background necessary to understand the terms of the TPP Agreement.  *See* Section II &

n.2, *supra*.  Yet, it is black letter law that the Court is free to look to extrinsic sources to supply a

reasonable construction of an ambiguous or missing term in a contract.  *See United States v.

President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 172 (D. Mass. 2004) (Court

allowed extrinsic evidence to resolve the meaning of a term in a cooperative agreement between

parties).

### 2.       *Chase Distorts Plaintiffs' Position Regarding Eligibility*

The second important manner in which Chase distorts Plaintiffs' claims involves the

question of eligibility.  With its characterization of Plaintiffs' position, Chase suggests that a

borrower's evaluation for HAMP remains open-ended after the TPP Agreement has been executed

by the borrower.  This is not so.  The Complaint describes the HAMP contracts at issue here as

involving a two-step process in which the borrower is determined eligible for HAMP based on

information collected by Chase prior to the TPP Agreement being sent.  FAC ¶¶ 39-40.  In other

words, if a borrower has received a TPP Agreement, he has already been determined initially

eligible for the program.  FAC, Ex. 2 at 17-18.  That determination is subject to confirmation in the

form of the trial period, during which Chase is permitted to validate the information that it used to

---

[9] Simply because the contract at issue here was made as part of a federal program, drawing on that program
as the source of certain principles of the agreement, does not render it unenforceable.  Were the case
otherwise, a court would not be able to enforce a contract touching on issues of federal law, where that law
was devoid of a private right of action.  This is not so.  *See, e.g., Chalfin v. Beverly Enterprises, Inc.*, 741 F.
Supp. 1162, 1178 (E.D. Pa. 1989) (ruling that genuine issues of material fact exist on claim for breach of
nursing home resident's contract made in context of federal and state health care laws that did not contain a
private cause of action).  Moreover, Massachusetts courts regularly look to federal sources of law that are not
independently enforceable as a means of determining the standard governing unfairness under G.L. c. 93A.
*See Commonwealth v. Fremont Investment & Loan,* 452 Mass. 733, 744-46 & n.20 (2008) (citing, *inter alia*,
an advisory letter from the Office of the Comptroller of the Currency and a cease and desist order from the
FDIC).

decide eligibility if it has not already done so, and the borrower is given the opportunity to show that it can make the estimated payments for three months. *Id.* If the information on which the initial decision was made is verified, the borrower is necessarily still eligible for a HAMP modification. If the borrower also makes all three of her payments during the trial period, as is the case with the named plaintiffs and the putative class, then Chase is required to tender the permanent modification. *See* Section II*, supra.* The named plaintiffs and the putative class here consists of borrowers who have fully complied with the terms of the TPP Agreement and have therefore met the conditions necessary to receive permanent modifications.

Most importantly for present purposes, the nature of Chase's attack is wholly inappropriate at this stage of the litigation. Chase's distortion is based on its speculation that "[a]lthough reliance on the applicant's initial, verbal representations allowed servicers to expedite the TPP process, it also resulted in some borrowers, who were originally extended TPPs, being ultimately found ineligible for permanent modifications, once their information was later verified." Mot. at 5. This does not describe the facts applicable to any of the Named Plaintiffs, facts which must be accepted as true for the purposes of the present motion. Had Chase appropriately found a named plaintiff to be ineligible for a permanent modification based on a disparity between the information used to determine eligibility and the verification documents, Chase surely will have ample opportunity to so demonstrate as the case progresses.[10]

**B.**   **Plaintiffs Have Stated a Claim for Breach of Contract**

*1.*   *Plaintiffs Have Adequately Alleged Consideration*

---

[10] Although inquiry into these matters is not yet appropriate, Plaintiffs concede that there may exist a limited number of Chase borrowers – not including themselves --who will not ultimately be eligible to execute permanent modifications because of a change in circumstances that occurs during the trial period. Such borrowers would be ineligible to execute permanent modifications because the form contract used to effect permanent modifications – not yet a part of the record in this case – requires the borrowers to certify that the information on which their eligibility was determined continues to be true in all material respects. This issue will be part of the parties' class certification briefing.

The TPP Agreement is supported by legally sufficient consideration. The requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee. *Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority*, 15 Mass. App. Ct. 992, 993, 448 N.E.2d 70, 73 (1983) (citing Restatement (Second) of Contracts § 73, Cmt. b (1979)). The adequacy of the consideration (its monetary value) is not relevant, so long as there is some consideration. *V. & F.W. Filoon Co. v. Whittaker Corp.*, 12 Mass. App. Ct. 932, 933, 425 N.E.2d 399, 400 (1981).

Plaintiffs have adequately alleged consideration here, both in the form of a benefit to the promisor and in the form of a detriment to the promisee. Plaintiffs' allegations that they made payments in an amount and manner different from that required by their pre-existing loan documents and complied with the other terms of the TPP Agreements, all of which actions were requested by Chase and none of which were pre-existing legal obligations, are sufficient to establish consideration for Chase's promises to provide Home Affordable Modifications.

