UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                            )
RAMIZA DURMIC, DONALD                       )
TREANNIE, JEAN LICATA, AND                  )
ARSENIA RODRIGUES, on behalf of             )
themselves and all others similarly situated, )
                                            )
       PLAINTIFFS,                          )
                                            )
v.                                          )      Civil Action No. 10-cv-10380-RGS
                                            )
J.P. MORGAN CHASE BANK, NA,                 )      **LEAVE TO FILE GRANTED**
                                            )      **ON AUGUST 13, 2010**
       DEFENDANT.                           )
_____)

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

**INTRODUCTION**

Plaintiffs spend most of their opposition brief backtracking from the theories alleged in the First Amended Complaint ("FAC"). They instead advance new theories based on facts never pled. Whether new or old, none of these attempts to articulate a valid claim succeeds. Fundamentally, plaintiffs still cannot identify any valid consideration for their various contract theories. Though the FAC asserts that plaintiffs' Trial Period Plan ("TPP") payments were the consideration, plaintiffs already admittedly had a pre-existing contractual obligation to pay that money or more. Perhaps recognizing this weakness, the opposition retreats from the TPP payments and argues that the mere submission of documents to verify their finances and the signing of the TPPs were sufficient consideration. As a matter of law, they were not. At most, such acts are conditions precedent or subsequent to participation in the TPPs, not a bargained-for detriment given in exchange for a permanent modification.

Moreover, plaintiffs cannot show agreement on the essential terms of the supposedly promised modifications. Though plaintiffs vaguely reference unspecified "formulas" in the HAMP Guidelines that they claim fix such terms, the Guidelines actually provide that loan term, interest amount, and principal amount remain open for later determination.

Plaintiffs do not allege the basic elements of their contract claim. Each of their other claims is derivative of the contract claim and equally flawed. The FAC should be dismissed.

## ARGUMENT

### I. PLAINTIFFS' CLAIM THAT THEY ARE HAMP-ELIGIBLE IS BESIDE THE POINT AND NOT ALLEGED.

Plaintiffs spend a significant portion of their opposition brief asserting that they are eligible for HAMP modifications. (Pls.' Opp'n to Mot. to Dismiss ("Opp'n") at 1-2, 7-8.) As an initial matter, that claim is beside the point, as plaintiffs' causes of action are not pled under HAMP, but rather under common-law theories, the elements of which they cannot satisfy.

Moreover, the FAC contains *no* allegations that plaintiffs were eligible for HAMP modifications. Nor does the FAC allege that plaintiffs' verified documentation satisfied the NPV test, or that the substance of the documentation plaintiffs submitted after receiving the TPPs was identical to their prior representations. Without these factual allegations, plaintiffs' assertion that they should have been provided permanent HAMP modifications, even if it had been made in the complaint, is nothing more than a naked legal conclusion, which should not be credited in analyzing Chase's 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusion").

In an attempt to work around the deficiencies in their pleading, plaintiffs posit that they were found eligible to receive TPPs, so they must therefore be eligible for permanent HAMP

modifications. This reasoning too is faulty. First, nothing in the TPP represents that Chase has fully evaluated the borrowers for eligibility for permanent modifications. On the contrary, the TPP makes it clear that additional evaluation remains to be done. (FAC Ex. 8 at p. 9 (noting that the lender will evaluate "*if* I qualify for the Offer" after receiving the borrower's signed copy of the TPP) (emphasis added); *id.* at p. 11 ¶ 2.G (noting that the TPP "is not a modification" and that "the Loan Documents will not be modified unless . . . I meet all of the conditions required for modification")).

