## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **DONALD TREANNIE, HEATHER TREANNIE, JEAN LICATA, SHELBY VENUTI, MARK VENUTI, NATALIE LAYMAN, and ARSENIA RODRIGUES,** on behalf of themselves and all others similarly situated,<br><br>   **Plaintiffs,**<br>vs.<br><br>**J.P. MORGAN CHASE BANK, NA, CHASE HOME FINANCE, LLC**<br><br>   **Defendants.** | **C.A. NO. 1: 10-CV-10380-RGS**<br><br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>Leave to file granted<br>March 9, 2011 |

### INTRODUCTION

1.      Donald and Heather Treannie, Jean Licata, Shelby and Mark Venuti, Natalie Layman, and Arsenia Rodrigues bring this suit on behalf of themselves and a class of similarly situated Massachusetts residents ("Plaintiffs") to challenge the failure of Defendant J.P. Morgan Chase Bank, NA acting independently and through its subsidiary Defendant Chase Home Finance, LLC (referred to jointly as "Chase" or "Defendants" where not otherwise described in their individual capacities) to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.      Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the

bargain expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure.

3.      In 2008, J.P. Morgan Chase accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  On July 31, 2009 Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA signed a contract with the U.S. Treasury (attached as Exhibit 1 and incorporated herein by reference) agreeing to participate in HAMP -- a program in which Chase received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

4.      As a participating servicer in HAMP, Chase has entered into written agreements with Plaintiffs, known as Trial Period Plan ("TPP") Agreements.  In these Agreements, Chase agreed to a finite "trial period," and promised that successful completion of this trial period would result in the tender of a permanent loan modification under HAMP rules.  Plaintiffs, for their part, have complied with this agreement by submitting the required documentation and making payments. Despite Plaintiffs' efforts, Chase has failed to meet its contractual obligation to tender permanent modifications complying with HAMP rules.

5.      The same problems affect other members of the putative class. As a result, Plaintiffs and hundreds, if not thousands, of other Massachusetts homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. Defendants' actions breach the TPP Agreement, thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

6.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332

because the action is between parties that are citizens of different states and the amount in

controversy is greater than $75,000. For diversity jurisdiction purposes, a national bank is a

citizen of the state designated as its main office on its organization certificate. *Wachovia Bank,*

*N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).  J.P. Morgan Chase Bank, NA is, on information and

belief, a citizen of New York.  Plaintiffs are citizens of Massachusetts.

7.     This court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in

that it is brought as a putative class action in which the matter in controversy exceeds the sum or

value of $5,000,000, exclusive of interest and costs, and at least one member of the class of

plaintiffs is a citizen of a State different from any defendant.

8.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the

unlawful practices are alleged to have been committed in this District, Defendants regularly

conduct business in this District, and the named Plaintiffs reside in this District.

## PARTIES

9.     Donald Treannie and Heather Treannie (née Heather Gilbert) (hereinafter "the

Treannies" or "Donald and Heather Treannie") are a married couple residing at 4 Rothchild

Drive, Foxborough, Massachusetts 02035 (hereinafter "Rothchild Drive").

10.    Jean Licata is an individual residing at 365 Reservoir Avenue, Revere, MA 02151

(hereinafter "365 Reservoir Avenue") with her husband Jerry Sacco and her 91-year-old mother.

11.    Mark and Shelby Venuti are a married couple residing at 10 Blueberry Hill Road,

Groveland, MA 01834.

12.    Natalie Layman is an individual residing with her 9-year-old grandson at 111

Middlesex Street, Bradford, MA 01835.

13.    Arsenia Rodrigues is an individual residing at 31-33 Michigan Avenue,

Somerville, MA 02145.

14.     J.P. Morgan Chase Bank, N.A. is a loan servicer with its corporate headquarters located at 270 Park Avenue, New York, NY 10017-2014.

15.     Chase Home Finance, LLC is a subsidiary of J.P. Morgan Chase Bank, N.A., located at 3415 Vision Drive, Columbus, OH 43219.

16.     All times herein mentioned, Defendants, J.P. Morgan Chase Bank, N.A. and Chase Home Finance, LLC, both individually and collectively, are and were agents and/or joint venturers of each other, and in so doing the acts alleged herein were acting within the course and scope of such agency.

17.     Each Defendant had actual and/or constructive knowledge of the acts of the other Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

## FACTUAL BACKGROUND

### *The Foreclosure Crisis*

18.     Over the last three years, the United States has been in a foreclosure crisis.  In 2009, a congressional oversight panel noted that one in eight U.S. mortgages was already in foreclosure or default, and an additional 250,000 foreclosures were beginning every month.[1]  In April 2010, the congressional oversight panel reported that foreclosures were continuing at a rapid pace.  In total, 2.8 million homeowners received a foreclosure notice in 2009.[2]

19.     The number of Massachusetts properties with foreclosure filings in 2008 was 150% higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two

---

[1] *October Oversight Report: An Assessment of Foreclosure Mitigation Efforts After Six Months*, Congressional Oversight Panel at 3 (October 9, 2009), http://cop.senate.gov/documents/cop-100909-report.pdf.
[2] *April Oversight Report: Evaluating Progress on TARP Foreclosure Mitigation Programs*, Congressional Oversight Panel at 3 (April 14, 2010), http://cop.senate.gov/documents/cop-041410-report.pdf.

years.[3]

20.     The numbers continue to rise; in September 2010, foreclosures in Massachusetts increased 26.6% compared with the same month last year.[4]  In the third quarter of 2009, foreclosures were filed on 12,667 Massachusetts properties, a 35% increase over the same period of 2008.[5]  Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure filings against them which, while slightly less than 2008, still represents an increase of over 100% from 2007 levels and an increase of more than 400% over 2004.[6]