Compliance with the TPP Agreement results in legal detriment to the Plaintiffs of two general types.  First, the borrower is required to provide extensive financial information, make binding representations concerning his or her personal circumstances and agree to undergo credit counseling.  FAC, Ex. 9 at 1.  The borrower may also be required to make payments into a newly established escrow account, if one did not already exist.  FAC Ex. 2 at 11.  Satisfaction of these conditions was requested of Plaintiffs by Chase in the TPP Agreement, and, as discussed below, they improve Chase's position for the purposes of underwriting the modification and for ultimate payment of the loan as modified.  Before entering into the TPP Agreements, Plaintiffs had no obligation to fulfill these conditions.  Thus, they are legal detriments to the Plaintiffs – completely apart from any payment of money towards the pre-existing debt – and constitute consideration for Chase's promises to provide Home Affordable Modifications.  "[I]t is a sufficient *legal* detriment to

the promissee if it promises or performs any act, regardless of how slight or inconvenient, which it is not obligated to promise or perform so long as it does so at the request of the promisor and in exchange for the promise." Samuel Williston, *A Treatise on the Law of Contracts* §7:4 (4th ed. 2008) (emphasis in original). *See also*, *Wit v. Commercial Hotel Co.*, 253 Mass. 564, 572 (1925) ("It would be a detriment to the promisee, in a legal sense, if he, at the request of the promisor and upon the strength of that promise, had performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obliged to perform.")

Second, the fact that Plaintiffs are required to make payments in specific amounts requested by Chase and differing from their prior obligation independently satisfies the requirement of consideration (and further distinguishes this case from the partial payment cases discussed below). The TPP Agreement is an exchange of mutual promises to alter the timing and conditions of payment of a debt. Such mutually agreed changes in performance constitute consideration:

> Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration; *but a similar performance is consideration if it differs from what was required by the duty in a way which reflects more than a pretense of bargain*.

Restatement (Second) of Contracts § 73 (emphasis added). *See also id.*, illustration 7 ("Any payment by A at an earlier time, or in a different medium from that required by the duty, is consideration."); Williston, *supra*, §7:27 ("If a debtor does something more or different in character from that which it was legally bound to do, it will constitute consideration for the promise.")

Defendant acknowledges that TPP payments are different in amount from the payments Plaintiffs are obligated to make under their original loan documents. Mot. at 11. Furthermore, the TPP Agreement makes clear that Plaintiffs' payments are held in accounts maintained by servicers, instead of immediately applied to their loans, making them different in character from the payments Plaintiffs were otherwise obligated to make. FAC Ex. 9 at 2; Mot. at 12. Defendant itself acknowledges that the TPP payments do not satisfy Plaintiffs pre-existing legal obligations:

"Plaintiffs had a pre-existing legal obligation to make payments *as required by their loan documents*…. Participation in the TPPs did not relieve plaintiffs of their obligations to repay their loans." Mot. at 12 (emphasis added).  Nevertheless, Chase requested that Plaintiffs make TPP payments instead of paying the pre-existing loan obligation.  Thus, making the TPP payments is a legal detriment to Plaintiffs.[11]

Although it is unnecessary for Plaintiffs, in demonstrating the existence of consideration, to show that Chase also received a benefit from their performance, Chase was, in fact, benefitted. Chase performed an NPV test for each Plaintiff before offering a TPP Agreement.  Mot. at 4.  As Chase explains in the Motion to Dismiss, "[t]he NPV is essentially an accounting calculation to determine whether it is more profitable to modify the loan or allow the loan to go into foreclosure." Mot. at 4, citing *Williams v. Geithner*, 2009 U.S. Dist. LEXIS 104096 at *8-9 n.3 (D. Minn. Nov. 9, 2009).  If Chase did not expect to be benefitted by the TPP Agreements, it would not have extended them to Plaintiffs and requested Plaintiffs' compliance.

Other specific elements of Plaintiffs' performance also benefit Chase.  For instance, where borrowers are required to set up escrow accounts, Chase is benefitted because borrowers' risk of defaulting on property tax obligations is lessened, increasing the value of Chase's security interest. Credit counseling for borrowers is similarly beneficial to Chase, since it presumably reduces the risk of default.  Borrowers' provision of detailed financial information to Chase is also beneficial, since it should allow Chase to predict with greater certainty borrowers' ability to pay and likelihood