Second, as plaintiffs concede, the TPPs were extended based on verbal financial information, whereas HAMP eligibility must be determined based on *verified* documentation. (Opp'n at 7-8.) Even a small difference between the verbal and verified information can alter the NPV analysis and make the difference between eligibility and ineligibility. That is precisely why the HAMP Guidelines require that permanent modifications may be extended based only on *verified* financial information. (FAC Ex. 2, at pp. 15, 18.) Nowhere does the FAC allege that plaintiffs' verified information was *exactly* the same as their initial verbal information. Instead, plaintiffs rely on the allegation that they complied "in all material respects" with the TPPs, which state that the "provided . . . information" was "truthful and correct." (Opp'n at 2; FAC Ex. 2, ¶ 2.) Just because plaintiffs were materially truthful in giving verbal information, however, does not mean that the information was the same as their verified information. Many borrowers see their financial circumstances change by the time they send in documentation. And, even for honest applicants, the verbal information they convey is often different from that which is gathered from their documentation because they are not as precise as the documentation, or because they may, with honest intentions, include or exclude certain categories of income or

expenses for which the lender ultimately accounts.[1]  For this reason, the HAMP Guidelines anticipate that the verbal and verified information may be different, even for borrowers who were extended TPPs (before the full documentation requirement went into effect).  (FAC Ex. 2, at p. 18.)  In the end, plaintiffs have not alleged, even in a roundabout way, that they were HAMP-eligible.

## II. PLAINTIFFS DO NOT ALLEGE A VALID, ENFORCEABLE CONTRACT OR PROMISE (COUNTS I, II, AND III).

Even if plaintiffs had alleged that they were HAMP-eligible, their claims would still fail.  As plaintiffs note, there is no cause of action to enforce HAMP.  (Opp'n at 6.)  Plaintiffs' opposition confirms that they cannot state the basic elements of the breach of contract theory they are forced to fall back on.

### A. Plaintiffs Suffered No Legal Detriment from Participating in TPPs.

Plaintiffs must identify a legal detriment to themselves or a benefit to Chase from participating in the TPP in order to allege valid consideration for their contract and implied covenant claims, and must allege detrimental reliance for their promissory estoppel claim.  (Mot. to Dismiss ("Mot.") at 10-11, 18, 20.)  Although the FAC advances plaintiffs' TPP payments as the consideration (FAC ¶ 142), defendant's opening brief explained how the preexisting legal duty rule conclusively precludes that characterization.  Not surprisingly, plaintiffs' opposition

---

[1] The HAMP Guidelines contain highly specific and technical definitions of the income and expenses to be considered in determining eligibility.  (*See* FAC Ex. 2 at p. 6 (income ignores payroll deductions and "includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payments, . . . and monthly income from annuities, insurance policies, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income"); *id.* ("non-borrower household income" should be included if "the income has been, and reasonably can continue to be, relied upon to support the mortgage payment"); *id.* (housing expense should include "property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees" but not "mortgage insurance premium payments or payments due to holders of subordinate liens").)

largely abandons that notion, and instead offers several new theories of consideration, none of which were alleged in the FAC. None are legally sufficient in any event.

Plaintiffs first point to the mere acts of signing the TPP letter and transmitting financial documentation as purported consideration. Although plaintiffs characterize these acts as "mak[ing] binding representations concerning [the borrower's] personal circumstances" and the submission of "extensive financial information" (Opp'n at 9), the TPPs make clear that plaintiffs were required only to "confirm[]" the information already provided. (FAC Exs. 8, 9, 10, 12 at p. 1.) Accordingly, the signing and transmittal of documents was simply a condition to participation in the TPP, not bargained-for consideration in exchange for a permanent modification at the end of the TPP. "A condition of a promise" is not consideration if "a reasonable person . . . would not understand that performance of the condition was requested as the price or exchange for that promise." 3 Samuel Williston, *A Treatise on the Law of Contracts* ("Williston on Contracts") § 7:18 (4th ed. 2008). "If a benevolent man says to a tramp, 'If you go around the corner to the clothing shop there, you may purchase an overcoat on my credit,' no reasonable person would understand that the short walk was requested as the consideration" instead of a necessary condition for the provision of the promised coat. *Id.*; *see also Plowman v. Indian Refining Co.*, 20 F. Supp. 1, 5 (E.D. Ill. 1937) (requiring employees to travel to employer's office to collect pension checks, though potentially inconvenient, "was simply a condition imposed upon them in obtaining gratuitous pensions and not consideration").