21.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

22.     State legislative efforts were able to temporarily slow the pace of completed foreclosures in 2009, but toward the end of the year, the number of new filings once again rose, demonstrating that foreclosures were merely delayed, not prevented.[7]

23.     The foreclosure crisis is not over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at*

---

[3] RealtyTrac Staff, *Foreclosure Activity Increases 81 Percent in 2008*, Jan. 15, 2009, http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681 (last visited February 4, 2011).
[4] Jennifer B. McKim, *Mass. Foreclosures up nearly 27%*, The Boston Globe, October 22, 2010, *available at* http://www.boston.com/business/articles/2010/10/22/mass_foreclosures_up_nearly_27_percent/.
[5] RealtyTrac Staff, *Foreclosure Activity Hits Record High in Third Quarter*, Oct. 15, 2009, http://www.realtytrac.com/foreclosure/foreclosure-rates.html (last visited February 4, 2011).
[6] Daren Blomquist, *A record 2.8 million properties receive foreclosure notices in 2009*, http://www.realtytrac.com/landing/2009-year-end-foreclosure-report.html?a=b&accnt=233496 (last visited February 4, 2011).
[7] For 2007 comparison, see Gavin, Robert,*Fewer Lose Their Homes in August*, Boston Globe, Sept. 23, 2009, *available at* http://www.boston.com/realestate/news/articles/2009/09/23/foreclosures_in_mass_drop_but_petitions_soar/ (last visited February 4, 2011).

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study

showing monthly mortgage rate resets).

### *Creation of the Home Affordable Modification Program*

24.     Congress passed the Emergency Economic Stabilization Act of 2008 on October

3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February

17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

25.     The purpose of the Act is to grant the Secretary of the Treasury the authority to

restore liquidity and stability to the financial system, and ensure that such authority is used in a

manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

26.     The Act grants the Secretary of the Treasury the authority to establish the

Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may

purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

27.     Congress allocated up to $700 billion to the United States Department of the

Treasury for TARP. 12 U.S.C. § 5225.

28.     In exercising its authority to administer TARP, the Act mandates that the

Secretary "shall" take into consideration the "need to help families keep their homes and to

stabilize communities." 12 U.S.C. § 5213(3).

29.     The Act further mandates, with regard to any assets acquired by the Secretary that

are backed by residential real estate, that the Secretary "shall implement a plan that seeks to

maximize assistance for homeowners" and use the Secretary's authority over servicers to

encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C.A. §5219.

30.     The Act grants authority to the Secretary of the Treasury to use credit

enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable

foreclosures." *Id.*

31.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

32.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

33.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

34.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

35.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

36.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1000.00 for each HAMP modification.

### *Broken Promises Under HAMP*

37.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage

loans.  Chase is a servicer and its actions described herein were made as agents for the entities

that hold mortgage loans.

38.     Should a servicer elect to participate in HAMP,[8] they execute a Servicer

Participation Agreement ("SPA") with the federal government.

39.     As a Congressional Oversight Panel evaluating HAMP noted, "[p]articipation in

the program by servicers is voluntary, but once a servicer elects to participate, adherence to the

program standards is mandatory for all the servicer's loans."  Congressional Oversight Panel,

December 14, 2010 report at 4 (hereinafter "COP Report").[9]

40.     On July 31, 2009, Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase

Bank, NA, executed an SPA, thereby making Chase a participating servicer in HAMP.  This

document is attached and incorporated as Exhibit 1. The SPA also binds subsidiary Chase Home

Finance, LLC.

41.     The SPA executed by J.P Morgan Chase, N.A. incorporates all "guidelines,"

"procedures," and "supplemental documentation, instructions, bulletins, letters, directives, or

other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with

the duties of Participating Servicers. These documents together are known as the "Program

Documentation" (SPA at ¶ 1.A.), and are incorporated by reference herein.

42.     The SPA mandates that a Participating Servicer "shall perform" the activities

described in the Program Documentation "for all mortgage loans it services."  (SPA at ¶¶ 1.A.,

2.A.)[10]

---

[8] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal
Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program,
are subject to mandatory inclusion in HAMP.  Otherwise, participation by servicers in the HAMP program is
voluntary.
[9] *Available at* http://cop.senate.gov/reports/library/report-121410-cop.cfm.
[10] The Program Documentation includes the Making Home Affordable Program Handbook for Servicers of Non-
GSE Mortgages, Version 3.0 (December 2, 2010) ("HB"), *available at*

43.     The Program Documentation requires Participating Servicers to evaluate all first-lien loans where two or more payments are delinquent for HAMP modifications. (HB, § 2.2. at 46.)  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

44.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[11]  The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

45.     Before it offers a borrower a TPP, the servicer must determine that the loan meets certain criteria (including that the investor who owns the loan is participating in HAMP) and also evaluate the homeowner's eligibility for a permanent Home Affordable Modification, subject to verification of the information used to make the evaluation.  *See* HB, § 5; HB, § 6; HB, § 1.1. This includes determining what the terms of the modification will be under the HAMP "Waterfall" and checking to make sure the modification passes the "Net Present Value" test.  HB § 7 at 73-77; HB § 6.3 at 65-67.

46.     The TPP Agreement defines a finite trial period in which the homeowner makes mortgage payments in an amount determined using the HAMP "waterfall," based on the initial financial information provided.

---

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_30.pdf.  As of December 2, 2010, the HB incorporates and supersedes in their entirety Supplemental Directives 09-01, 09-02, 09-03, 09-04, 09-06, 09-07, 09-08, 09-10, 10-01, 10-02, 10-03, 10-4, 10-05, 10-06, 10-07, 10-08, 10-09, 10-10, 10-11, 10-12, 10-13, 10-14 and 10-15, as well as related Frequently Asked Questions.  *See* Supplemental Directive 10-17: *Making Home Affordable Program- Handbook for Servicers* (December 2, 2010), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1017.pdf.
[11] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in HB, § 6.3 and HB, § 7.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

47.     Chase offers TPP Agreements to eligible homeowners by way of a TPP
Agreement[12], which describes the homeowner's duties and obligations under the plan and
promises a permanent HAMP modification for those homeowners that execute the agreement
and fulfill the documentation and payment requirements.