---

[11] In attempting to avoid the conclusion that making TPP Payments is a legal detriment to Plaintiffs, Defendant tries to characterize these circumstances as *beneficial* to Plaintiffs.  Mot. at 13.  Defendant completely ignores both the definition of "legal detriment" and the fact that Plaintiffs must pay every penny of their loan obligations and potentially more, not to mention the increased risk of foreclosure and damage to Plaintiffs' credit scores that result from the deepening arrearages.  Only if Defendant follows through on its promises and provides Plaintiffs with permanent loan modifications, will the lower payments made during the TPP period constitute a benefit to Plaintiffs.  "A promise or an act may be a detriment although *on balance* the promisor is making a good bargain. Thus a promise to pay £10,000 for a Rolls Royce worth £12,000, is nonetheless a detriment." Black's Law Dictionary (8th ed. 2004), detriment (quoting P.S. Atiyah, *An Introduction to the Law of Contract* 101 (3d ed. 1981)).

of default.  For borrowers who do not satisfy the terms of the TPP Agreement and therefore do not

receive a Home Affordable Modification, this information improves Chase's ability to make

intelligent decisions about other loss mitigation options.  A bargained-for benefit to the promisor,

even with no legal detriment to the promisee will render a bargain enforceable.  Williston, *supra*,

§7:5; *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280 (1974) (money paid to promisor was

sufficient consideration, even though it came from trust fund rather than from promissee, and was

thus not detrimental to promissee).

Defendant cites the rule that a debtor's partial payment on a debt is not consideration for the

creditor's promise to discharge the remainder of the debt.  Mot. at 11.  While this is an accurate

statement of a recognized exception to the general rule that any detriment or benefit constitutes

consideration, the pre-existing duty exception is narrow and is not applicable to the circumstances

alleged in this case:

> The foundation of the rule [that payment of a less sum is not consideration for
> relinquishing a legal right to the remainder] seems therefore to be, that in the case of
> the acceptance of a less sum of money in discharge of a debt, inasmuch as there is no
> new consideration, no benefit accruing to the creditor, and no damage to the debtor,
> the creditor may violate, with legal impunity, his promise to his debtor, however
> freely and understandingly made.  This rule, which obviously may be urged in
> violation of good faith, is not to be extended beyond its precise import; and
> whenever the technical reason for its application does not exist, the rule itself is not
> to be applied.

*Brooks v. White*, 43 Mass. 283, 285 (1841).  The very cases cited by Defendant to establish the rule

acknowledge its narrow applicability.  *In re Lloyd, Carr and Co.*, 617 F.2d 882, 890 (1st Cir. 1980)

("[E]xceptions are recognized to the general rule in cases where the circumstances indicate that the

policy of deterring extortion is not applicable."); *Emerson v. Deming*, 304 Mass. 478, 481 (1939)

("The application of the rule does not extend beyond the limits upon which it is based, and if the

agreement for accord and satisfaction is shown to rest upon a new consideration, in the way of some

benefit to the creditor or detriment to the debtor, then such an agreement is valid.").

There can be no concern of extortion by the Plaintiffs in this case, who applied to participate in a large-scale loan modification program created by the U.S. Treasury in the face of a national economic crisis, and who attested to their real financial hardships.  FAC at ¶¶ 47, 50, 61, 71, 92-93, 107, 109.  Furthermore, the TPP Agreements at issue are neither factually nor legally equivalent to the narrow circumstances in which the pre-existing duty exception applies.  The TPP Agreement simply is not a promise to discharge a portion of the borrower's debt in exchange for partial payment.  Neither the TPP Agreement nor the Home Affordable Modification which should follow its successful completion involves any discharge of a borrower's original indebtedness.  The TPP Agreement itself provides that the borrower understands "that nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents."  FAC, Ex. 9 at 3.  Nor are the borrower's obligations under the TPP Agreement limited to paying part (or even all) of the pre-existing debt.  Chase's attempt to avoid its contractual obligations by mischaracterizing the agreement as gratuitous debt forgiveness must fail.

## 2.   *Plaintiffs Sufficiently Allege Damages*

Chase's argument that Plaintiffs have failed to state a claim for breach of contract because they fail to allege damages is likewise without foundation.  In order to state a claim for breach of contract, "in general, it is sufficient to aver the making of the contract, its terms and the breach thereof."  *Daddario v. City of Pittsfield*, 301 Mass. 552, 555 (1938).  *See also Hacker v. Nitschke*, 310 Mass. 754, 757 (1942) (finding sufficient a count which "alleges the facts upon which an implied contract arose, and the facts constituting a breach of that contract"); *Faulkner*, 2010 WL 2472275 at *8-9 (finding plaintiffs' allegations regarding the existence and breach of a loan modification contract sufficient to defeat a motion to dismiss).

As discussed above, Plaintiffs have alleged that Chase entered into written contracts with

13

each of them and with each member of the proposed class. FAC at ¶¶ 50, 74, 95, 111, 127.  *See*

Section II, *supra*.  It is a long established principle of Massachusetts law that "[f]or every breach of

a promise made on good consideration, the law awards some damage." *Hagan v. Riley*, 13 Gray

515, 516 (Mass. 1859).  *See also Clark v. Gulesian*, 197 Mass. 492, 494 (1908); *Singarella v. City

of Boston*, 342 Mass. 385, 386-387 (1961).  The object in determining the damages for a breach is

to put the wronged party in as good a position as if the other party fully had performed.  *See e.g.