Here, the signing of the TPP letter and transmittal of documentation of plaintiffs' income were conditions required for Chase to analyze plaintiffs' eligibility for and the terms of a possible permanent modification reducing plaintiffs' monthly mortgage payments. The TPP states that "[t]his Plan will not take effect unless and until . . . I . . . sign it," and thereby certify to

the representations above.  (FAC Ex. 8 at p. 8; FAC Exs. 9-10, 12 at p. 1.)  As such, the signing of the TPP letter and the transmittal of documentation were either conditions precedent, *Cheschi v. Boston Edison Co.*, 654 N.E.2d 48, 54 (Mass. App. Ct. 1995) ("A condition precedent defines an event which must occur before a contract becomes effective or before an obligation to perform arises"), or conditions subsequent, the non-occurrence of which would have rendered the TPP voidable after it had taken effect.  *O'Marah v. Walkey*, No. 07-4012, 2009 WL 981678, at *14 (Mass. Super. Ct. Nov. 26, 2008).  In fact, plaintiffs themselves concede that the representations were "conditions" of the TPPs.  (*See* Opp'n at 9 (referring to "[s]atisfaction of these conditions"); FAC ¶¶ 59, 144.)

Nowhere does the FAC allege that Chase bargained for plaintiffs' financial information as the "price" for the offer of a permanent modification.  Indeed, there is no allegation that Chase had any interest in obtaining plaintiffs' financial information other than to evaluate them for a HAMP modification.  Williston on Contracts § 7:18 (a condition is likely not intended as consideration unless "the happening of the condition will benefit the promisor").  Although plaintiffs' opposition speculates that their information could be useful for some kind of underwriting (Opp'n at 11-12), the FAC makes no such allegation.  Indeed, it is difficult to imagine any benefit to Chase when, by plaintiffs' own admission, they had *already* verbally provided Chase with that information before any purported TPP agreement.  (Opp'n at 7-8.)

The act of transmitting documentation is not consideration.  *See* Williston on Contracts § 7:21 ("When a document is transferred, if the promisor was bargaining not for the paper but for a right supposed to be but not in fact evidenced by the paper, the fact that the paper itself was surrendered will not support the promise, since the surrender of the paper is in such a case merely a condition, and not the consideration."); *cf. Marmer v. Kaufman*, 2010 Mass. App.

Unpub. LEXIS 225, at *3 (Mass. App. Ct. 2010) ("The mere presence of some incident to a contract which might under some circumstances be upheld as consideration for a promise, does not necessarily make it the consideration for the promise in that contract") (unpublished).

Plaintiffs' certifications of their willingness to obtain credit counseling or to set aside a portion of the TPP payments in an escrow account are similarly conditions to TPP participation, not bargained-for consideration.[2]  Moreover, none of the plaintiffs allege that Chase required them to obtain credit counseling or make payments into any newly-established escrow account.

Plaintiffs' argument that Chase would not have extended TPPs if Chase did not expect to benefit (Opp'n at 11) is emblematic of the circular logic that permeates plaintiffs' newfound theories.  By that flawed logic, there would always be consideration, as no rational actor would ever enter into an agreement without an anticipated benefit.  In any event, here, the purported "benefit" at issue is Chase's ability to obtain partial payment on plaintiffs' mortgages.  That "benefit" is one that plaintiffs already had a preexisting legal duty to provide.