48.     Under the terms of the TPP Agreement, if the homeowner executes the
Agreement, complies with all documentation requirements and makes all three TPP monthly
payments, the second stage of the HAMP process is triggered, in which the homeowner is
offered a permanent modification.

49.     The Program Documentation provides that the borrowers must make "current"
TPP monthly payments in order to receive a permanent modification.  "Current" is defined for
TPP Agreements with effective dates on or after June 1, 2010, as the borrowers having made
each trial period payment by the last day of the month in which it is due.  For TPP Agreements
with effective dates before June 1, 2010, "current" is defined as the borrower having made all
trial period payments by the last day of the final month of the trial period.  HB, § 8.3 at 77-78.

50.     Chase has routinely failed to live up to their end of the TPP Agreement and offer
permanent modifications to homeowners. In December 2010, the U.S. Treasury reported that J.P
Morgan Chase Bank, NA had 195,841 HAMP-eligible loans in its portfolio.[13]  However, just
66,441 have resulted in permanent modifications even though many more homeowners had made
the payments and submitted the documentation required by the TPP Agreement.  The report

---

[12] Plaintiffs refer to Supplemental Directives 09-01: *Introduction of the Home Affordable Modification Program* at
17-18 (April 6, 2009), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf, and 09-03:
*Home Affordable Modification Program- Trial Period Guidance* at 1-2 (July 6, 2009),
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0903.pdf, in effect at the time Plaintiffs' TPPs
were entered into, for a description of the Trial Period Plan requirements incorporated into Plaintiffs' and other class
members' Agreements.
[13] Making Home Affordable Program: Servicer Performance Report Through December 2010 (January 31, 2011),
http://www.treasury.gov/initiatives/financial-
stability/results/MHAReports/Documents/Dec%202010%20MHA%20Report%20Final.pdf.

estimates that Chase's conversion rate of TPPs into permanent loan modifications was a mere
38% at an average trial length of 7.8 months. The report indicates that Chase is among the worst
servicers in the nation in terms of the conversion rate of trial period plans into permanent
modifications.

51.     By failing to live up to the TPP Agreement and convert TPP Agreements into
permanent modifications, Chase is leaving homeowners in a state of limbo and stressful anxiety,
wondering if their homes can be saved. Chase is also preventing homeowners from pursuing
other avenues of resolution, including using the money they are putting toward TPP payments to
fund bankruptcy plans, relocation costs, short sales or other means of curing their defaults.
Chase's conduct in promising a permanent modification following compliance with a TPP
Agreement was the direct cause of Plaintiffs' inability to successfully pursue other avenues of
resolving their defaults.

*Donald and Heather Treannie*

52.     The Treannies have been the owners of the property located at 4 Rothchild Drive
since July 26, 2006.

53.     On December 21, 2006, Plaintiffs Donald and Heather Treannie took out a
mortgage loan for their residence at 4 Rothchild Drive from American Mortgage Network, Inc.,
DBA American Mortgage Network of MA, a DE Corp.

54.     The servicing of the Treannies' mortgage loan was transferred to Washington
Mutual (hereinafter WAMU) and then to Chase.  Chase continues servicing the Treannies' loan
to this date.

55.     Sometime after taking out the mortgage loan, Donald and Heather Treannie began
experiencing hardships, which caused them to be at risk of imminent default.

56.     In or about February, 2009 the Treannies began seeking help with their mortgage from their servicer.

57.     After meeting the terms of a prior temporary agreement, J.P. Morgan Chase Bank, N.A. offered the Treannies a TPP Agreement under HAMP by letter dated June 22, 2009.

58.     Donald and Heather Treannie accepted the offer by signing the TPP Agreement July 1, 2009 and then returning it to Chase. A copy of the TPP Agreement signed by the Treannies is incorporated and attached hereto as Exhibit 2.

59.     The TPP Agreement defined a finite trial period of July, August and September 2009 and required monthly mortgage payments during those 3 months.

60.     The TPP Agreement is entitled "Home Affordable Modification Trial Period Plan," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

61.     The TPP Agreement also states:  "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer."  Nevertheless, Chase has sent neither a signed copy of the Plan, nor a written rejection.

62.     Donald and Heather Treannie timely made each of the payments described in the TPP Agreement due in July, August and September, 2009.  They have also continued to make

monthly payments at the trial period level following the end of the trial period.

63.     Despite being current on their mortgage payments when they accepted WAMU's forbearance offer in March, 2009 and despite having made all payments under that agreement and the subsequent TPP Agreement (with the exception of the December, 2009 payment that Chase would not accept), Chase made negative credit bureau reports concerning the Treannies.

64.     By letter dated September 16, 2009 Chase sent the Treannies a "Notice of Incomplete Request" informing them that they needed to provide Chase with a signed copy of their 2008 tax return.  The Treannies timely provided Chase with the requested documents.

65.     By letter dated October 2, 2009 Chase sent a letter entitled "YOUR MODIFICATION IS AT RISK-URGENT RESPONSE NEEDED!"  The letter required production of documents which the Treannies timely provided.

66.     By letter dated January 31, 2010, Chase sent a notice similar to that described in the preceding paragraph requesting documentation.  The Treannies timely provided those documents.

67.     Since the TPP period began, and at all times relevant hereto, Donald and Heather Treannie have timely responded to all information and document requests made by Chase by supplying the documents and information requested.