Bucholz v. Green Bros. Co.*, 272 Mass. 49, 54 (1930).  Put another way, the plaintiff is entitled to

damages for harms that "flow according to common understanding as the natural and probable

consequences of the breach." *Evans v. Yegen Associates, Inc.*, 556 F. Supp. 1219, 1230

(D.Mass.1982) (citing *Bucholz*, 272 Mass. at 54).  There is no requirement of specific pleading for

damages flowing naturally from the breach.  *See Sherlag* at 235.  Defendant does not and cannot

cite authority to the contrary.

Had Chase performed under the TPP Agreements it entered into with Plaintiffs, Plaintiffs'

would have received a Home Affordable Modification before the end of the TPP period, altering

their loan documents effective the first day of the month following the three-month TPP period.

FAC, Ex. 9 at 1, 2.  Upon modification of their loan documents, Plaintiffs no longer would have

been in default of their mortgage obligations (which they necessarily were during the TPP, even if

they were current at the start of the TPP), all existing arrearages would have been capitalized, late

fees would have been forgiven and Plaintiffs would have had affordable monthly payment amounts

going forward. FAC, Ex. 9 at 3, Ex. 2 at 9, 15, 18, 22.  Each month that Chase fails to perform its

obligations under the TPP Agreements, Plaintiffs' existing loan documents remain in full force and

effect and Plaintiffs accrue greater fees and charges, are forced further into delinquency on their

mortgages, are in default for longer periods, are at heightened risk of losing their homes to

foreclosure, and experience further damage to their credit.  FAC ¶¶ 154, 155.  These consequences

are the natural result of Chase's breaches.  Plaintiffs' allegations – which set out the existence and

terms of the contracts and the alleged breach – are sufficient to put Chase on notice of the damages

that are the consequence of such breach, and therefore are sufficient.

Even if those allegations were not enough, Plaintiffs also have alleged damages more

specifically.  Had Chase performed under the TPPs it entered into with Plaintiffs, Plaintiffs would

not have been subjected to any foreclosure-related activity during the period after their permanent

modifications would have become effective (because Plaintiffs would no longer have been in

default).  Plaintiffs allege that because of Chase's breaches, Plaintiffs have incurred foreclosure-

related fees and costs that they would not otherwise have incurred.  FAC at ¶¶ 55-58, 147, 162, 166.

At least one named Plaintiff has experienced foreclosure activity during the TPP.  FAC at ¶¶ 55-

58.[12]

### 3.        The TPP Agreements Are Complete, Enforceable Contracts

The TPP Agreements establish the precise nature and timing of each party's obligations and

leave nothing to be negotiated at a later date.  They are complete and enforceable contracts.

Defendant asserts that key terms of the permanent modification that is to follow the TPP are left

undetermined.  Mot. at 16.  As explained below, this is false (and Defendant identifies no other

missing terms that could destroy the enforceability of the contract).  The loan modification cases

cited by Chase are inapplicable, because the TPP Agreement is not itself a loan agreement, but a

promise to *provide* Plaintiffs with such an agreement at a specified date if Plaintiffs comply with the

necessary conditions.  Nor is the TPP Agreement a mere "agreement to agree," since the essential

terms of the promised Home Affordable Modification Agreement are not open to negotiation or

discretionary alteration by either side.

---

[12] Plaintiffs also allege that they were damaged by losing opportunities to pursue other means of avoiding foreclosure.  FAC at ¶¶ 147, 162, 166.  These lost opportunities are not too speculative.  *Cf. Don v. Soo Hoo*, 75 Mass. App. Ct. 80 (2009) (affirming jury award of damages for lost opportunity to obtain a bankruptcy discharge).

The TPP Agreement makes clear that the terms of the permanent modification are to be determined using the mathematical formulas provided for in the HAMP Program Documentation. The very first sentence of the TPP Agreement provides:

> If I am in compliance with this Trial Period Plan…, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3.

FAC, Ex. 9 at 1. "Home Affordable Modification Agreement" is not generic language; the term has technical meaning, supplied by the HAMP Program Documentation.[13] As this court has noted in the context of a consent decree interpreted as a contract, Massachusetts courts rely upon "the usual considerations of contract interpretation, including the language of the decree; the circumstances surrounding its formation; its purposes; any technical meaning words used may have had to the parties; and any other documents expressly incorporated in the decree." *U.S. v. Boston Scientific Corp.*, 167 F. Supp. 2d 424, 432 (D. Mass. 2001). As discussed above, *see supra* Section IV(A)(1), the Court may look to HAMP and its Supplemental Directives as extrinsic sources providing meaning to the contractual terms agreed to by the parties. *See United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 172 (D. Mass. 2004).