Finally, plaintiffs make a half-hearted attempt to defend the TPP payments as valid consideration.  Plaintiffs do not contest that their TPP payments were *less than* their mortgage payments and that their TPP payments went to paying down their mortgages.  Nor could they, as the very purpose of a TPP is to reduce the borrower's monthly mortgage payment.  (FAC Ex. 2, at pp. 8-10.)  Instead, plaintiffs assert that their reduced TPP payments did not constitute payments on a preexisting obligation because they were different in amount and character from the payments plaintiffs were legally obligated to make.  That argument strains credulity.

Plaintiffs' position that any modification in the amount — including the payment of a

---

[2] In any event, plaintiffs already had a pre-existing legal duty under their mortgages to pay taxes and insurance into escrow accounts. (*See* Motion for Judicial Notice, filed herewith, Exs. 1-4, at p. 4 § 3.)  Those mortgages, which are referenced in the FAC and upon which plaintiffs rely, are properly before this Court on a motion to dismiss. (FAC ¶¶ 45, 69, 90, 105.)  *See Clorox Co. Puerto Rico v. Proctor & Gamble Comm. Co.*, 228 F.3d 24, 32 (1st Cir. 2000).

lesser amount than what is due — suffices for consideration is both illogical and contrary to black-letter law. *See* Williston at § 7:21 ("When the consideration is of the same nature as the thing promised and is *equal or smaller in amount* the courts have held that no consideration exists." (emphasis added)); *Cohoon v. Citizens Bank*, No. 002774, 2000 WL 33170737, at *3 (Mass. Super. Ct. Nov. 11, 2000) ("[A]n agreement to give and accept in full discharge of this indebtedness an amount less than that which was admittedly due would not be binding and would not prevent the creditor from enforcing payment of the balance of the debt.").

Nor do plaintiffs explain how their reduced TPP payments were so different in "character" from their existing loan obligations as to be transformed into new consideration. Plaintiffs do not allege that, in making payments under their TPPs, they paid their debts before they were due, in a different medium, at a different place, etc. *See* Williston at § 7:27. Although plaintiffs argue that TPP payments are "held in accounts maintained by servicers, instead of immediately applied to [borrowers'] loans" (Opp'n at 10), the TPP states that payments are so held only "until they total an amount that is enough to pay [the borrower's] oldest delinquent monthly payment on [the] loan in full." (FAC Exs. 8-10, 12 at ¶ 2.D.)  In the end, plaintiffs cannot escape the fact that TPP payments fall squarely within their preexisting mortgage obligations, however "narrow[ly]" the pre-existing duty rule is defined (Opp'n at 12).

### B.     The Complaint Does Not Allege Damages.

Even if plaintiffs could somehow overcome the lack of valid consideration or legal detriment, Counts I through III still fail for lack of damages.[3]  Plaintiffs' opposition again

---

[3] As to their contract claim, plaintiffs argue damages are not a required element. (Opp'n at 13-15.) That is incorrect. *See, e.g.*, *City of Revere v. Boston/Logan Airport Assocs., LLC*, 443 F. Supp. 2d 121, 126-27 (D. Mass. 2006) (rejecting contract claim for lack of cognizable damages).  None of the cases cited by plaintiffs is to the contrary, as none involved a failure to allege damages. *See Daddario v. Pittsfield*, 17 N.E.2d 894, 896 (Mass. 1938) (alleging "great damage"); *Hacker v. Nitschke*, 39 N.E.2d 644, 646 (Mass. 1942) (alleging "injury").

backtracks from the allegations in the FAC and asserts the new theory that they have "accrue[d] greater fees and charges" and "experience[d] further damage to their credit" by not receiving modifications. (Opp'n at 14.) But, this is nowhere alleged in the FAC. The paragraphs of the FAC cited by plaintiffs allege only that Chase imposed unspecified "fees and charges" on some "borrowers" and that "fees and charges *may* be applied" (emphasis added), without alleging they were applied to plaintiffs. (*Id.* (citing FAC ¶¶ 154, 155).) No mention is made of plaintiffs' credit. Plaintiffs cannot avoid dismissal based on allegations not pled.