68.     By letters dated November 2, 2009 and February 26, 2010, the Treannies have been offered, without reference to their HAMP TPP Agreement, unaffordable loan modifications by Chase under a program Chase calls their "Homeownership Preservation Program."  These non-HAMP offers include the payment of fees and other costs by the Treannies to Chase that Chase would not be able to charge under HAMP.  The Treannies have not accepted any of those offers and have continued making their payments under the TPP Agreement.

69.     Despite their compliance in all material respects with the terms of the TPP
Agreement, Chase did not tender the Treannies a permanent loan modification meeting the rules
of HAMP by September 30, 2009.

70.     Chase has inflicted on Donald and Heather Treannie redundant and ambiguous
and threatening demands for documents, deceptive non-HAMP loan modification offers, and
undeserved negative credit bureau reports.

71.     Like the other class members in this matter, Donald and Heather Treannie have
been living in a state of limbo and stressful anxiety, without any assurances that their home will
not be foreclosed, despite their compliance with HAMP requirements and their right to a
permanent HAMP modification.

*Jean Licata*

72.     Jean Licata has been the owner of 365 Reservoir Avenue since April 25, 2005,
when she was deeded the home from her elderly, disabled mother.  Ms. Licata has lived in the
home with her mother for many years.

73.     On this same date, the existing mortgage on 365 Reservoir Avenue was
refinanced with an adjustable rate mortgage loan from Washington Mutual Bank, FA (hereinafter
the "mortgage loan").

74.     The servicing of Ms. Licata's mortgage loan was transferred to Chase sometime
after the closing of the mortgage loan, and continues to this date.

75.     After taking out the mortgage loan, Ms. Licata began experiencing financial
hardships, which combined to cause her to have difficulty making payments on her mortgage
loan and resulted in her falling behind on the payments.

76.     In August 2009, Jean Licata applied for a HAMP loan modification.  Ms. Licata's

application included documentation of her status, including documents verifying her income and financial situation.

77.     J.P. Morgan Chase Bank, N.A. offered Jean Licata a verified income TPP Agreement under HAMP. The TPP Agreement defined a finite trial period of September, October and November 2009 and required monthly mortgage payments during those 3 months.

78.     Ms. Licata timely accepted the TPP Agreement on September 4, 2009 by returning the executed TPP Agreement to Chase along with supporting documentation.  A copy of the TPP Agreement signed by Ms. Licata is incorporated and attached hereto as Exhibit 3.

79.     The first sentence of the TPP Agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

80.     The TPP Agreement also states: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  Nevertheless, Chase has never sent a signed copy of the TPP Agreement, nor a written rejection within the three-month period specified by the TPP.

81.     Jean Licata timely made each of the payments described in the TPP Agreement due in September, October and November 2009.  She also made a timely payment consistent with the trial period amount due in December, 2009.  Ms. Licata is currently setting aside an

amount equivalent to her trial period payment each month, in the hopes that her loan will be permanently modified.

82.     Since the TPP Agreement began, and at all times relevant hereto, Jean Licata has timely responded to all information and document requests made by Chase by supplying the documents and information requested.

83.     By letter dated March 11, 2010, Defendant Chase Home Finance, LLC informed Ms. Licata that she did not qualify for a HAMP modification based on the results of the NPV calculation. A copy of the TPP denial letter is attached hereto as Exhibit 4.  At the time she received this rejection, Ms. Licata's financial situation was not materially different than it was at the time she submitted her application and verified income documentation.

84.     By offering Ms. Licata a TPP Agreement based on verified income, Chase should already have determined that Ms. Licata passed the net present value test.

85.     Despite her compliance in all material respects with the terms of the TPP Agreement, Chase did not provide Jean Licata with a permanent loan modification by November 30, 2009, nor has it done so since then.

86.     The three (3) month Trial Period plan which Jean Licata had been informed would result in a permanent loan modification offer by the end of November, 2009 unless she was otherwise notified, has instead resulted in redundant, ambiguous and threatening demands for documents and a denial based on information in Chase's possession prior to its offer of the TPP Agreement.

87.     Like the other class members in this matter, Jean Licata has been living in a state of limbo and stressful anxiety, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and her right to a permanent HAMP

modification.

*Shelby and Mark Venuti*

88.     Shelby and Mark Venuti have been the owners of 10 Blueberry Hill Road,

Groveland, Massachusetts since August 28, 2007.

89.     On August 29, 2007, Mr. and Mrs. Venuti took out a mortgage for their residence

at 10 Blueberry Hill Road from American Mortgage Network, Inc., D/B/A American Mortgage

Network of Massachusetts.

90.     The servicing of the Plaintiffs' mortgage loan was transferred to Chase sometime

after its origination and continues to this date.

91.     In January 2009, Mr. and Mrs. Venuti began experiencing various hardships,

which caused them to fall behind on their mortgage payments.

92.     In or about February, 2009 the Venutis began seeking help with their mortgage

from their servicer.

93.     The Venutis applied for a HAMP loan modification through a Chase

representative over the phone.  The Venutis also sent in an application to Chase that included

documentation of their financial status, including documents verifying their income and financial

situation.

94.     On July 30, 2009, Chase Home Finance, LLC offered Shelby and Mark Venuti a

TPP Agreement entitled *Home Affordable Modification Trial Period Plan*.  The TPP Agreement

defined a finite trial period of August, September and October 2009 and required monthly

mortgage payments during those 3 months.

95.     Although the TPP Agreement was to be effective August 1, 2009, Chase did not

send the Venutis the TPP Agreement until after this date.  Although the Venutis attempted to

make their first TPP payment on August 1, 2009 on the phone, Chase insisted that the Venutis

wait for the TPP Agreement and payment coupons to arrive.