Decades of Massachusetts court decisions confirm the conclusion that the TPP Agreements are complete, addressing all of the parties' duties and obligations, and therefore are enforceable contracts. "The courts… are slow to turn a plaintiff out of court for the reason that the promise given and relied on was so vague that it can be given no effect." *Weiner v. Pictorial Paper Package Corp.*, 303 Mass. 123 (1939). "[T]he need for further documents does not preclude the formation of

---

[13] Other language of the TPP Agreements supports the conclusion that the terms of the permanent modification are to be determined by reference to HAMP. The TPP Agreement is titled the "HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN" in large, capitalized, bold font at the top of the contract. FAC, Ex. 9 at 1. There is a footnote on each page of the Plan that identifies the contract as a "Fannie Mae/Freddie Mac Uniform Instrument" created for HAMP participating servicers. FAC, Ex. 9 at 1-3.

a binding agreement." *Targus Group Intern., Inc. v. Sherman*, 76 Mass. App. Ct. 421, 429 (2010).

*See also George W. Wilcox, Inc. v. Shell Eastern Petroleum Products*, 283 Mass. 383, 388 (1933)

(finding that for a contract to be enforceable, the terms need only be set out "with sufficient

definiteness and clarity that a court, by interpretation with the aid of existing and contemplated

circumstances, may enforce it.").  The TPP Agreements contain every term necessary for

compliance by each party and for enforcement by the courts in the event of a breach.

### C.    Plaintiffs Have Stated a Claim for Breach of the Covenant of Good Faith and Fair Dealing

As discussed above, Plaintiffs adequately have alleged the existence of contracts between

themselves and Chase.  "Every contract implies good faith and fair dealing between the parties to it.

The covenant of good faith and fair dealing requires that neither party shall do anything that will

have the effect of destroying or injuring the right of the other party to the fruits of the contract."

*T.W. Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 569-570 (2010) (internal quotations and

citations omitted).  The "essential inquiry" when determining whether a party to a contract has

breached the covenant of good faith and fair dealing is to consider whether "the challenged conduct

conformed to the parties' reasonable understanding of performance obligations, as reflected in the

overall spirit of the bargain."  *Speakman v. Allmerica Financial Life Ins.*, 367 F. Supp. 2d 122, 132

(D. Mass. 2005).  The covenant is violated where there is "evasion of the spirit of the bargain, lack

of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to

specify terms, and interference with or failure to cooperate in the other party's performance."

*Restatement (Second) Contracts* §205.

The fruits of the TPP Agreement that should have flowed to Plaintiffs consisted of the

promised protection from foreclosure during the plan and a permanent loan modification at the end

of three months, with all arrearages capitalized, late fees forgiven and affordable payments.  FAC,

Ex. 9.  In order to secure those fruits, Plaintiffs had to comply with their TPP Agreement.  *Id.*

17

Chase, by its actions, has interfered with Plaintiffs' ability to secure the benefits of the contracts in at least two ways.  First, Plaintiffs allege that Chase fails to communicate with or adequately supervise foreclosure attorneys (FAC at ¶152), so that Plaintiffs are not protected from foreclosure activity during the TPP, in either the initial three months, or when it extends for longer. Although the TPP specifies that "the Lender will suspend any scheduled foreclosure sale," FAC, Ex. 9 at 2, Chase has allowed sales of some Plaintiffs' homes to be scheduled and has not suspended them while the trial period is pending. FAC at ¶¶ 55, 57-58.  Chase's behavior very clearly breaches the covenant of good faith and fair dealing.  *See, e.g., Tufankjian v. Rockland Trust Co*. 57 Mass. App. Ct. 173, 178-179 (2003) (finding that bank which agreed to provide financing for auto-dealership violated the covenant by "conducting itself in a manner at odds" with borrower by, *inter alia*, failing to complete appraisal on time and using a more expensive appraiser).

Second, Plaintiffs allege that Chase undermines Plaintiffs' ability to satisfy the requirement to provide income verification by failing to hire sufficient staff, by losing documents, repeatedly requesting documents it had already received, giving conflicting and confusing instructions to borrowers and making mistakes in processing documents.  FAC at ¶¶ 60-61, 87, 152, 154.  By promising borrowers one thing without the intention and/or ability to provide it, Chase dishonestly breached the covenant.  *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009) ("In the lender-borrower context, the implied covenant would require that the bank be honest in its dealings with plaintiffs") (internal quotations omitted).

Even if such actions do not breach the letter of the TPP Agreement, they are a breach of the covenant of good faith and fair dealing. *Massachusetts v. Mylan Laboratories*, 608 F. Supp. 2d 127, 158-59 (D. Mass. 2008), *citing Speakman*, 367 F. Supp. 2d at 132 (breach of covenant does not

require breach of contract).[14]

**D.    Plaintiffs Have Made Allegations Sufficient to Entitle Them to Relief Based Upon Promissory Estoppel**

There are three essential elements that, if met, give rise to a claim for promissory estoppel. There must be 1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; 2) an act or omission resulting from the representation by the person to whom it was made; and 3) detriment to such person as a result of the act or omission.  *See e.g. Turnpike Motors, Inc. v. Newbury Group, Inc.*, 413 Mass. 119, 123 (1992).