      **C.**    **Plaintiffs Cannot Identify the Material Terms of Their Alleged Contracts.**

Counts I through III fail for yet a third independent reason: the purported contract does not specify the material terms of the loan modifications allegedly promised. Plaintiffs cannot point to any language in the TPPs specifying key terms such as the principal amount, interest rate, or loan term. (See FAC Exs. 8-10, 12.) Indeed, the TPPs make it clear that those key terms have yet to be determined. (See FAC Ex. 8 at p. 10 (noting that "the Lender will determine the new payment amount" after receiving the borrower's documentation).) Plaintiffs baldly claim that those terms can be determined "using the mathematical formulas provided in the HAMP Program Documentation," and that those terms "are not open to negotiation or discretionary alteration." (Opp'n at 15-16.) Tellingly, this claim is made without citation to any formula in the HAMP Guidelines attached to the FAC. Nor do plaintiffs state what any of the supposedly pre-determined terms of their modifications would be.

Contrary to plaintiffs' claims, the HAMP Guidelines make it clear that the essential terms of the potential modification remain *open*. As an initial matter, the target monthly payment amount — and, indeed, whether any qualifying monthly payment amount is possible — remains indeterminate until the borrower has submitted documentation during the trial period. (FAC Ex.

2 at p. 15 ("servicers must calculate the terms of the modification using verified income").) Moreover, even once the borrower's verified income and expenses are known, the servicer retains significant discretion to vary the loan terms. For example, where interest rate reductions would be insufficient to reduce the monthly payment to 31% of the borrower's income, the loan servicer may choose one of four strategies to further reduce the monthly payment: (1) extending the loan term, (2) forbearing on charging interest on some portion of the principal, (3) forgiving some portion of the principal, or (4) some combination thereof. (FAC Ex. 2 at p. 9 (authorizing the servicer to "extend the term . . . by up to 480 months . . . to achieve the target monthly mortgage payment ratio"); *id.* at p. 8 (authorizing the servicer to "agree[] to a modification . . . where principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31%"); *id.* at p. 10 ("servicers may forgive principal to achieve the target monthly mortgage payment ratio").) Accordingly, the loan term, principal amount, and interest payments remain open terms. In addition, the servicer has discretion to alter the interest rate, loan term, and amount of principal forbearance or forgiveness to reduce the monthly payment amount *below* 31% of the borrower's income ratio. (*Id.* at p. 8.) Servicers may also choose whether to leave the interest rate fixed for more than five years. (*Id.*) All of those terms remain to be agreed upon.

    Massachusetts courts have repeatedly refused to enforce purported loan agreements where, as here, the loan term, principal amount, and interest payments remain unspecified. (*See* Mot. at 17-18 (collecting cases).) Plaintiffs' opposition does not distinguish these cases, but instead cites a series of inapposite cases not involving loans. In *Weiner v. Pictorial Paper Package Corp.*, 20 N.E.2d 458 (Mass. 1939), which applied New York law, the court enforced an agreement because the terms *were* specified: employment on a 25% commission. *Id.* at 462-

63. In *Targus Group Int'l, Inc. v. Sherman*, 922 N.E.2d 841 (Mass. App. Ct. 2010), the court enforced a settlement agreement with specific terms: $500,000 within six months. *Id.* at 850. *George W. Wilcox, Inc. v. Shell Eastern Petroleum Prods.*, 186 N.E. 562 (Mass. 1933), held an agreement *unenforceable* because it did not specify price. *Id.* at 564.

### III.   PLAINTIFFS HAVE NO VIABLE 93A CLAIM.

#### A.   Plaintiffs Cannot Allege that They Sent a 93A Demand Letter.

Plaintiffs spend their opposition insisting that a M.G.L. c. 93A claimant seeking to represent a putative class need only submit a demand letter on his or her own behalf, and need not obtain a demand letter from each putative class member. (Opp'n at 20-21.) That, however, is not the issue. The problem here is that none of the four *named plaintiffs* who purport to bring the 93A claim as class representatives sent a demand letter, and the Court is without jurisdiction over the 93A claim.