96.     The Venutis immediately accepted the TPP Agreement by returning the executed

TPP Agreement to Chase at or around August 8, 2009.  A copy of the TPP Agreement signed by

the Venutis is incorporated and attached hereto as Exhibit 5.

97.     The first sentence of the TPP Agreement provides: "If I am in compliance with

this Loan Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in

all material respects, then the Lender will provide me with a Loan Modification Agreement

('Modification Agreement'), as set forth in Section 2 [below], that would amend and supplement

(1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  Section 3 of the

TPP Agreement references the means by which the principal balance and monthly payment

amounts of the permanent modification will be calculated.

98.     The TPP Agreement also states: "I understand that after I sign and return two

copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify

for the Offer or will send me written notice that I do not qualify for the Offer." Nevertheless,

Chase never sent a signed copy of the TPP Agreement, nor a written rejection within the three-

month period specified by the TPP.

99.     The Venutis made each of the payments described in the TPP Agreement due in

August, September and October 2009.  At the end of their trial period, the Venutis were told by a

Chase representative to continue making trial period payments while their application was still

being reviewed.  They continued to make payments consistent with the trial period amount.

100.     Since the trial period Agreement began, and at all times relevant hereto, the

Venutis have timely responded to all information and document requests by Chase by supplying

the documents and information requested.

101.    In the midst of the Venutis' trial period, by letter dated October 1, 2009, Chase

sent the Venutis an "Acceleration Warning (Notice of Intent to Foreclose)."  The letter indicated

that the Venutis were in default and had thirty-two (32) days to cure their default.  On that same

day, Chase sent the Venutis another HAMP solicitation.  The Venutis did not understand why

they were being foreclosed on if they were in the midst of their trial period.  The Venutis were

unable to obtain an explanation of this letter from Chase.

102.    On October 2, 2009, Chase demanded financial documents already in its

possession; however, the Venutis timely provided them to Chase.  The Venutis continued to

receive threatening and ambiguous requests for documentation thereafter.

103.    On December 1, 2009, while the Venutis were making payments beyond the trial

period, Chase sent the Venutis another Notice of Intent to Foreclose.  When the Venutis called

Chase to inquire about this notice, a Chase representative told them to "ignore" the notice and

that they were still being considered for a HAMP modification.

104.    By letter dated June 7, 2010, Defendant Chase Home Finance, LLC informed Mr.

and Mrs. Venuti that they did not qualify for a HAMP modification based on the results of the

Net Present Value ("NPV") calculation.  When the Venutis called Chase to inquire about this

development, a Chase representative told them to continue to make payments consistent with the

trial period amount and to reapply for HAMP.

105.    However, Chase continued to send the Venutis Notices of Intent to Foreclose.

106.    By offering the Venutis a TPP Agreement based on documented financial

information, Chase should have already determined that the Venutis passed the NPV test.

107.    In September 2010, Chase refused to accept further payments from the Venutis.

108.    Despite their compliance in all material respects with the terms of the TPP

Agreement, Chase did not provide the Venutis with a permanent modification by the

Modification Effective Date, nor has it done so since then.

109.    Indeed, instead of tendering the Venutis a permanent modification based on

HAMP rules on terms that would have been in effect at the end of their trial period, Chase has

told the Venutis to reapply for a HAMP modification.

110.    Like the other class members in this matter, the Venutis have been living in a state

of limbo and stressful anxiety, without any assurances that their home will not be foreclosed,

despite their compliance with HAMP requirements and their right to a permanent HAMP

modification.

*Natalie Layman*

111.    Ms. Layman has been the owner of 111 Middlesex Street, Bradford,

Massachusetts for over 25 years.  She lives with her nine-year old grandson.

112.    In 2007, Ms. Layman took out a mortgage loan for her home at 111 Middlesex

Street, Bradford, Massachusetts.

113.    The servicing of Ms. Layman's mortgage loan was transferred to Chase sometime

after April 23, 2007.  Chase continues servicing Ms. Layman's loan to date.

114.    Sometime after taking out the mortgage loan, Ms. Layman began experiencing

various hardships, which caused her to fall behind on her mortgage payments.

115.    In or about October, 2009, Ms. Layman began seeking help with her mortgage

from her servicer.

116.    On January 19, 2010, Chase Home Finance, LLC offered Ms. Layman a TPP

Agreement entitled *Home Affordable Modification Trial Period Plan*.  The TPP Agreement

defined a finite trial period of March, April and May 2010 and required monthly mortgage payments during those months.

117.    Ms. Layman timely accepted the TPP Agreement by returning the executed TPP Agreement to Chase. Ms. Layman also provided Chase with documentation of her hardship and financial status.  A partial copy of the TPP Agreement signed by Ms. Layman is incorporated and attached hereto as Exhibit 6.

118.    On information and belief, the first sentence of the TPP Agreement provides: "If I am in compliance with this Loan Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement ('Modification Agreement'), as set forth in Section 2 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

119.    The TPP Agreement also states: "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer." Nevertheless, Chase never sent a signed copy of the TPP Agreement, nor a written rejection within the three-month period specified by the TPP.

120.    Ms. Layman made each of the payments described in the TPP Agreement due in March, April and May 2010.

121.    At the end of her trial period, Ms. Layman had still not heard from Chase on the status of her permanent modification.  She, therefore, continued to make payments consistent with the trial period amount.

122.     Despite entering into a TPP Agreement with Chase, on April 16, 2010, Chase sent Ms. Layman a "Notice of Intent to Foreclose" demanding payment of all arrears and late fees and threatening foreclosure if the default was not cured by July 20, 2010.

123.     Since the TPP Agreement began, and at all times relevant hereto, Ms. Layman has timely responded to all information and document requests by Chase by supplying the documents and information requested.

124.     On May 27, 2010, and again in July 2010, Chase demanded financial documentation from Ms. Layman, which she timely provided.