Defendant's argument for dismissing Plaintiffs' promissory estoppel claim is a repetition of its contract arguments, and just as ineffectual.  Defendant asserts that Plaintiffs have not alleged damage or detriment as a result of their reliance on and performance under the TPP Agreement. Mot. at 20.  As discussed in Section IV(B)(1), above, Plaintiffs payments and other performance under the TPP Agreement constitute detrimental reliance on Defendant's promises.  Detriment in the context of contract or promissory estoppel means "giving up something which immediately prior thereto the promisee was privileged to retain, or doing something or refraining from doing something which he was then privileged not to do, or to refrain from doing." *Cavanaugh v. U.S. Government*, 640 F. Supp. 437, 440 (D. Mass. 1986) (citing Williston, Contracts [3rd ed.] § 102A). Also, Plaintiffs were damaged by their reliance, as discussed in Section IV(B)(2), *supra*.

**E.    Plaintiffs State a Claim for Relief Under G.L. c. 93A**

*1.    Plaintiffs Met the Demand Letter Requirement of G.L. c. 93A*

Chase argues that the demand letter sent by Ramiza Durmic, on March 4, 2010 was inadequate under G.L. c. 93A to request relief on behalf of a class.  Yet, the very first sentence of

---

[14] A claim for breach of the covenant of good faith and fair dealing does not require a showing of bad faith. *Liss v. Studeny*, 450 Mass. 473, 477 & n.3 (2008) (citing *Nile v. Nile*, 432 Mass. 390, 398-399 (2000)).

Ms. Durmic's letter, attached as Exhibit 13 to the Complaint [Docket No. 4] ("the Demand Letter"),

states that it is being sent by Ms. Durmic "and a class of similarly situated individuals."  The ten-

page Demand Letter goes on to explicitly describe the putative class on whose behalf it was sent:

> Claimants believe that there are hundreds, if not thousands, of Massachusetts residents who are similarly situated to Ms. Durmic, i.e. homeowners who have entered into Trial Period Plan ("TPP") Agreements with Chase under the U.S. Treasury Department's Home Affordable Modification Program ("HAMP"), complied with all of the requirements of such Agreements, including but not limited to the making of three monthly Trial Period payments and the provision of documentation, yet have not been given a permanent modification in accord with the TPP Agreement.  The identities of such Massachusetts residents are known only to Chase.

Demand Letter at 1-2.   Chase cannot claim, therefore, that the Demand Letter was insufficiently

descriptive of the claimants sending the letter.  In these circumstances, the putative class is entitled

to rely upon the initial demand letter in satisfaction of the statutory requirement.

The Court's analysis of this issue should begin with the Supreme Judicial Court's

admonishment regarding chapter 93A that "technicalities are not to be read into the statute in such a

way as to impede the accomplishment of substantial justice." *Baldassari v. Public Fin. Trust*, 369

Mass. 33, 41 (1975) ("*Baldassari*").   "This includes the reading of the demand letter requirement."

*Richards v. Arteva Specialties S.A.R.I.*, 66 Mass. App. Ct. 726, 730 (2006) ("*Richards*"), *citing

Baldassari*, 369 Mass. at 41-42.  Chase's complaint regarding the Demand Letter is archetypal of a

"technicality" put forth to defeat Plaintiffs' legitimate claims.  The burden should thus be placed on

Chase to show how the Plaintiffs' course of action undermines the interests promoted by the

statute's demand letter requirement.

Chase cannot meet this burden. Chase identifies the purpose of the demand letter

requirement as "encourage[ing] negotiation and settlement" and "limit[ing] damages by capping

recoverable damages at the amount of the defendant's reasonable tender."  Mot. at 22, *citing Slaney

v. Westwood Auto, Inc.*, 322 N.E.2d 768, 779 (Mass. 1975).  Chase claims that it could not make a

settlement offer to Plaintiffs or putative class members because they were not individually identified in the demand letter.  This position strains credibility.  Counsel routinely engage in classwide settlement discussions prior to the certification of a class, and classes are frequently certified at the same time as the court considers a proposed class settlement.[15]  Furthermore, the information required to determine the number and identities of the individuals on whose behalf the letter was sent is in Chase's possession, and not available to Plaintiffs prior to discovery.  Chase should be able to determine with precision from examination of its own records which of its borrowers in Massachusetts have been offered TPP Agreements, have submitted documentation verifying their income, made their payments for three months, and have not received a Modification Agreement.