Plaintiffs cite no authority permitting them to proceed in such a fashion. (Opp'n at 21.) In *Richards v. Arteva Specialties S.A.R.L.*, 850 N.E.2d 1068 (Mass. App. Ct. 2006), Dawn Richards had served each defendant with a demand letter on behalf of herself and a putative class. *Id.* at 1072. The court held Richards's letter sufficient to sustain a 93A putative class action filed *by her*, concluding that "only a demand letter *made on the claimant's own behalf* is required." *Id.* at 1074 (emphasis added). Nothing in the opinion suggests that Richards's claim could have been sustained on the basis of a demand letter sent by someone else, especially had that letter resulted in settlement. On the contrary, the court held that review of the demand letter should focus "solely [on] the description of the *individual claimant's own injury*," not that of putative class members. *Id.* at 1075 (emphasis added). Here, no demand was made on any of the four 93A claimants' *own behalf* describing their *own* injuries.

*Baldassari v. Public Finance Trust*, 337 N.E.2d 701 (Mass. 1975), on which plaintiffs rely, is also inapposite. There, two of the four named plaintiffs sent a demand letter. The court permitted the remaining two plaintiffs to proceed on their 93A claim because the defendants had not responded to the demand letter sent by the other two. "If no reasonable tender of settlement is made in response to the first demand, further demands are not likely to serve any useful purpose." *Id*. at 707. But the court cautioned that "[a] separate question would be presented if the plaintiff who made the statutory demand were shown to have accepted a tender of settlement." *Id.* (refusing to "decide whether in such a case another claimant's right to sue would depend on his sending a second demand letter"). That is precisely the situation here. Chase has already made reasonable tenders of settlement, which were accepted, to the three previous 93A claimants who had sent Chase a demand letter, and 93A requires that Chase have an opportunity to do so for each named plaintiff. To hold otherwise would eviscerate 93A's demand letter requirement.

    **B.**  **The Alleged Acts at Issue Either Fail to State Any Claim or Are Duplicative of Plaintiffs' Contract Claim.**

Plaintiffs concede that their 93A claim must be dismissed if it is derivative of the contract claim. (Opp'n at 23 n.17.) Yet, they identify no valid independent basis for their 93A claim.

Plaintiffs first argue that the Court should "evaluate Defendant's compliance with its obligations under HAMP." (Opp'n at 24.) This argument belies plaintiffs' repeated accusation that Chase "misleads the Court" and "[m]ischaracterizes [p]laintiffs' [l]egal [p]osition" by stating that plaintiffs seek to perform an "'end-run' around the lack of a private cause of action in HAMP." (Opp'n at 5-6.) Apparently, that is exactly what plaintiffs seek.

Massachusetts law bars such a distortion of 93A. Under the very case cited by plaintiffs, 93A permits suit only where a private right of action is "compatible with the objectives and

enforcement mechanisms that the underlying statute contains." (Opp'n at 24 n.18 (citing *Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co.*, Inc., 56 Mass. App. Ct. 853, 858 (2002).) As federal courts have repeatedly held, HAMP delegates compliance authority to Freddie Mac alone. *See, e.g.*, *Marks v. Bank of Am., N.A.*, No. 03:10-cv-08039-PHX-JAT, 2010 U.S. Dist. LEXIS 61489, at *12, *17-20 (D. Ariz. June 21, 2010). (*See also* Mot. at 6 n.2.) To permit a back door right of action via state law would destroy the purpose of that scheme. *Aleem v. Bank of America*, No. EDCV 09-01812-VAP (RZx), 2010 U.S. Dist. LEXIS 11944, at *9-10 (C.D. Cal. Feb. 9, 2010) (dismissing California unfair competition law claim to enforce HAMP).