125.     In July 2010, Ms. Layman received another Notice of Intent to Foreclose from Chase.

126.     During this same month, a Chase representative, "Steve," told Ms. Layman on the phone that she was denied a permanent HAMP modification based on the results of the Net Present Value ("NPV") test.

127.     By letter dated August 11, 2010, Chase informed Ms. Layman of the NPV inputs used to deny her a HAMP loan modification.  The letter indicated that Chase used the incorrect income in its calculations.

128.     On September 21, 2010, Chase sent Ms. Layman a notice demanding documentation and indicating that she owed $8,507.80 on her mortgage loan.

129.     In December 2010, Ms. Layman resumed paying her full monthly mortgage amount as instructed to by Chase.

130.     On or about January 31, 2011, Ms. Layman sent Chase her financial documentation again in hopes that it would result in a permanent loan modification.

131.     However, Chase continued to send Ms. Layman Notices of Intent to Foreclose.

132.    As of this date, Ms. Layman has not received a permanent modification nor received a written decision of eligibility consistent with HAMP rules.

133.    Despite her compliance in all material respects with the terms of the TPP Agreement, Chase did not provide Ms. Layman with a permanent modification by the Modification Effective Date, nor has it done so since then.

134.    Like the other class members in this matter, Ms. Layman has been living in a state of limbo and stressful anxiety, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and her right to a permanent HAMP modification.

*Arsenia Rodrigues*

135.    Arsenia Rodrigues has been the owner of 31-33 Michigan Avenue since June, 2006, when Ms. Rodrigues took out an adjustable rate mortgage loan with Washington Mutual Bank, FA.

136.    The servicing of the Plaintiff's mortgage loan was transferred to Chase sometime after the closing of the mortgage loan, and continues to this date.

137.    After taking out the mortgage loan, Ms. Rodrigues began experiencing financial hardships, which caused her to be at risk of imminent default.

138.    In the spring of 2009, Ms. Rodrigues began working with an attorney at Greater Boston Legal Services to prepare the documents necessary to request a loan modification.

139.    On April 29, 2009, Ms. Rodrigues applied for a loan modification from Chase. The package mailed to Chase included a hardship affidavit, Borrower's Assistance Form, IRS 4506-T form, 2008 tax return, a statement of homeowners insurance and complete proof of income.

140.    By letter dated June 1, 2009, Defendant J.P. Morgan Chase Bank, N.A. offered Ms. Rodrigues a verified income TPP Agreement entitled *Home Affordable Modification Trial Period Plan*.  The TPP Agreement defined a finite trial period of June, July and August 2009 and required monthly mortgage payments during those months.  The TPP Agreement is incorporated and attached hereto as Exhibit 7.

141.    Ms. Rodrigues timely accepted the offer by returning the executed TPP Agreement to Chase.

142.    The first sentence of the TPP Agreement provides: "If I am in compliance with this Loan Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement ('Modification Agreement'), as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."  Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

143.    The TPP Agreement also states "I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of the Plan if I qualify for the Offer or will send me written notice that I do not qualify for the offer."  Nevertheless, Chase did not send a signed copy of the Plan.

144.    Ms. Rodrigues made each of the payments described in the TPP Agreement due in June, July and August, 2009.  She was told by a Chase representative not to make a payment in September, so she placed the September payment in escrow with her attorney.  Ms. Rodrigues timely made payment at the TPP Agreement amount in October, 2009 and has placed in escrow the TPP Agreement amount in each of the following months.

145.     Since the TPP period began, and at all times relevant hereto, Ms. Rodrigues has timely responded to all information and document requests made by Chase by supplying the documents and information requested.

146.     Despite her compliance in all material respects with the terms of the TPP Agreement, Chase did not provide Ms. Rodrigues with a permanent loan modification at the completion of her TPP.

147.     On or about November 17, 2009, Ms. Rodrigues' attorney contacted the HAMP Support Center by email to request that Ms. Rodrigues' modification be escalated for immediate action and that she be advised as to the reason for delay in approving her permanent modification.  Chase did not respond to this request.

148.     By letter dated November 30, 2009, Chase informed Ms. Rodrigues that she did not qualify for a HAMP modification.  The reason given for the denial was "[y]our income is insufficient for the amount of credit you have requested."  Ms. Rodrigues' financial situation had not materially changed since Chase offered her a verified income TPP.

149.     From December 2009 through March 2010, Ms. Rodrigues' attorney made multiple requests to Chase and to the HAMP Support Center asking for the case to be reviewed.

150.     In April, 2010, Chase informed Ms. Rodrigues that she did not qualify for a HAMP modification based on the results of the NPV calculation.

151.     By offering Ms. Rodrigues a TPP Agreement based on verified income, Chase should already have determined that Ms. Rodrigues passed the net present value test. Ms. Rodrigues' attorney sent a request to Chase for the NPV inputs. Chase has not responded to this request.

152.     Ms. Rodrigues is in compliance with her TPP Agreement and her representations

to Chase continue to be true in all material respects.

153.    Chase has therefore breached the provision of the TPP Agreement that compliance with the TPP Agreement for the three-month trial period would result in a permanent loan modification.

154.    Like the other Plaintiffs in this matter, Ms. Rodrigues has been living in limbo, without any assurances that her home will not be foreclosed, despite her compliance with HAMP requirements and her right to a permanent modification.

### *Class Allegations*

155.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

156.    The Plaintiffs sue on behalf of themselves and all Massachusetts homeowners whose loans have been serviced by Defendants and who, since July 31, 2009, have entered into a TPP Agreement with the Defendants and made all trial period payments identified in that TPP Agreement, other than borrowers to whom Defendants sent, prior to the end of their trial period, either:

a.    The Home Affordable Modification Agreement required by their TPP Agreement; or

b.    A written Non-Approval Notice on a basis permitted by their TPP Agreement.