It is important to note that Chase has *not* asserted that the Demand Letter insufficiently described the unfair practice alleged or the damages claimed.  Chase's sole criticism of the Demand Letter -- its unavoidable failure to individually identify all other class members – has been explicitly rejected by the Massachusetts Appeals Court in *Richards*, *supra*.  The court there engaged in a close textual analysis to conclude that the statute's use of the singular forms "claimant" and "petitioner" was significant and intentional, *Richards* holds that a demand letter sent on behalf of a class need only identify the class representative himself, and adequately describe only her injury. *See Richards*, 66 Mass. App. Ct. at 732  (noting that the legislature chose *not* to require the demand letter to identify "the claimant and any similarly situated persons on behalf of whom the claimant brings the action.")   Such a position makes eminent sense – the whole purpose of Rule 23 is to aggregate a multitude of claimants not before the court through the use of adequate class representatives who share common claims, are typical, and otherwise meet the requirements of the rule.  So long as the Demand Letter served to put Chase on notice as to the identity of that class, in order that it might assess an appropriate offer of settlement, the Plaintiffs have met their duties

---

[15] Indeed, Chase has negotiated and entered into classwide settlements in other cases prior to class certification, including cases involving the lawyers present on both sides of this case.

under the statute.

Chase's position that an individual class representative should not be permitted to submit a demand on behalf of similarly situated individuals, if accepted, would eviscerate Chapter 93A's class action component.   Chapter 93A is not merely subject to Rule 23 – the Massachusetts legislature saw fit to provide expressly for class actions in G.L. c. 93A §9(2). The Supreme Judicial Court subsequently has recognized the value of the class action device, even when it must be reconciled with the demand letter requirement.   "If a proper demand is made by one plaintiff, identifying him as the claimant and reasonably describing the act or practice relied on and the injury suffered by him, we think he and others similarly situated may join in a class action to redress that injury and similar injuries caused by the same act or practice.  Multiple demands for relief need not be filed on behalf of all the members of the class."  *Baldassari*, 369 Mass. at 42.[16]

### 2.   *Plaintiffs' 93A Claims are Independent of Their Contract Claims*

Chase's substantive argument on Plaintiffs' claim under G.L. c. 93A suggests that its success is wholly contingent on the existence of a contract.   While Plaintiffs have properly pled the

---

[16] *Baldassari* left open the question whether this same reasoning applied in a situation where the class representative accepts the original offer of settlement as an individual.  Nevertheless, where the Demand Letter's description of the injury and damages to the class is not challenged as inadequate, Plaintiffs assert that the same rationale identified in the *Baldassari* Court applies.  Plaintiffs seek, *inter alia,* classwide injunctive relief – yet to require a succession of class representatives to present Demand Letters each time their predecessor is picked off by the Defendant would render chapter 93A's class action component null and void.  "The modern class action is 'designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions.'" *Baldassari*, 369 Mass. at 42, *quoting American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974).  In a similar vein, the Supreme Court has stated:

> Requiring multiple plaintiffs to bring separate actions, which effectively could be "picked off" by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement.

*Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980).

existence of a contract, their 93A claim stands on its own and is not, as Chase suggests, dependent

on the success of their contract claim.[17]

It is well-established that a plaintiff need not make out all of the elements of a common law

contract claim in order to succeed under 93A.  Chapter 93A "creates broad new rights, forbidding

conduct not previously unlawful under the common law of contract and tort or under any prior

statute."  *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 78 (1977) *citing Slaney v. Westwood

Auto, Inc.*, 366 Mass. 688, 693 (1975) and *Commonwealth v. DeCotis*, 366 Mass. 234, 244 n.8

(1974).  Massachusetts jurisprudence is replete with rulings that 93A was violated on the basis of

conduct that, "although legally proper, [is] unfair to the public."  *Schubach v. Household Finance

Corp.*, 375 Mass. 133, 142 (1978) *quoting Spiegel, Inc. v. F.T.C.,* 540 F.2d 287, 291 (7th Cir. 1976).

So, for instance, the SJC has adjudged as violative of the Act circumstances as far-ranging as: the

otherwise proper foreclosure of a mortgage, *see Kattar v. Demoulas*, 433 Mass. 1, 12-13 (2000); the

collection of utility charges otherwise legal under a rate-setting statute, *see Lowell Gas Co. v.

Attorney General*, 377 Mass. 37, 51-52 (1979); and the otherwise proper filing of suit in forum

where one of the parties lives or has a regular place of business, *see Schubach*, 375 Mass. at 135-37.