Moreover, even if permissible, any HAMP-based 93A claim would be wholly derivative of plaintiffs' contract claim. The sole HAMP "violation" alleged is Chase's purported failure to "convert TPPs into permanent modifications." (FAC ¶¶ 42-43 (cited in Opp'n at 24).)

Plaintiffs then contend that Chase "caused them to forego other avenues of curing their default and saving their home." (Opp'n at 24.) As explained in Chase's opening brief, though, plaintiffs were free to take those actions before and remain free to do so now. (Mot. at 14.)

Finally, plaintiffs assert that Massachusetts regulations prohibit "false or misleading representations" or descriptions of services. (Opp'n at 25.) The only misrepresentation alleged in the FAC, however, is that the TPPs purportedly promised permanent modifications but failed to deliver them. That allegation, again, is wholly derivative of the contract claim.

### IV. PLAINTIFFS IDENTIFY NO PROMISE BY CHASE TO PROVIDE A MODIFICATION BY A PARTICULAR DEADLINE.

Three plaintiffs who were not denied permanent modifications attempt to save their claims by arguing that their TPPs "explicitly promis[ed] them permanent modifications on a date certain." (Opp'n at 25.) No language in the TPPs, however, promises modification by any date.

Plaintiffs note that the TPPs state that "time is of the essence." (*Id*.) That phrase, however, means only that "parties will be held to the deadlines they have imposed upon themselves." *Owen v. Kessler*, 778 N.E.2d 953, 956-57 (Mass. App. Ct. 2002). The only deadlines mentioned by the TPPs are dates for trial payments. (FAC Exs. 8-10, 12 at ¶ 2.) *See Maloney v. Beaudette*, No. 91-3196, 1995 Mass. Super. LEXIS 814, at *10 (Mass. Super. Ct. Jan. 4, 1995) ("time is of the essence" provision did not create a deadline where none existed).

Plaintiffs note that the TPPs define "Modification Effective Date" as the end of the Trial Period. (Opp'n at 25.) Nowhere, however, do the TPPs state that a modification must be made by that date. In fact, the TPPs state no modification can occur until *after* that date. (FAC Exs. 8-10, 12 at ¶ 2.G.)[4]

---

[4] The new HAMP directive issued in January 2010 reinforces this point. Supp. Dir. 10-01, *available at* https://www.hmpadmin.com/portal/docs/hamp_servicer/sd1001.pdf.  This directive "amends key features" of the program, introducing, for the first time, a deadline for servicers to determine HAMP eligibility. *Id.* at 1, 3. That deadline applies only to TPPs with effective dates on or after June 1, 2010, and hence does not apply to plaintiffs. *Id.*

## CONCLUSION

For the foregoing reasons, the FAC should be dismissed in its entirety.

Dated:  August 18, 2010

Respectfully submitted,
JPMorgan Chase Bank, N.A.,
By its attorneys,

/s/ Donn A. Randall
Donn A. Randall (BBO No. 631590)
Matthew A. Kane (BBO No. 666981)
Bulkley, Richardson and Gelinas, LLP
98 North Washington St., Suite 500
PO Box 9750
Boston, MA  02114-0016
Telephone: (617) 368-2520
Facsimile: (617) 368-2525
drandall@bulkley.com
mkane@bulkley.com

OF COUNSEL:
Michael J. Agoglia (CA SBN 154810)
Wendy M. Garbers (CA SBN 213208)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
magoglia@mofo.com
wgarbers@mofo.com

## CERTIFICATE OF SERVICE

I, Donn A. Randall, hereby certify that a true copy of the foregoing document was served upon all counsel of record via this Court's CM/ECF system or, if not registered on this Court's CM/ECF system, then via first class mail, postage prepaid, on August 18, 2010.

/s/ Donn A. Randall
Donn A. Randall