157.    Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

158.    Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants. Plaintiffs believe that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed class is so numerous that joinder

of all members is impracticable.

159.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

160.    All members of the class have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

a.   the nature, scope and operation of Defendants' obligations to homeowners under HAMP;

b.   whether Defendants' receipt of an executed TPP Agreement, along with supporting documentation and required monthly payments, creates a binding contract or otherwise legally obligates Defendants to offer class members a permanent HAMP modification;

c.   whether Defendants' failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

d.   whether the Court can order Defendants to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

161.    The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a timely permanent modification.

162.    The individual named Plaintiffs will fairly and adequately represent the interests

of the class. They are committed to the vigorous prosecution of the class' claims and have

retained attorneys who are qualified to pursue this litigation and have experience in class actions

– in particular, consumer protection actions.

163.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2)

and Fed. R. Civ. P. 23(b)(3).

164.    A class action is superior to other methods for the fast and efficient adjudication

of this controversy. A class action regarding the issues in this case does not create any problems

of manageability.

165.    The Defendants have acted or refused to act on grounds that apply generally to the

class so that final injunctive relief or corresponding declaratory relief is appropriate respecting

the class as a whole.

## COUNT I
### *Breach of Contract*

166.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

167.    Plaintiffs bring this claim on their own behalf and on behalf of each member of

the Class described above.

168.    As described above, the TPP Agreement sent by Defendants to Plaintiffs

constitutes a valid offer.

169.    By executing the TPP Agreements and returning it to Defendants along with the

supporting documentation, Plaintiffs accepted Defendants' offers.

170.    Alternatively, Plaintiffs' return of the TPP Agreements constituted offers.

Acceptances of these offers occurred when Defendants accepted Plaintiffs' payments during the

trial period and beyond.

171.    Plaintiffs' trial period payments to Defendants constitute consideration. By

making those payments, Plaintiffs gave up the ability to pursue other means of saving their homes, and Defendants received payments it might otherwise not have received.

172.    There is additional consideration in the form of agreements to undergo financial counseling and the provision of substantial financial documentation by Plaintiffs as a condition of the contract. This allowed Defendants to evaluate its options under the security agreement including the costs and benefits of foreclosure to it.  Plaintiffs were also required to make payments into a new escrow account.

173.    In the alternative, the TPP Agreement is a type of binding Agreement for which the law does not require consideration.

174.    Plaintiffs and Defendants formed valid contracts.

175.    To the extent that the contracts were subject to a condition subsequent providing Chase an opportunity to review the documentation submitted by Plaintiffs during the trial period, this condition was waived by Chase and/or it is estopped to assert it as a defense to Plaintiffs' claims.

176.    To the extent that Plaintiffs rendered any defective performance under the contract, this condition was waived and, therefore, excused by Chase and/or it is estopped to assert it as a defense to Plaintiffs' claims.

177.    To the extent that Chase provided Plaintiffs with written denials of eligibility after the close of the defined trial period, the reason(s) for denial was accepted and excused by Chase following the close of the trial period and, therefore, waived by Chase.

178.    By failing to offer Plaintiffs permanent HAMP modifications by the close of the trial period defined in the contracts, Defendants breached those contracts and any further obligations by Plaintiffs remaining under the contract was excused.

179.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make trial period payments and provide documentation.

180.    Plaintiffs have suffered harm and are threatened with additional harms from Defendants' breach.  Plaintiffs' harm is measured by the difference between their current circumstances and the circumstances they would have been in but for Defendants' breach.

181.    To the extent that Plaintiffs accepted permanent modifications at a time after the close of each Plaintiff's trial period, Plaintiffs' harm is measured by the difference between the terms of the accepted permanent modification and the permanent modification that should have been tendered at the close of each Plaintiff's trial period.

182.    By making payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In addition, Plaintiffs built up substantial and unmanageable delinquency in an amount exceeding that which otherwise would have accrued absent the breach.

183.    In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a permanent modification is not offered at the close of the TPP, the borrower's permanent modification terms and other options may be adversely affected and additional fees and charges may be applied.  On information and belief, Defendants have imposed on Plaintiffs improper fees and costs related to loans in default during and after their trial period.

184.    Plaintiffs also suffered additional harm in the form of foreclosure and collection activity against their homes.

185.    Plaintiffs have suffered the additional harm of adverse credit reporting, thus undermining their credit standing for lower cost refinancing and other necessary credit transactions.

186.    Plaintiffs have lived in a state of stressful anxiety because of the limbo in which the Defendants have placed them.

187.    Members of the putative class have experienced damages in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

COUNT II
**_Breach of the Implied Covenant of Good Faith and Fair Dealing_**

188.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

189.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

190.    Defendants are obligated by contract and common law to act in good faith and to deal fairly with each borrower.

191.    "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." _Uno Restaurants, Inc. v. Boston Kenmore Realty Corp._, 441 Mass. 376, 385 (2004).

192.    Chase routinely and regularly breaches this duty by:

a.      failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

b.      failing to supervise its agents and employees properly including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

31

    c.      routinely demanding information it has already received;

    d.      making inaccurate calculations and determinations of Plaintiffs' eligibility

for HAMP;

    e.      failing to follow through on written and implied promises;

    f.      failing to follow through on contractual obligations; and

    g.      failing to give permanent HAMP modifications and other foreclosure

alternatives to qualified borrowers.

193.    These actions constitute bad faith by the Defendants.

194.    On information and belief, the Defendants financially benefit from their breaches

in a variety of ways, including but not limited to by not hiring sufficient staff to meet their

obligations under HAMP, the imposition of fees and charges on borrowers' accounts during and

after their TPP, and obtaining greater fees from foreclosing than from modifying loans they

service.