Therefore, regardless of how the Court rules on Counts I-III, Plaintiffs have successfully

pled that Chase's actions were unfair and thus constitute a violation of G.L. c. 93A and its

regulations.  *See Langston v. LaBrecque*, 25 Mass. App. Ct. 463, 464 (1988).  Unfairness is found

where the practice, without necessarily having been previously considered unlawful, offends public

---

[17] In support of its position, Chase cites *Park Drive Towing v. City of Revere*, 442 Mass. 80 (2004) and
*Pimental v. Wachovia Mortgage Corp.*, 411 F. Supp. 2d 32 (D. Mass. 2006).  In both of these contexts,
courts found that plaintiffs' 93A claims failed because they were completely coextensive with unsuccessful
contract claims.  Chase's suggestion that these cases create a rule that 93A claims must fail whenever they
are paired with unsuccessful contract claims finds no support in law or logic. That the 93A claims in *Park
Drive Towing* and *Pimental* were wholly duplicative of the breach of contract claims in those cases does not
mean that this will always be the case.  Moreover, the rule that Chase suggests would render 93A
superfluous, as it would serve no purpose other than to replicate common law.  As argued below, Plaintiffs'
93A allegations stand on their own.

policy as it has been established by statutes, the common law, or otherwise-whether, in other words,

it is within at least the penumbra of some common-law, statutory, or other established concept of

unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes

substantial injury to consumers.  *See Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 777

(1980).  Here, Plaintiffs have pled that the Defendant's conduct violated certain of the Attorney

General's regulations related to unfair and deceptive acts.  FAC ¶ 165.  The Court may also evaluate

Defendant's compliance with its obligations under HAMP to determine whether it has offended

public policy and thus acted unfairly.[18]  As alleged in the FAC, Chase is routinely falling short of

meeting its obligations under HAMP, both globally, *see* FAC ¶¶ 42-43 and specifically with regard

to Plaintiffs, *see* FAC ¶¶ 44-125.

Further, Plaintiffs' 93A claims are also founded in the allegation that Defendant's actions

were deceptive.  FAC ¶ 165.  A practice may be a found to violate 93A if it "could reasonably be

found to have caused a person to act differently from the way he otherwise would have acted."

*Lowell Gas. Co. v. Attorney Gen.*, 377 Mass. 37, 51 (1979).  Plaintiffs allege that the Defendant's

conduct caused them to forego other avenues of curing their default and saving their home, to their

detriment. FAC at ¶¶ 43, 147, 155, 162.  Such an allegation makes perfect logical sense – the

Defendant's promise that Plaintiffs' compliance would lead to permanent loan modification at

lower monthly payments caused them to pursue this course of action over any other available

option.

Finally, Plaintiffs allege that Chase violated specific regulations promulgated by the

Attorney General under G.L. c 93A.  FAC ¶ 165.  In particular, Plaintiffs allege that Chase violated

---

[18] The common law, statutory or other source of the standard of unfairness need not contain a private right of action in order for a 93A claim to stand. *See Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc.*, 56 Mass. App. Ct. 853, 858 (2002)  ("Violation of a specific statute that does not itself permit private recovery may give rise to private claim under c. 93A if the violation amounts to an unfair method of competition or an unfair or deceptive practice independently prohibited by G.L. c. 93A, §2, and if recovery under c. 93A is compatible with the objectives and enforcement mechanisms the underlying statute contains."  )

940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or misleading representations to borrowers; and 940 C.M.R. § 25.03, because it offers Foreclosure-related Services within the meaning of 940 C.M.R. § 25.01 without adequately describing the services offered.  Chase never mentions these allegations in its memorandum, for the very good reason that these claims are clearly completely independent of Plaintiffs' contract claims.

>    **F.**    **Plaintiffs Did Not Receive a Modification Agreement by the Date Promised**

Chase's argument that three of the named plaintiffs have failed to state a claim for relief because they do not allege that they were denied permanent modifications is wrong.  The TPP Agreement, Section 2(A), expressly acknowledges, "TIME IS OF THE ESSENCE" and lays out three monthly payments that are to be made, *followed by a permanent modification with an effective date of the first day of the following month*.  *See, e.g.*, FAC Ex. 9 at 2.  Chase's position that it is entitled to an endless period of continuing evaluation to determine a borrower's eligibility is directly contradicted by this contractual language.

In making this argument, Chase ignores the core claim in this case:  that for months on end, Chase leaves borrowers in limbo, with diminished ability to pursue other avenues of resolving their desperate situations, and that it does so despite having entered into TPP Agreements with them, explicitly promising permanent modifications on a date certain if they comply with the terms.  The failure to meet this promise for eligible borrowers is a breach of the TPP Agreement, a violation of the duty of good faith and fair dealing, a breach of a promise on which Plaintiffs reasonably relied, to their detriment, and violated Plaintiffs' rights under 93A.  Improper denial of a permanent modification is not necessary for these claims.

>    **V.**    **CONCLUSION**

For the reasons stated above, the Court should deny Chase's motion to dismiss the Complaint.

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
(617) 542-9595 *(telephone)*
(617) 542-8010 *(fax)*

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE:  July 29, 2010

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on July 29, 2010.

*/s/ Gary Klein*
Gary Klein (BBO 560769)