195.    As a result of these failures to act in good faith and the absence of fair dealing,

Defendants caused Plaintiffs harm.  By making TPP payments both during and after the TPP,

Plaintiffs forewent other remedies that might be pursued to save their homes, such as

restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their

defaults, such as selling their homes.  In addition to the lost opportunity cost of pursuing other

means of dealing with their defaults, when a permanent modification is not offered at the close of

the TPP, the borrower's permanent modification terms may be adversely affected and additional

fees and charges may be applied.  Plaintiffs have suffered the additional harm of having adverse

reporting against their credit profiles.  Plaintiffs have also incurred damages because the

Defendants' breach, i.e., Chase's failure to provide permanent HAMP modifications, means that

Plaintiffs are further in arrears than they would have been otherwise.  Last, plaintiffs have been living in a state of stressful anxiety because of the limbo in which the Defendants have placed them.

196.    Members of the putative class have experienced damages in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

COUNT III
*Promissory Estoppel, in the alternative*

197.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

198.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

199.    Defendants, by way of their TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

200.    Defendants' TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

201.    Plaintiffs did indeed rely on Defendants' representation, by submitting TPP payments.

202.    Given the language in the TPP Agreements, Plaintiffs' reliance was reasonable.

203.    Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a permanent HAMP modification.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes. In light of the declining real estate market in Massachusetts

since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.

204.     In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a permanent modification is not offered at the close of the TPP, the borrower's permanent modification terms are adversely affected and additional fees and charges are applied.  On information and belief, Defendants have imposed improper fees and costs on Plaintiffs during and after the Trial Period.

205.     Plaintiffs have also suffered detriment in the form of foreclosure and collection activity against their homes.

206.     Plaintiffs have also incurred damages in reliance on the TPP Agreement, i.e., Chase's failure to provide permanent HAMP modifications, means that Plaintiffs are now further in arrears than they would have otherwise been.

207.     Plaintiffs have been living in a state of stressful anxiety because of Defendants' conduct and in light of the ongoing risk of foreclosure.

208.     Members of the putative class have experienced harm in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

COUNT IV

***Violation of the Massachusetts Consumer Protection Act and Applicable Regulations***
*On behalf of the Treannies, Jean Licata, the Venutis, Natalie Layman, Arsenia Rodrigues and a class of similarly situated Massachusetts homeowners ("the enumerated plaintiffs")*

209.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

210.     The enumerated plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

211.     Defendants have violated and continue to violate the Massachusetts Consumer Protection Act, G.L. c. 93A, §2 and applicable regulations promulgated by the Massachusetts Attorney General pursuant to G.L. c. 93A, §2(c) including, without limitation:

a.      940 C.M.R. § 3.16, in that its conduct was unfair, deceptive, oppressive, unconscionable, and contrary to public policy and generally recognized standards applicable to the consumer lending business;

b.      940 C.M.R. § 3.16, in that its conduct violated the requirement of good faith and fair dealing applicable to contracts under G.L. c. 106, §1-203;

c.      940 C.M.R. § 3.16, in that its conduct violated existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety or welfare, as detailed below;

d.      940 C.M.R. § 3.05, in that it made deceptive representations or failed to disclose relevant information as to loan modifications offered to borrowers;

e.      940 C.M.R. § 8.06, in that it is a Mortgage Lender and made false or misleading representations to borrowers; and

f.      940 C.M.R. § 25.03, because it offers Foreclosure-related Services within the meaning of 940 C.M.R. § 25.01 without adequately describing the services offered.

212.     The enumerated plaintiffs have been injured by virtue of Defendants' violations. Said injuries include, but are not limited to:

a.      wrongful foreclosures;

b.      otherwise avoidable losses of homes to foreclosure;

c.      less favorable loan modifications;

     d.      increased fees and other costs to avoid or attempt to avoid foreclosure;

     e.      loss of savings in fruitless attempts to secure loan modifications;

     f.      loss of opportunities to pursue other refinancing or loss mitigation

strategies; and

     g.      significant stress and emotional distress.

213.    Defendants' conduct was and is willful or knowing within the meaning of the

Massachusetts Consumer Protection Act, G.L. c. 93A, §9.

214.    Defendants' refusal to grant relief upon demand was and is in bad faith, with

knowledge or reason to know that the act or practice complained of violated G.L. c. 93A, §2.

215.    On March 4, 2010, prior plaintiffs in this action sent Chase a demand for relief

pursuant to G.L. c. 93A on their own behalf and on behalf of a group of similarly situated

individuals. The similarly situated individuals include Plaintiffs Treannies, Licata, Venutis,

Layman and Rodrigues. A copy of this letter is attached as Exhibit 8.  Although Chase made

individual offers of settlement to the original named plaintiffs, it made no offer of settlement to

the class of similarly situated individuals identified in the March 4, 2010 letter in accordance

with G.L. c. 93A, § 9(2).

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

     a.      Certify this case as a class action and appoint the named Plaintiffs to be class

representatives and their counsel to be class counsel;

     b.      Enter a judgment declaring the acts and practices of Chase complained of herein

to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as

well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members;

c.      Grant a permanent or final injunction enjoining Chase's agents and employees, affiliates and subsidiaries, from continuing the practices that are the subject of this action;

d.      Order Chase to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of Chase's contractual obligations together with other relief required by contract and law;

f.      Award actual and/or statutory minimum damages pursuant to M.G.L. c. 93A § 9(3) to the Plaintiffs and the class;

g.      Award multiple damages pursuant to M.G.L. c. 93A § 9(3) to the Plaintiffs and the class;

h.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees pursuant to M.G.L. c. 93A § 9(3);

i.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN

727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
Tel:  (617) 542-8010
Fax:  (617) 542-8028

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE: March 10, 2011

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on March 10, 2011.

*/s/ Gary Klein*
Gary Klein